1  C. Brooks Cutter (SBN 121407)
   bcutter@cutterlaw.com
2  John R. Parker, Jr. (SBN 257761)
   jparker@cutterlaw.com
3  **CUTTER LAW P.C**.
   401 Watt Avenue,
4  Sacramento, CA 95864
   Tel: 916.290.9400
5  Fax: 916.588.9330

6  Charles J. LaDuca
   charles@cuneolaw.com
7  Beatrice O. Yakubu
   byakubu@cuneolaw.com
8  **CUNEO GILBERT & LADUCA, LLP**
   4725 Wisconsin Avenue N.W., Suite 200
9  Washington, D.C. 20016
   Tel: 202.789.3960
10
   Melissa W. Wolchansky
11 wolchansky@halunenlaw.com
   **HALUNEN LAW**
12 1650 IDS Center
   80 South 8th Street
13 Minneapolis, Minnesota 55402
   Tel: 612.605.4098
14

15 *Counsel for Plaintiff and the Proposed Class*

16
17             **UNITED STATES DISTRICT COURT**
18             **EASTERN DISTRICT OF CALIFORNIA**
19
   **RAYCHEL JACKSON**                    )   CASE NO. _____
20                                         )
   *On Behalf of Herself and Others Similarly* )
21 *Situated*                              )
                                           )   **COMPLAINT AND DEMAND FOR**
22                    Plaintiff            )   **JURY TRIAL**
                                           )
23        v.                               )
                                           )
24 **JOS. A. BANK CLOTHIERS, INC**         )
                                           )
25                    Defendant            )
                                           )
26 _____       )
27
28

Plaintiff, Raychel Jackson, through undersigned counsel, on behalf of herself and all others similarly situated, alleges the following:

**INTRODUCTION**

1.      This is a class action against Jos. A. Bank Clothiers, Inc. ("JAB" or "Defendant") for its deceptive and unlawful use of so-called "sales" based on inflated, arbitrary, and false "regular" prices. In its direct marketing to consumers via in-store advertising displays, print advertising and via its website (www.josbank.com), JAB advertises false "regular" prices, false price discounts, and false free apparel promotions for its men's suits, sport coats, and dress pants.

2.      On information and belief, JAB suits, sport coats, and dress pants are sold exclusively at JAB stores.[1]

3.      During the "Class Period," as defined below, JAB misrepresented, and continues to misrepresent, the nature and amount of price discounts for its men's suits, sport coats, and dress pants by offering specific dollar and percentage discounts from those same inaccurate and inflated "regular" prices. These purported free apparel promotions and discount offers are false because the referenced "regular" price is, in each instance, fabricated, inflated and not representative of JAB's true "regular" price, within the preceding three months, for its men's suits and other apparel. To the contrary, no consumer pays JAB's "regular" prices for JAB suits.

4.      JAB's "buy one get one [or more] free" suit offers and other similar promotions require consumers to buy one "regular" price suit to get one or more free item of JAB men's apparel; but the "regular" prices are a sham.

5.      Upon information and belief, JAB does not sell any meaningful quantity of suits, and it had no intention of selling any meaningful quantity of such products, at the "regular" retail prices employed in their advertising and marketing materials. Instead, these purportedly "regular" prices are constructed from whole cloth by JAB to deceive consumers into believing they are getting a good deal.

---

[1] Tailored Brands, Inc., *10-K* (2016) at 4 ("Jos. A Bank is a branded house whose merchandise is sold substantially under the exclusive JAB label").

Complaint and Demand for Jury Trial

6.     Furthermore, the advertised "regular" prices for JAB's men's suits, sport coats, and dress pants, which purport to be a "regular" price for those items, are not the prevailing retail market prices within three months immediately preceding the publication and dissemination of the advertised "regular" prices, as required by California law.

7.     The Federal Trade Commission (FTC) described false regular pricing schemes, similar to JAB's scheme in all material respects, as deceptive:

> One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonable substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If on the other hand, the former price being advertised is not bona fide but fictitious – for example, where an artificial price, inflated price was established for the purpose of enabling the subsequent offer of a large reduction – the "bargain" being advertised is a false one; the purchaser is not receiving the usual value he expects.

16 C.F.R. 233.1(a)

8.     California statutory and regulatory law also expressly prohibits false former pricing schemes. Cal. Bus. & Prof. Code § 17501, entitled "Value determinations*; Former price advertisement*," states:

> For the purpose of this article the worth or value of anything advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

> *No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement* or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement (emphasis added).

9.     JAB artificially sets the false reference prices to deliberately create false impressions among customers regarding the products' value and the bargains that customers will receive if they purchase the products. These false reference prices increase the demand for the products, which also increases the prices that JAB charges for the products.

10.     Thousands of consumers have been victims of JAB's deceptive, misleading, and unlawful pricing scheme, which has been disseminated to consumers via in-store display advertising, internet advertising, and print advertising. JAB's false advertising focuses reasonable purchasers' attention on fictitious bargains and price discounts. As a result, purchasers, including Plaintiff, have reasonably perceived that they are receiving valuable price reductions or bargains regarding their purchase of men's suits, sport coats, or dress pants. This perception has induced reasonable purchasers, including Plaintiff, to buy such products from JAB at prices set by JAB and to refrain from shopping for the same or similar products from competitors of JAB.

11.     Plaintiff and the Class members did not get the actual discounts and savings that JAB promised them, they did not receive products which had the value JAB promised those products would have, they were deprived of the benefit of their bargained-for exchanges, and they suffered damages in an amount to be determined at trial.

12.     JAB knows or reasonably should know that its comparative price advertising is false, deceptive, misleading, and unlawful under federal and California state law.

13.     The facts that JAB misrepresented or failed to disclose are facts that a reasonable person would have considered material, *i.e.*, facts that would contribute to a reasonable person's decision to purchase men's suits, sport coats, or dress pants at the prices set by JAB. JAB's false representations regarding "regular" prices and false representations of purported savings, discounts, and bargains are objectively material to the reasonable consumer and therefore reliance upon such representations may be presumed as a matter of law. Prices, including purported "regular" prices, matter significantly to consumers.

14.     At all relevant times, JAB has been under a duty to Plaintiff and others similarly situated to disclose the truth about its "regular" prices.

15.     Plaintiff relied upon false representations of "regular" price, purported savings, and discounts in connection with JAB's "regular" prices when purchasing men's suits, sport coats, and dress pants from JAB in California.

16.     Plaintiff reasonably and justifiably acted and relied to her detriment on JAB's

failure to disclose and concealment of, the truth about JAB's false "regular" price advertising scheme in purchasing JAB men's suits, sport coats, and dress pants.

17.    JAB intentionally concealed and failed to disclose the truth about its misrepresentations and false "regular" price advertising scheme for the purpose of inducing Plaintiff and others similarly situated to purchase JAB men's suits, sport coats, and dress pants.

18.    The claims and issues asserted herein are governed by federal and California state law. The state of California has the greatest interest in policing corporate conduct occurring within the state that affects the rights and interests of its citizens.

19.    Plaintiff, individually, and on behalf of all others similarly situated, seek restitution and injunctive relief.

20.    For reasons made clear below, a class action lawsuit is the most efficient way to remedy the harm done by JAB's deceptive sales practices and to make whole the consumers JAB has systematically deceived and misled.

## THE PARTIES

21.    Plaintiff, Raychel Jackson, is a resident of Galt, California. In or around January 2014, Plaintiff viewed a JAB television commercial which advertised a "buy one suit at "regular" and price get 3 suits free" promotion. On February 1, 2014, in reliance on Defendant's false and deceptive advertising, marketing and pricing schemes, Plaintiff purchased four suits, Style No. 007813600215 at the purported "regular" price of $995, and received three supposedly "free" suits Style Nos. 007891000217, 007880810259, and 007884540258 from JAB's store in Stockton, California. She would not have otherwise purchased these suits, or would not have purchased these suits for the price she did, absent JAB's false "regular" price advertising and was damaged thereby.

22.    Similarly, all members of the putative Class as described below are California residents who purchased JAB merchandise in California.

23.    Defendant Jos. A Bank, Inc. is a Delaware corporation with its principal place of business in Hampstead, Maryland.

24.    JAB does not have corporate offices in California. The employees who were, and

are, involved with the pricing decisions placed at issue in this Complaint work at JAB's headquarters in Maryland. Most of the documentary evidence relevant to this Complaint is located at JAB's headquarters in Maryland, including the relevant policies and communications.

25.     JAB operates a national chain of retail clothing stores, with over 600 stores nationwide, and dozens of stores in California alone.

26.     When in this Complaint reference is made to any act of "JAB" or "Defendant," such shall be deemed to mean the officers, directors, agents, employees or representatives of JAB committed or authorized such acts, or failed and omitted to adequately supervise or properly control or direct its employees while engaged in the management, direction, operation or control of the affairs of JAB and did so while acting within the scope of their employment or agency.

## JURISDICTION AND VENUE

27.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and Plaintiff is a citizen of the State of California while Defendant is a citizen on the States of Delaware and Maryland.

28.     This Court has jurisdiction over JAB because it is a corporation or other business entity authorized to do business in the state of California and registered with the California Secretary of State to do sufficient business with sufficient minimum contracts in California or otherwise intentionally avail itself of the California market through the ownership and operation of its stores within the state of California, to render the exercise of jurisdiction by the California courts consistent with traditional notions of fair play and substantial justice.

29.     Venue is proper in the Eastern District of California pursuant to 28 U.S.C. 1391, because JAB regularly conducts business in that District and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred and continue to occur in that District.

/ / /

## **FACTUAL ALLEGATIONS**

30.     "Consumers paying of a product or service set up a mental account in which the negative value of the prices paid, the so-called 'pain of payment,' is associated (coupled) with the positive value of the opportunity to consume the product or service."[2] However, "[w]hen the association between a unit of consumption and its prices is decoupled, the unit of consumption is undervalued and the pain of payment is lowered."[3] This is known as transaction decoupling, and for tangible products, it leads to greater consumption.[4]

31.     At the same time, perceptions of savings also impact consumers' willingness to purchase an item. For consumers, both the dollar and percentage amount of the deal positively influence their perception of their savings.[5] Likewise, the presence of a "regular" price as an external reference price increases perceptions of objective value, thereby raising the consumer's desire to purchase the product.[6]

32.     Empirical marketing studies demonstrate that reference pricing actually creates an impression of higher value:

> Comparative price advertising offers consumers a basis for comparing the relative value of the product offering by suggesting a monetary worth of the product and any potential savings… [A] comparative price advertisement can be construed as deceptive if it makes any representation, … or involves any practice that may materially mislead a reasonable consumer.

*Comparative Price Advertising: Informative or Deceptive?*, Dhruv Grewal and Larry D. Compeau, Journal of Public Policy & Marketing, Vol. 11, No. 1, at 52 (Spring 1992). Furthermore,

> [b]y creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product… Thus,

---

[2] Joseph W. Alba (editor), Dilip Soman (contributor), *Effects of Transaction Structure on Price Perceptions and Consumption*, Consumer Insights: Finding from Behavioral Research (2011) at 2, *available at* http://www.msi.org/uploads/files/ConsumerInsights-Chap7.pdf.

[3] *Id.*

[4] *Id.*

[5] Joseph W. Alba (editor), Aradhana Krishna (contributor), *Perceptions of Price Deals*, Consumer Insights: Finding from Behavioral Research (2011) at 2, *available at* http://www.msi.org/uploads/files/ConsumerInsights-Chap7.pdf.

[6] *Id.*

Complaint and Demand for Jury Trial

the reference price is not truthful, a consumer may be encouraged to purchase as a result of a false sense of value.

*Id.* at 55−56.

33.    To take advantage of these two marketing principles, JAB provides a "regular" price on the tag, giving the consumer the perception that this is the value of the item. Then JAB offers a steep discount off of (*e.g.* 75% off) or free items for (*e.g.* buy one get three free) the "regular" price, thus giving the perception of savings, while lowering the pain of payment per item.

34.    Upon information and belief, during the last several years, and on a near continuous basis, JAB advertised various offers for suits, all of which expressly or impliedly were based on false "regular" prices, including the following: "Buy 1 (suit at "regular" price) get 2 (suits) FREE!"; "OVER 65% OFF ALL SUITS!"; "Buy a Suit, Get 2 Suits, 2 Dress Shirts, 2 Silk Ties FREE!"; "ENTIRE STORE!, Buy Any 1, GET 2 FREE!"; "Buy Any Suit, Get 1 Suit, 2 Shirts, 2 Silk Ties FREE!"; "All Suits 60% off your 1st, 70% off your 2nd"; "THREE TIMES THE SUIT SALE! Buy 1 Suit, Get 2 FREE!"; and so on.

35.    At other times, suits were touted as being "65% OFF" and even up to "75% OFF" but were always advertised as having a "regular" price in excess of that amount. The advertisements were made both within and without the Defendant's physical stores.

36.    JAB advertised similar or identical sales with regard to sport coats and dress pants, including: "Buy one sport coat get one free!"; "Buy one sport coat get two shirts and two dress pants free!"; "60% off blazers and sport coats!"; and "50% off dress pants!" Examples of marketing materials that JAB used to tout its "sales" in the past 4 years are attached hereto as Exhibit 1.

37.    JAB also advertised "free", "% off" and similar sales via the internet, television, radio, e-mail, direct phone calls to consumers and out-of-store signage.

38.    In each case, JAB based these purported discounts on phantom "regular" prices – prices that do not reflect the true price formerly paid by consumers for their suits.

39.    The "sales," which are supposedly based on discounts from "regular" prices, are deceptive because JAB suits, sport coats, and dress pants are on "sale" nearly 100% of the time.

40.     Because JAB suits, sport coats, and dress pants are sold exclusively at JAB and are on sale in near perpetuity, the items' "regular" price is not the prevailing market price for the three months in advance of any sale. Thus, it is not in actuality the "regular" price.

41.     In fact, when then-New York State Attorney General Eliot Spitzer investigated Jos A. Bank's sales practices in New York in 2003, he found that less than 1% of Jos A. Bank's suits, formal wear, dress pants and sport coats were sold at the purported "regular" price. *See* Exhibit 2, attached hereto. Upon information and belief, a similar number of suits in California are sold at a price falsely touted as "regular."[7]

42.     Nevertheless, JAB still maintains an approximately 60% gross margin on its suits, sport coats, or dress pants, even after all sales and promotions. See 10-K at p. 38, attached hereto as Exhibit 3. This is how JAB can afford to have a "three times the suit" sale or a "Buy 1, Get 2 free" sale while still generating significant profits.

43.     JAB's deception injures and damages the consumer who is not getting the bargain they believed they were. Rather, they are paying a price equal to or even in excess of the true "regular" price of the merchandise.

44.     This practice violated and continues to violate California Business & Professions Code §§ 17200, et seq., California's Business & Professions Code §§ 17500, et seq., and the California Consumers' Legal Remedies Act, California Civil Code §§ 1750, et seq. This also violated and continues to violate the Federal Trade Commission Act and its guidelines.

45.     Per JAB's 2011 10-K, its sales practices were investigated by the Attorney General's office in both Georgia and Florida. (*See* Ex. 3) Ohio's Attorney General also served a subpoena on JAB requesting documents related to their marketing practices.

**The Consumer Transaction Between Plaintiff And JAB**

46.     Plaintiff Jackson purchased suits at the advertised and purported "regular" price of $995 and received 3 "free" suits from a JAB store in Stockton, California on February 1, 2014.

---

[7] It appears Jos A. Bank did temporarily cease to use the particular deceptive marketing practices for which the New York State Attorney General fined them in 2004 in the state of New York. They continued to use those practices, which are substantially similar to the practices alleged herein, elsewhere.

Complaint and Demand for Jury Trial

*See* Exhibit 4, attached hereto. The "free" suits were said to have the same "regular" price as the purchased suit. She would not have otherwise purchased these suits, or would not have purchased these suits for the price she did, absent JAB's false "regular" price advertising and was damaged thereby.

47.     Plaintiff Jackson was induced to make her purchases because JAB's advertising led her to believe she was getting a great bargain – four suits for the price one, (plus the cost of alterations). In fact, the reason Plaintiff entered into the transaction with JAB was to receive high quality men's apparel at a price much lower than that typically charged for such merchandise.

48.     However, the "regular" price JAB advertised – $995 for the suits Jackson purchased – did not reflect the true price formerly paid by consumers these for JAB suits, or in any way represent a true "regular" price. Instead, these purported "regular" prices were false and deceptive, as the prevailing retail price for a JAB men's suit of the type involved in these transactions during the three months immediately prior to Plaintiff's purchase of such items was materially lower than $995.

49.     JAB, in advertising a completely inaccurate and inflated "regular" price for the suit purchased by Plaintiff, intentionally misled her into purchasing such items and paying the prices set by JAB for such items.

50.     Plaintiff relied upon the "regular" price representation, believed herself to be getting the significant bargain advertised, and would not have purchased the JAB suits or paid the prices set by JAB for such items, in the absence of JAB's "regular" price misrepresentations.

51.     Despite the false regular pricing scheme used by JAB, Plaintiff would purchase JAB products in the future, if product labels and marketing promotions accurately reflect "regular" prices and discounts. Currently, however, Plaintiff and consumers have no realistic way to know which—if any—of JAB's price comparisons are not false or deceptive. If the Court were to issue an injunction ordering JAB to comply with California's comparative price advertising laws, and prohibiting JAB's use of the deceptive practices discussed herein, Plaintiff would likely shop for JAB's products again in the near future.

Complaint and Demand for Jury Trial

52.     The Class members all purchased suits, sport coats, or dress pants under substantially similar conditions as Plaintiff throughout the Class Period.

**THE STATUTE OF LIMITATIONS WAS TOLLED THROUGHOUT THE DURATION OF THE *LUCAS* ACTION**

53.     On July 9, 2014, David Lucas and Eric Salerno filed a putative class action complaint against JAB in the Southern District of California alleging substantially identical claims to the ones at issue here. *Lucas et al v. JAB Clothiers, Inc.*, Case No. 3:14-cv-01631-LAB-JLB. After two years of litigation, it was revealed that the remaining named plaintiff, David Lucas, did not have standing to bring the action. Class certification was briefed, though not yet decided, and ultimately voluntarily withdrawn on July 14, 2016. David Lucas also moved to voluntarily dismiss his claims with prejudice on July 14, 2016. The Court granted that motion on October 20, 2016.

54.     The statute of limitations for this action was tolled by the *Lucas* lawsuit as per *American Pipe* and its progeny. *See Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974). "[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 349 (1983) (internal quotation omitted). This is true regardless of whether Lucas had standing to bring the prior lawsuit. *See Genesee Cty. Employees' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1082, 1130-35 (D.N.M. 2011); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 894 F. Supp. 2d 144, 154-56 (D. Mass. 2012). This case does not seek to re-litigate an earlier denial of class certification, or to rectify any deficiency in an earlier would-be *class*; rather, it seeks to rectify a deficiency in an earlier *class representative*. As such, *American Pipe* tolling is warranted. *See Catholic Soc. Servs., Inc. v. I.N.S.*, 232 F.3d 1139, 1149 (9th Cir. 2000) ("[T]he statute of limitations was tolled during the pendency of the first class action for the class members and would-be class members in the action now before us . . . [because] Plaintiffs in this case are not attempting to relitigate an earlier denial of class certification, or to correct a procedural deficiency in an earlier would-be class."); *Yang v. Odom*, 392 F.3d 97, 107 (3d Cir. 2004) ("[C]lass claims should be tolled where the district court denies class certification based on

deficiencies of a class representative, and not on the validity of the class itself."); *Falk v. Children's Hosp. Los Angeles*, 237 Cal. App. 4th 1454, 1470, 188 Cal. Rptr. 3d 686, 697 (2015), *review denied* (Oct. 14, 2015) (applying tolling "if class certification is denied in the earlier action based solely on Rule 23 deficiencies in the putative class representative-and not on Rule 23 deficiencies"); *see also Sawyer v. Atlas Heating & Sheet Metal Works, Inc.,* 731 F. Supp. 2d 850, 854 (E.D. Wis. 2010), *aff'd,* 642 F.3d 560 (7th Cir. 2011) (allowing tolling under *American Pipe* when the previous class representative had voluntarily dismissed his case, and the court had denied the new class representative's request to substitute himself as the named plaintiff). In sum, because putative class members reasonably expected to be represented in the originally filed *Lucas* action, their claims were tolled while that action was pending.

55.     In the alternative, the statute of limitations was tolled under California's doctrine of equitable tolling. *Jones v. Blanas*, 393 F.3d 918, 928 (9th Cir. 2004). Equitable tolling applies "where a first action, embarked upon in good faith, is found to be defective for some reason." *Hatfield v. Halifax PLC*, 564 F.3d 1177, 1188 (9th Cir. 2009). Here, it would be unjust under the circumstances for the putative class to forfeit potential claims simply because the class representative in the previous action was unable to represent the class. Defendant has been put on notice of these claims from the prior action, and will suffer no prejudice from being forced to litigate them here. The two cases raise the same claims and will require similar evidence. As such, even if the statute of limitations was not tolled under *American Pipe*, it was equitably tolled under California law.

## CLASS ALLEGATIONS

56.     Plaintiff re-alleges by reference, as if fully set forth herein, all of the above paragraphs.

57.     Plaintiff brings this action on herself and the following class of similarly situated individuals initially defined as:

>All persons who, while in the United States and within the applicable statutory limitation (the "Class Period"), purchased a suit, dress pants or sport coats/suit jackets from JAB, where the purchase price of the item was for a percentage or discount off an advertised "regular" price, or where the purchase was for a suit,

dress pants or sport coat/suit jacket based on a "regular" price in connection with an offer of at least one other "free" item of JAB apparel (the "Nationwide Class").

Excluded from the Class are JAB, as well as its officers, employees, agents or affiliates and any judge, who presides over this action, as well as all past and present employees, officers and directors of JAB. Also excluded are Plaintiff's counsel and employees of those law firms. Plaintiff reserve the right to expand, limit, modify or amend this class definition, including the addition of one or more subclasses, in connection with their motion for class certification, or at any other time, based upon, inter alia, changing circumstances or new facts obtained during discovery.

58.    Additionally, or in the alternative, Plaintiff brings this action on herself and the following class of similarly situated individuals initially defined as:

All persons who, while in the state of California and within the applicable statutory limitation (the "Class Period"), purchased a suit, dress pants or sport coats/suit jackets from JAB, where the purchase price of the item was for a percentage or discount off an advertised "regular" price, or where the purchase was for a suit, dress pants or sport coat/suit jacket based on a "regular" price in connection with an offer of at least one other "free" item of JAB apparel (the "California Class")

(collectively the Nationwide Class and the California Class, the "Class").

59.    Numerosity: Upon information and belief, the Class is composed of hundreds of thousands of California individuals, whose joinder of this action would be impracticable. The disposition of their claims through this class action will benefit Class members, the parties and the Court.

60.    Existence and Predominance of Common Questions of Fact and Law: There is a well-defined community of interest in questions of law and fact affecting the Class. These questions of law and fact predominate over individual questions affecting individual Class members, including, but not limited to, the following:

a.    Whether JAB falsely advertises price discounts from "regular" prices on men's suits, sport coats, and dress pants it sold to California residents;

b.    Whether JAB falsely advertises and sells men's suits, sport coats, and dress pants in connection with false "free", "1/2 OFF" and "% OFF" offers, which are based on false "regular" prices;

c.      Whether the "regular" prices advertised by JAB were the prevailing market prices on men's suits, sport coats, and dress pants it sold to California residents during the three-month period preceding the dissemination or publication of the advertised "regular" prices;

d.      Whether JAB's use of false or deceptive price advertising constitutes false advertising under California law;

e.      Whether JAB engaged in unfair, unlawful or fraudulent business practices under California law;

f.      Whether JAB failed to disclose material facts about its product pricing and discounts;

g.      Whether JAB has made false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions or "free" JAB apparel;

h.      Whether JAB's conduct, as alleged herein, is intentional and knowing;

i.      Whether Class members are entitled to damages or restitution; and, if so, what is the amount of revenues and profits JAB received or were lost by Class members as a result of the conduct alleged herein;

j.      Whether Class members are threatened with irreparable harm or are otherwise entitled to injunctive and other equitable relief; and, if so, what is the nature of such relief;

k.      Whether a backward-reaching injunction is required to remedy the past effects of the unlawful, unfair and fraudulent conduct alleged herein; and if so, what steps are required of JAB to correct the consequences of its past wrongful acts alleged herein; and

l.      Whether Plaintiff and Class members are entitled to an award of reasonable attorneys' fees, prejudgment interest and cost of suit(s).

61.     Typicality: Plaintiff's claims are typical of and are not antagonistic to, the claims of all Class members. Plaintiff and the Class she seeks to represent have all been deceived (or were likely to be deceived) and damaged by JAB's false "regular" price schemes, as alleged herein. Plaintiff and all Class members have similarly suffered injury, including the loss of money, arising from JAB's unfair, unlawful and deceptive conduct, as described herein.

62.     Adequacy: Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent. Plaintiff will fairly and adequately represent and protect the interest of the Class because she is not antagonistic to the Class. Plaintiff has retained counsel who is competent and experienced in the prosecution of consumer fraud and class action litigation.

63.     Superiority: A class action is superior to other available means for the fair and efficient adjudication of Plaintiff and Class members' claims. Plaintiff and members of the Class have suffered monetary harm as a result of JAB's unfair, unlawful, and fraudulent conduct. Because of the relatively modest size of individual Class members' claims, few, if any, Class members could afford to seek legal redress of the wrongs complained of herein on any individual basis. Absent the class action, Class members and the general public will likely continue to be deceived and suffer monetary losses and the violations of law described herein will continue without remedy and JAB will be permitted to retain the proceeds of its misdeeds.

64.     All Class members, including Plaintiff, were exposed to one or more of JAB's misrepresentations or omissions of material fact claiming that "regular" advertised prices were in existence. Due to the scope and extent of JAB's consistent false price advertising scheme, dissemination in a massive, years-long campaign to consumers via in-store display advertising, internet advertising and print advertising, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all members of the Class. In fact, as a matter of practice, the false "regular" prices are displayed on the sales tag of each suit purchased in store and next to each item ordered from JAB's catalog or website. It can be reasonably presumed that all Class members, including Plaintiff, affirmatively acted in response to the material

misrepresentations contained in JAB's false advertising scheme when purchasing men's suits, sport coats, and dress pants from JAB.

65.    As a matter of public policy, this consumer matter should proceed as a consumer class action that will produce several salutary byproducts, including:

      a.    A therapeutic effect upon those sellers who indulge in deceptive practices;

      b.    Aid to legitimate business enterprises by curtailing illegitimate competition; and

      c.    Avoidance to the judicial process of the burden of multiple litigation involving identical claims.

66.    The Class should be certified and each Class member should be compensated in a manner that will put the Class member in a position the member would be in had they been charged the true "regular" price of the merchandise.

**FIRST CAUSE OF ACTION**
**Violation of Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200 *et seq.* – "Unfair" Prong)**
**(On behalf of the California Class)**

67.    Plaintiff re-alleges by reference, as if fully set forth herein, all of the above paragraphs.

68.    The UCL defines unfair business competition to include any "unlawful, unfair, or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

69.    A business act or practice is "unfair" under the Unfair Competition Law if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

70.    JAB has violated and continues to violate the "unfair" prong of the UCL by falsely representing that its California consumers are receiving a bargain, deal or price discount in connection to a referenced "regular" price of men's suits, sport coats, or dress pants where JAB has inflated the purported "regular" prices for such products, such that the promised discount or bargain is false, misleading and deceptive.

Complaint and Demand for Jury Trial

71.    JAB has violated and continues to violate the "unfair" prong of the UCL by falsely representing that its California consumers are receiving "free" JAB apparel as an incentive to purchase a suit with a purported "regular" price that is false, misleading and deceptive.

72.    These acts and practices are unfair because they are likely to cause consumers to believe falsely that JAB is offering value, discounts or bargains from the prevailing market value or worth of the products sold that do not, in fact, exist. As a result, purchasers, including Plaintiff, have reasonably perceived that they are receiving either valuable price reductions on purchases of men's suits, sport coats, or dress pants, or valuable "free" apparel in exchange for purchasing a suit for the "regular" price at JAB. This perception has induced reasonable purchasers, including Plaintiff, to buy such products from JAB at the prices set by JAB and to refrain from shopping for the same or similar products from competitors of JAB.

73.    The gravity of the harm to members of the California Class resulting from these unfair acts and practices outweighs any conceivable reasons, justifications or motives of JAB for engaging in such deceptive acts and practices. By committing the acts and practices alleged above, JAB has engaged and continues to engage, in unfair business practices within the meaning of California Business & Professions Code §§ 17200, *et seq*.

74.    Through its unfair acts and practices, JAB has improperly obtained money from Plaintiff and As a result of JAB's unfair acts and practices, Plaintiff, members of the California Class, and the general public have suffered injury in fact and have lost money or property. These violations have unjustly enriched JAB at the expense of Plaintiff and the California Class.

75.    Under Section 17203 of the Business & Professions Code, Plaintiff and the other members of the California Class are entitled to (a) an injunction ordering JBA to cease engaging in any acts of unfair competition and to engage in a corrective advertising campaign in compliance with all applicable laws; (b) restitution and disgorgement of all unjustly retained profits paid to JBA; (c) equitable relief; (d) pre- and post-judgment interest at the highest rate allowable by law; and (e) payment of attorneys' fees and costs pursuant to Section 1021.5 of the California Code of Civil Procedure.

**SECOND CAUSE OF ACTION**
**Violation of Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200 *et seq.* – "Fraudulent" Prong)**
**(On behalf of the California Class)**

76.     Plaintiff re-alleges by reference, as if fully set forth herein, all of the above paragraphs.

77.     The UCL defines unfair business competition to include any "unlawful, unfair, or fraudulent" act or practice, as well as any "unfair, deceptive, untrue, or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

78.     A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public. JAB's marketing and advertising materials – include, but are not limited to, its in-store advertising displays, print advertising and internet website advertising – are "fraudulent" within the meaning of the UCL because they have deceived Plaintiff, the California Class and are likely to deceive members of the general public into believing that JAB is offering value, discounts or bargains from the prevailing market value or worth of the products sold that do not, in fact, exist. As a result, purchasers, including Plaintiff, have reasonably (but falsely) perceived that they are receiving either valuable bargains or price reductions on purchases of men's suits, sport coats, or dress pants from JAB. This perception has induced reasonable purchasers, such as Plaintiff, to buy such products from JAB and to refrain from shopping for the same or similar products from competitors of JAB.

79.     JAB's acts and practices, as described herein, have deceived Plaintiff and are highly likely to deceive members of the consuming public. Specifically, in deciding to purchase a JAB's "regular" price suit along with 3 "free" suits, Plaintiff relied on JAB's misleading and deceptive representations regarding its "regular" price, "sale" price and "free" apparel. Each of these factors played a substantial role in Plaintiff's decision to purchase those products at JAB, and Plaintiff would not have purchased those items at JAB in the absence of JAB's misrepresentations. Accordingly, Plaintiff suffered monetary loss as a direct result of JAB's practices described herein.

80.     As a result of JAB's unfair acts and practices, Plaintiff, members of the California Class, and the general public have suffered injury in fact and have lost money or property. These

violations have unjustly enriched JAB at the expense of Plaintiff and the California Class.

81.     Under Section 17203 of the Business & Professions Code, Plaintiff and the other members of the California Class are entitled to (a) an injunction ordering JBA to cease engaging in any acts of unfair competition and to engage in a corrective advertising campaign in compliance with all applicable laws; (b) restitution and disgorgement of all unjustly retained profits paid to JBA; (c) equitable relief; (d) pre- and post-judgment interest at the highest rate allowable by law; and (e) payment of attorneys' fees and costs pursuant to Section 1021.5 of the California Code of Civil Procedure.

**THIRD CAUSE OF ACTION**
**Violation of Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200 et seq. – "Unlawful" Prong)**
**(On behalf of the California Class)**

82.     Plaintiff re-alleges by reference, as if fully set forth herein, all of the above paragraphs.

83.     The UCL defines unfair business competition to include any "unlawful, unfair, or fraudulent" act or practice, as well as any "unfair, deceptive, untrue, or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

84.     A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

85.     The Federal Trade Commission (FTC) describes false former pricing schemes, similar to JAB's pricing scheme in all material respects, as deceptive:

> (a)     One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonable substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If on the other hand, the former price being advertised is not bona fide but fictitious – for example, where an artificial price, inflated price was established for the purpose of enabling the subsequent offer of a large reduction – the "bargain" being advertised is a false one; the purchaser is not receiving the usual value he expects.

16 C.F.R. 233.1(a).

(b)     A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial price of time, in the recent, regular course of his business, honestly and in good faith – and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based.

16 C.F.R. 233.1(b).

86.     California statutory and regulatory law also expressly prohibits false former price schemes. Cal. Bus. & Prof. Code § 17501, entitled "*Value determinations; Former price advertisements,*" states:

For the purpose of this article the worth or value of anything advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

*No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement* or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement. [Emphasis added.]

87.     As detailed in Plaintiff's Fourth Cause of Action below, Cal. Civ. Code § 1770, subsection (a)(13) prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions."

88.     JAB's use of a reference to "regular" price, "free" JAB apparel, or purported percentage discounts in connection with its marketing and advertisements concerning its suits, sport coats, and dress pants violates Title 16, Code of Federal Regulations, Section 233, Cal. Bus. & Prof. Code § 17501, and Cal. Civ. Code § 1770, section (a)(13). JAB violates these laws by advertising false bargains or discounts in connection with "regular" priced suits, sport coats, and dress pants, that were, in fact, not the prevailing market prices within three months next preceding the publication and dissemination of advertisements containing the false "regular" prices.

89.     As a result of JAB's unfair acts and practices, Plaintiff, members of the California Class, and the general public have suffered injury in fact and have lost money or property. These violations have unjustly enriched JAB at the expense of Plaintiff and the California Class.

90.     Under Section 17203 of the Business & Professions Code, Plaintiff and the other members of the California Class are entitled to (a) an injunction ordering JBA to cease engaging in any acts of unfair competition and to engage in a corrective advertising campaign in compliance with all applicable laws; (b) restitution and disgorgement of all unjustly retained profits paid to JBA; (c) equitable relief; (d) pre- and post-judgment interest at the highest rate allowable by law; and (e) payment of attorneys' fees and costs pursuant to Section 1021.5 of the California Code of Civil Procedure.

### FOURTH CAUSE OF ACTION
### Violation of the Consumers Legal Remedies Act,
### Cal. Civ. Code § 1750, *et seq.*)
### (On behalf of the California Class)

91.     Plaintiff re-alleges by reference, as if fully set forth herein, all of the above paragraphs.

92.     This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §§ 1750, *et seq.* (the "CLRA").

93.     Plaintiff and each member of the proposed California Class are "consumers" within the meaning of Civil Code § 1761(d).

94.     JAB's sale of men's suits, sport coats, and dress pants to Plaintiff and the California Class are "transactions" within the meaning of Civil Code § 1761(e). The apparel purchased by Plaintiff and the California Class are "goods" within the meaning of Civil Code § 1761(a).

95.     JAB has engaged in unfair methods of competition and unfair or deceptive acts or practices against Plaintiff and the members of the California Class, in violation of the CLRA, by falsely representing that consumers, including Plaintiff, were receiving either a price discount from referenced "regular" sales prices of its suits, sport coats, or dress pants, or "free" apparel for buying a suit for a "regular" sales price, both where JAB inflated the purported "regular" price such that the promised discount, value, bargain and "free" apparel, were false, in violation of Cal. Civ. Code § 1770, subsection (a)(7) ([r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another), subsection (a)(9) ("[a]dvertising goods or services with intent not to sell them as advertised"), and subsection (a)(13)

("[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions").

96.     As a result of these acts and practices, Plaintiff and the California Class were damaged in that JAB's unlawful and misleading acts and practices alleged herein played a substantial and material role in the decision of Plaintiff and the California Class to purchase men's suits, sport coats, or dress pants at JAB. Absent these acts and practices, Plaintiff and the California Class would not have purchased the apparel that they did from JAB.

97.     Pursuant to California Civil Code § 1780(a)(2), Plaintiff, on behalf of themselves and the California Class, request that this Court enjoin JAB from continuing to engage in the unlawful and deceptive methods, acts and practices alleged above. Unless JAB is permanently enjoined from continuing to engage in such violations of the CLRA, future consumers will be damaged by its acts and practices in the same way as have Plaintiff and the members of the proposed California Class. Plaintiff also requests that this Court order a backward-reaching injunction in order to remedy the past effects of the unfair conduct alleged herein.

98.     Pursuant to Section 1782(d) of the CLRA, Plaintiff reserves the right to amend this Complaint to include a request for damages under the CLRA after complying with Section 1782(a) of the CLRA within thirty (30) days after the commencement of this cause of action for injunctive relief.

**FIFTH CAUSE OF ACTION**
**Violation of California False Advertising Law,**
**Cal. Bus. & Prof. Code § 17500 et seq.**
**(On behalf of the California Class)**

99.     Plaintiff re-alleges by reference, as if fully set forth herein, all of the above paragraphs.

100.    California's Business & Professions Code Section 17500 *et seq.* prohibits unfair, deceptive, untrue, or misleading advertising, including, but not limited to, false statements as to worth, value, and former price.

101.    JAB's practice of advertising the "regular" price on the tags, which were false and illusory was an unfair, deceptive, and misleading advertising practice because it gave the false

impression that the men's suits, sport coats, or dress pants were valued at more than what they paid. In fact, the men's suits, sport coats, or dress pants did not have an actual or expected "regular" price because the products were always offered for sale at a lower price when placed on sale at the JAB's stores in the three months prior to their sale.

102.    Through its unfair acts and practices, JAB has improperly obtained money from Plaintiff and members of the California Class. As such, Plaintiff requests that this Court cause JAB to restore this money to Plaintiff and all members of the California Class, and enjoin JAB from continuing to violate the FAL as discussed herein and from violating the FAL in the future. Otherwise, Plaintiff and other members of the California Class may be irreparably harmed or denied an effective and complete remedy.

**SIXTH CAUSE OF ACTION**
**Fraud and Fraud by Omission under Maryland Common Law**
**(On behalf of the Nationwide Class)**

103.    Plaintiff re-alleges by reference, as if fully set forth herein, all of the above paragraphs.

104.    As detailed herein, JAB provided Plaintiff and all other Class members with false or misleading material information and failed to disclose material facts about the men's suits, sport coats, and dress pants, including, but not limited to, the claims regarding the pricing of the men's suits, sport coats, and dress pants. These misrepresentations were made with knowledge of their inaccuracies, and Defendant's omissions were made with the knowledge that, without the material information, their pricing statements would be misleading.

105.    Defendant misrepresented that the "regular" price was a prevailing market price, when JAB consistently sold the men's suits, sport coats, and dress pants at significantly less than "regular" price in the three months prior.

106.    Defendant omitted that the "regular" price lacked any objective sales data to support it, i.e., that the products were never sold at the regular" price in the three months prior to the sale. This information was material because consumers believe that the "regular" price or list price is the price at which those goods normally sell in the marketplace.

107.    The misrepresentations and omissions made by JAB, upon which Plaintiff and the Nationwide Class members reasonably and justifiably relied, were intended to induce and actually did induce Plaintiff and the Nationwide Class members to purchase JAB's suits, sport coats, and dress pants.

108.    The fraudulent actions of JAB caused damage to Plaintiff and all other Nationwide Class members, who are entitled to damages and other legal and equitable relief as a result.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and on behalf of the other members of the Class, request that this Court award relief as follows:

A.    An Order certifying that this action may be maintained as a class action, that Plaintiff be appointed Class Representative and Plaintiff's counsel be appointed Class Counsel;

B.    An Order that JAB be permanently enjoined under the CLRA from its improper and unlawful activities and practices in violation of § 1770 described herein;

C.    Pursuant to Plaintiff's first four causes of action, a judgment awarding Plaintiff and all members of the Class restitution or other relief, including without limitation, disgorgement of all profits and unjust enrichment obtained by JAB as a result of its unlawful, unfair and fraudulent business practices described herein;

D.    A judgment awarding Plaintiff and members of the Class actual and compensatory damages in an amount according to proof for Defendant's conduct alleged under all causes of action herein entitling Plaintiff and members of the Class to actual and compensatory damages;

E.    A judgment awarding Plaintiff her costs of suit; including reasonable attorneys' fees pursuant to Code of Civil Procedure Section 1021.5 and as otherwise permitted by statute; and pre- and post-judgment interest; and

F.    Such other and further relief as may be deemed necessary or appropriate.

/ / /

/ / /

/ / /

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: November 23, 2016

By: */s/ John R. Parker, Jr.*
John R. Parker, Jr.

**CUTTER LAW P.C**.
401 Watt Avenue,
Sacramento, CA 95864
Tel: 916.290.9400
Fax: 916.588.9330

Charles J. LaDuca
charles@cuneolaw.com
Beatrice O. Yakubu
byakubu@cuneolaw.com
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue N.W., Suite 200
Washington, D.C. 20016
Tel: 202.789.3960

Melissa W. Wolchansky
wolchansky@halunenlaw.com
**HALUNEN LAW**
1650 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402
Tel: 612.605.4098

*Counsel for Plaintiff*

# EXHIBIT 1





+excludes shoes, watches, rentals, & gift cards. ★regular price ★★ of equal or lesser value. Prices in this mailer valid Monday, Dec. 19 & Tuesday, Dec. 20, 2011; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card Discount. Not applicable at Factory Outlet stores, nor through Catalog. For store information visit us at www.josbank.com.



Post Office Box 8428
Greensboro, NC 27419-0428



Presorted
First Class Mail
U.S. Postage
**PAID**
JoS. A. Bank
Clothiers



josbank.com



JOS. A. BANK
ESTABLISHED 1905

**SPECIAL PRIVATE EVENT**
**WITH THIS CARD:**
Monday, Dec. 26 –
Wednesday, Dec. 28, 2011

Public Event: Thurs. Dec. 29, 2011 - Mon. Jan. 2, 2012
Open 9:00 AM Monday - Saturday in most stores

Buy a Suit*
Get **2** Suits**
**2** Dress Shirts~
**2** Silk Ties~
**FREE!**

Get
**6 items**
FREE!

*regular price   **of equal or lesser value   ~ $84.50 or less

josbank.com

---

# Monday, December 26, 2011 - Monday, January 2, 2012

| Entire Stock of **PANTS** Dress and Casual Buy One*- Get One** **FREE!** | Entire Stock of **SHIRTS** Dress and Casual Buy One*- Get One** **FREE!** | Entire Stock of **SWEATERS** Buy One*- Get One** **FREE!** |
| --- | --- | --- |

*regular price   **of equal or lesser value.   Prices in this mailer valid Monday, Dec. 26, 2011 through Monday, Jan. 2, 2012; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card Discount.   Not applicable at Factory Outlet stores, nor through Catalog.   For store information visit us at www.josbank.com.



JOS. A. BANK
ESTABLISHED 1905

Post Office Box 8428
Greensboro, NC 27419-0428



Presorted
First Class Mail
U.S. Postage
**PAID**
JoS. A. Bank
Clothiers



josbank.com



## Tuesday, January 3 - Friday, January 13, 2012

Entire Stock
**SWEATERS**
**60% OFF***

Entire Stock
**OUTERWEAR**
**60% OFF***

All Executive
**DRESS PANTS**
**3 for $199**

**CLEARANCE**
**SHIRTS & SILK TIES**
NOW ONLY:
**$29⁹⁸-39⁹⁸**

*regular price. Prices in this mailer valid Tuesday, January 3 - Friday, January 13, 2012; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card Discount. Not applicable at Factory Outlet stores, nor through Catalog. For store information visit us at www.josbank.com.



Post Office Box 8428
Greensboro, NC 27419-0428

Presorted
First Class Mail
U.S. Postage
**PAID**
JoS.A. Bank
Clothiers



josbank.com



**JoS. A. BANK** — ESTABLISHED 1905
## CORPORATE DAY

### Tuesday, Jan. 17 & Wednesday, Jan. 18, 2012

Exclusive Corporate Card Member Specials:

**All Executive suits** ........................ **$179**

**All Signature suits & suit separates** ........................ **$259**

**All Signature Gold suits & suit separates** ........................ **$329**

**PLUS:** **60% off*** All Dress Shirts & Silk Ties with any Suit purchase!

**70% off*** All Sportcoats & Blazers

**70% off*** All Sweaters

**70% off*** All Outerwear

**60% off*** All other Suits, Suit Separates & Tuxedos

*regular price
josbank.com

*See back for additional great offers...*

---

## SUPER CORPORATE DAY

Tuesday, Jan. 17 & Wednesday, Jan. 18, 2012

# 50% Off*

### EVERYTHING ELSE**IN THE STORE!
including dress shirts, silk ties, sportshirts, pants, belts, socks and underwear.

**Excludes watches, shoes, rentals and gift cards

## 25% Off the regular price of ALL SHOES

*regular price. Prices in this mailer valid Tuesday, January 17 - Wednesday, January 18, 2012; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card Discount. Not applicable at Factory Outlet stores, nor through Catalog. For store information visit us at www.josbank.com.



Post Office Box 8428
Greensboro, NC 27419-0428


Presorted
First Class Mail
U.S. Postage
PAID
JoS.A.Bank
Clothiers

  

josbank.com





Post Office Box 8428
Greensboro, NC 27419-0428

Presorted
First Class Mail
U.S. Postage
PAID
JoS.A.Bank
Clothiers

  

josbank.com



*Exclusive Invitation for Corporate Card Members*

**CORPORATE DAYS – FEBRUARY 15 & 16, 2012**

*Open at 8:00 AM in most locations for your convenience!
Bring a co-worker and we'll sign him/her up to
be a Corporate Card member, too.*

# 75% OFF*
## All Signature Gold Suits

# 70% OFF*
### All Executive Suits
### All Leather Jackets
### All Cashmere Sweaters

# 60% OFF*
### All Other Suits
### All Sportcoats & Blazers
### All Outerwear

# 50% OFF*
### EVERYTHING ELSE
### In the Store**

## *Signature Collection*
### *Special Offers*

| | |
|---|---|
| All Signature Wool Suits ..... | **$269** |
| All Signature Wool Sportcoats ..... | **$199** |
| All Signature Wool Dress Pants ..... | **$99** |
| All Signature Dress Shirts ..... | **$59** |
| All Signature Ties ..... | **$39** |
| All Signature Cotton, Merino, & Silk Sweaters ..... | **$29** |

Scan this image to receive
these offers via email or simply visit:
www.MyJosBank.com/F12CDP

## Extra 30% Off of All Clearance Shirts & Ties

*REGULAR PRICE ** EXCLUDES SHOES, WATCHES, GIFT CARDS & RENTALS



EXCLUSIVELY FOR OUR
CORPORATE CARD MEMBERS

Bring a co-worker and we'll sign
him/her up too.

The Expert in Men's Apparel

Since 1905, Jos. A. Bank has offered exceptional quality, timeless style,
and unparalleled value in men's apparel.  As the preferred source for
professional, corporate-casual, and weekend attire, Jos. A. Bank adheres
to the highest standards of fabric, fit, and construction.  Our expert staff of
professional sales executives are always available to help you with
your wardrobe needs.

   josbank.com     

Prices in this mailer valid  Wednesday, February 15 & Thursday, February 16, 2012; however, some items may continue to be offered at
the same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular
size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card
Discount.  Not applicable at Factory Outlet stores, nor through Catalog or Internet.  For store information visit us at www.josbank.com.

430565



In our retail stores with this invitation.
Not available to the general public.

## WEDNESDAY, FEBRUARY 15
## & THURSDAY, FEBRUARY 16, 2012

### SIGNATURE COLLECTION SPECIAL OFFERS:

All Signature Wool Suits . . . . . . . . . . . . . $269
All Signature Wool Sportcoats . . . . . . . . . $199
All Signature Wool Dress Pants . . . . . . . . $99
All Signature Dress Shirts . . . . . . . . . . . . $59
All Signature Ties . . . . . . . . . . . . . . . . . . . $39
All Signature Cotton, Merino
& Silk Sweaters . . . . . . . . . . . . . . . . . . . . . $29

---

## 75% off regular price
### Entire Stock of Signature Gold Suits

---

## 70% off regular price
### Entire Stock of Executive Suits, Leather Jackets
### & Cashmere Sweaters

---

## 60% off regular price
### Entire Stock of Sportcoats, Blazers, Outerwear
### & All Other Suits

---

## 50% off regular price
### EVERYTHING ELSE IN THE STORE!
Excludes shoes, watches, gift cards, and rentals.

---

## EXTRA 30% off
### All Clearance Shirts & Ties



**ESTABLISHED 1905**

THE EXPERT IN MEN'S APPAREL

*6 Days Only!*

Tuesday, Feb. 21
through Sunday, Feb. 26

Preferred Customer

Dear          ,

Thank you for continually choosing Jos. A. Bank as your menswear store. As a valued customer, we are extending to you a **special offer not available to the general public**. Don't miss this opportunity to take advantage of these great savings. Please **bring this letter** to your favorite Jos. A. Bank store between **Tuesday, Feb. 21, and Sunday, Feb. 26, 2012**, and receive:

## All Suits, Sportcoats & Tuxedos
# 60% off* your 1st
# 70% off* your 2nd**
(Mix 'n Match)

In addition you will receive an
## Extra 25% off All Clearance items!

|                     | Orig.       | Clearance: | Now:     |
|---------------------|-------------|------------|----------|
| Clearance Suits     | $595        | $198       | $148.50  |
| Clearance Sportcoats| $395-450    | $138       | $103.50  |
| Clearance Shirts    | $69.50-135  | $39.98     | $29.99   |
| Clearance Silk Ties | $69.50      | $29.98     | $22.49   |

*Shop early for the best selection.*

*regular price  **equal or lesser value

EXTRA
25% off
ALL CLEARANCE
ITEMS!

josbank.com

*See additional great savings on the back.*

298305

# ADDITIONAL GREAT VALUES STOREWIDE

| | | |
|---|---|---|
| Huge Selection of Signature suits... | reg. $795 | **$349** |
| All Traveler suits, *including our Tailored Fit Collection*............... | reg. $750 | **$299** |

| | | |
|---|---|---|
| All Signature Wool sportcoats......... | reg. $595 | **$249** |
| All Camel Hair blazers...................... | reg. $450 | **$159** |
| All Signature dress pants................ | reg. $225 | **$109** |
| All Wool/Cashmere dress pants...... | reg. $165 | **$69** |
| All Traveler dress shirts/sportshirts, *including our Tailored Fit Collection*............... | reg. $87.50 | **2/$99** |
| Solid Color Merino Wool sweaters.... | reg. $99.50 | **$29** |

*PLUS:*
All leather jackets and Outerwear
All Hats, Gloves, and Scarves
ON SALE, including:

| | | |
|---|---|---|
| VIP Vintage leather jackets........... | reg. $700 | **$199** |
| Merino Wool topcoats................... | reg. $450 | **$159** |
| Gloves.............................................. | reg. $69.50 | **$29** |

## 6 Days Only!

Tuesday, Feb. 21– Sunday, Feb. 26

*Hurry for the best selection!*

   josbank.com

Prices in this mailer valid Tuesday, February 21 through Sunday, February 26, 2012; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card Discount. Not applicable at Factory Outlet stores, nor through Catalog or Internet. For store information visit us at www.josbank.com.







Prices in this mailer valid Monday, March 5 through Sunday, March 11, 2012; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card Discount. Not applicable at Factory Outlet stores, nor through Catalog. For store information visit us at www.josbank.com.



Post Office Box 8428
Greensboro, NC 27419-0428



Presorted
First Class Mail
U.S. Postage
PAID
JoS. A. Bank
Clothiers



josbank.com





*regular price **equal or lesser value. Prices in this mailer valid Monday, April 9 through Sunday, April 15, 2012; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card Discount. Not applicable at Factory Outlet stores, nor through Catalog. For store information visit us at www.josbank.com.



Post Office Box 8428
Greensboro, NC 27419-0428

Presorted
First Class Mail
U.S. Postage
PAID
JoS. A. Bank
Clothiers



  

josbank.com





*regular price  **equal or lesser value.  Prices in this mailer valid Monday, April 23 through Saturday, April 28, 2012; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card Discount.  Not applicable at Factory Outlet stores, nor through Catalog.  For store information visit us at www.josbank.com.



Post Office Box 8428
Greensboro, NC 27419-0428



Presorted
First Class Mail
U.S. Postage
PAID
JoS.A. Bank
Clothiers

  

josbank.com



Plus, going on now...

Entire stock of
**SPORTCOATS & BLAZERS**
BUY 1* GET 1*

**FREE**

Plus
**2 PANTS**
**FREE**

**THREE TIMES THE SUIT SALE**
**ALL SUITS**
BUY 1*
GET 2**

**FREE**

From our Traveler and Executive Collections to our finest Signature Suits

JOS. A. BANK
ESTABLISHED 1905
josbank.com

Monday, May 7 - Sunday, May 20, 2012    Additional great values on the back.



## All Traveler & Signature

- Dress Shirts
- Sportshirts
- Polos
- Dress Pants
- Casual Pants
- Shorts

Buy 1* Get Any 2nd** for
**$17**

Now through Sunday, May 13, 2012

*regular price  **equal or lesser value.  Prices in this mailer valid Monday, May 7 through Sunday, May 20, 2012 unless otherwise noted; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card Discount.  Not applicable at Factory Outlet stores, nor through Catalog.  For store information visit us at www.josbank.com.



Post Office Box 8428
Greensboro, NC 27419-0428

Presorted
First Class Mail
U.S. Postage
PAID
JoS.A.Bank
Clothiers



josbank.com





All David Leadbetter
Golf Apparel

## 50% off*

Inspired by the world's
foremost golf coach.
Garments cut to move
with your swing. Fabrics
stretch where needed,
but keep their shape.

*regular price



Signature
Imperial Blend
sportcoats

## 70% off*

Feel light and luxurious in
our premier fabric made
of the two luxury fibers
of pure silk and soft
camel hair.

THE JOS. A. BANK
GIFT CARD
ALWAYS FITS

Huge selection of
Executive, Traveler,
and Signature
dress pants

## 50% off*

Choose from a broad
selection of dress pants
made of 100% wool for
every day wear and
comfort. Available in
solids and patterns in
both plain and pleated
front styles.

*regular price

Monday, May 21 through

*Best sellers at prices you can count on and the savings stay in your pocket.*

## Our NEW Take It Easy Collection

Every moment away from work can be relaxing. Comfortable. Like the softness of your favorite easy chair. Like hanging out with a good friend. The day is ending. No problem. The weekend is beginning. Just start with the clothes.

**$37** each

All Take It Easy polos, shorts, short sleeve woven sportshirts, and pants

Garment washed 100% cotton or cotton/Tencel blend. Relaxed styling.

SAVINGS IN YOUR POCKET

Savings Stay in your Pocket Now through Father's Day!

### Tropical Blend Sportcoats

**$157**

A linen/wool blend makes it light, cool, and breathable. Add a softly constructed shoulder and you have a comfortable perfectly designed sportcoat for the warmer months!

### Executive Collection Pinpoint dress shirts

**$47**

Constructed in soft, two-ply Egyptian cotton for long-lasting quality and made with extra durable buttons. Buttondown, point, and spread collar styles to choose from in your exact sleeve length.







All Stays Cool sportshirts and polos and Traveler shorts

**$29** each

Special moisture-wicking cotton keeps you cool and dry.

All Traveler polos and short sleeve sportshirts

**$39** each

Soft and comfortable 100% cotton. Wrinkle resistant to look fresh all day.



Monday, May 21

All VIP Linen shorts & pants, and short sleeve sportshirts

**$49** each

Relax in comfort. Enjoy lightweight clothing with an easy drape, perfect for any escape away from work when the temperatures heat up. Richly textured 100% linen pants and cargo shorts are washed for comfort.



Monday, May 21 through
Monday, May 28, 2012
(Memorial Day)



All Stays Cool dress shirts
## $29

Special moisture-wicking cotton
keeps you cool and dry.  Wrinkle,
fade, and shrink resistant.  Spread
collar, point collar, and buttondown.



Huge selection of
Executive dress shirts
## $39

Classic 100% cotton dress shirts
in great looking patterns.

Presorted
Standard
U.S. Postage
PAID
JOS. A. Bank
Clothiers

Post Office Box 8428
Greensboro, NC 27419-0428

Postmaster: Please deliver in home May 16 - May 18, 2012.



JOS. A.
BANK

Going on now....

THREE TIMES THE SUIT SALE
ALL SUITS
BUY 1* GET 2**
FREE!

*regular price  **equal or lesser value.  Prices in this mailer valid May 21 - 28, 2012, unless otherwise noted;
however, some items may continue to be offered at the same or other prices.  Intermediate price reductions
may have been offered.  Advertised prices do not include accessories shown.  Big and tall prices will be
slightly higher than regular size prices.  Offers in this mailer not accepted on prior purchases and may not be
combined with any other offer or with a Corporate Card Discount.  Not applicable at Factory Outlet stores,
nor through Catalog.  For store information, visit us at josbank.com.






josbank.com



# FATHER'S DAY
# REWARD CERTIFICATES



## THE EXPERT IN MEN'S APPAREL

Over 550 stores nationwide.
For a store location nearest you, please visit us at www.josbank.com
We will be open extended hours for your shopping convenience.
Please contact your store for specific hours.

Offers in this mailer valid June 11 through June 17, 2012, unless otherwise noted; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Portly prices will be slightly higher than regular prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card Discount. Not applicable at Factory Outlet stores, Catalog or Internet. For store information, visit us at www.josbank.com.

## Father's Day Reward Certificates

Monday, June 11 – Sunday, June 17

Enclosed are four certificates featuring
$25 off your purchase of $125.  Each certificate may be
applied toward your purchase of any sale or regular priced
merchandise, excluding gift cards and rentals.

Save a total of $100 when you combine all four
Reward Certificates off a purchase of $500 or more.

Don't miss **SUPER TUESDAY**, June 12th!

Open Tuesday 8:00 am – 10:00 pm in most stores

## Buy 1 * Suit Get 2 ** Suits Free!

## 50% off * everything else in the store!
(excluding watches, shoes, gift cards and rentals)

Plus, use the enclosed **Reward Certificates**
to save up to $100 more.

Want to avoid the crowds on Tuesday?
Come in **Monday, June 11th**
and we'll honor the Super Tuesday offer.

*regular price **equal or lesser value



EXCLUSIVELY FOR OUR
CORPORATE CARD MEMBERS

### The Expert in Men's Apparel

Since 1905, Jos. A. Bank has offered exceptional quality, timeless style,
and unparalleled value in men's apparel. As the preferred source for
professional, corporate-casual, and weekend attire, Jos. A. Bank adheres
to the highest standards of fabric, fit, and construction. Our expert staff of
professional sales executives are always available to help you with
your wardrobe needs. In addition, we offer tailoring on the premises.



446203

 josbank.com

Prices in this mailer valid Monday, June 25 and Tuesday, June 26, 2012; however, some items may continue to be offered at the
same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular size
prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card
Discount. Not applicable at Factory Outlet stores, nor through Catalog or Internet. For store information visit us at www.josbank.com.



In our retail stores with this invitation
Not available to the general public

## MONDAY, JUNE 25
## & TUESDAY, JUNE 26, 2012

For your convenience, we will be open extended hours.

Bring a co-worker and we'll sign him/her up, too.

# 50% off*, 3rd" Free
### Suits, Tuxedos, Sportcoats (mix 'n match)

# 50% off*, 3rd" Free
### Sportshirts, Polos, Shorts (mix 'n match)

# 40% off*
### Pants, Silk Ties, Dress Shirts

## CLEARANCE
### Dress Shirts, Silk Ties, Sportshirts, and Polos
# $19.99

*regular price    **equal or lesser value





ONE SIZE FITS ALL

# THE PRIVATE EVENT

Monday, July 9 through Wednesday, July 11, 2012

Gift Card JoS. A. BANK ESTABLISHED 1905

The JoS. A. BANK Gift Card Always Fits.

*We will be open 8:00 am - 10:00 pm in most stores.*

JoS. A. BANK ESTABLISHED 1905

Post Office Box 8428
Greensboro, NC 27419-0428

Presorted
First Class Mail
U.S. Postage
PAID
JoS. A. Bank
Clothiers

Postmaster:
please deliver July 5-7, 2012.

NOW ACCEPTING PayPal IN OUR RETAIL STORE

*regular price. **equal or lesser value. Must have Private Event invitation to receive discounts mentioned in this offer. Offer valid July 9 through July 11, 2012; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offers or Corporate Card Discount. Not applicable at Factory Outlet stores, nor through Catalog. For store information visit us at www.josbank.com.

We will be open 8:00 am - 10:00 pm in most stores

Monday, July 9 through Wednesday, July 11, 2012

This Special Event and the enclosed offer are for our Finest Customers only.

# THE PRIVATE EVENT

Monday, July 9 through Wednesday, July 11, 2012
Open 8:00 am - 10:00 pm in most stores

*With this invitation in our retail stores:*



## 50% off*
Entire Stock
suits & sportcoats
## Any 2nd** FREE!
mix 'n match



## 50% off*
Entire Stock
dress shirts • ties
sportshirts • pants



## $29.99
Entire Stock
short-sleeve sportshirts
polos • shorts



## JOS. A. BANK
ESTABLISHED 1905

**4 DAYS ONLY**
**WITH THIS POSTCARD**
Friday, July 20 - Monday, July 23

### All Suits
# 50% off*

*Any 2nd***
# FREE!

# 50% off*
### All Dress Shirts and Ties
### 3rd** Free

## Private Event
for our Finest Customers

*regular price   **of equal or lesser value

josbank.com

*See back for additional great values...*

## CLEARANCE

| | |
|---|---|
| Huge selection Clearance suits....................... | $178 |
| Huge selection Clearance sportcoats............. | $98 |
| Huge selection Clearance dress shirts, sportshirts, polos, and cotton pants............... | $24.98-39.98 |
| Huge selection Clearance ties......................... | $19.98-29.98 |

Prices in this mailer valid July 20 through July 23, 2012; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card Discount. For store information visit us at josbank.com.



## JOS. A. BANK
ESTABLISHED 1905

Post Office Box 8428
Greensboro, NC 27419-0428

Presorted
First Class Mail
U.S. Postage
**PAID**
JoS.A. Bank
Clothiers

josbank.com



NOW ACCEPTING **PayPal**



Private Event for our Finest Customers
with this postcard

– Wednesday, August 1 - Monday, August 6, 2012 –

# ALL SUITS & SPORTCOATS
# 50%OFF*
# PLUS 2nd* FREE

**Jos. A. BANK**
ESTABLISHED 1905

All Dress Shirts, Ties & Pants
## BUY 1* GET 1*FREE

*REGULAR PRICE **EQUAL OR LESSER VALUE

– Now Through August 12, 2012 –

# BUY 1 GET 2** FREE

All Short-Sleeve Sportshirts,
Polos and Shorts

## MIX 'N MATCH!



**EXTRA**

# 50% OFF

Any Second*
Clearance Item

**EXAMPLE:**
2nd Clearance
Suit only

# $89!



– Now Through August 12 –

*regular price * * equal or lesser value. Prices in this mailer valid August 1 through August 6, 2012, unless otherwise noted; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores or through Catalog. For store information, visit us at **www.josbank.com**.



Post Office Box 8428
Greensboro, NC 27419-0428

josbank.com

   

NOW ACCEPTING **PayPal** IN OUR RETAIL STORE

Prsrt. Std.
U.S. Postage
PAID
J°S. A. Bank
Clothiers



Exclusively for
CORPORATE
JºS. A. BANK
ESTABLISHED 1905
CARD MEMBERS

*The Expert in Men's Apparel*

Since 1905. JoS. A. Bank has offered exceptional quality, timeless style,
and unparalleled value in men's apparel. As the preferred source for professional,
corporate-casual and weekend attire, JoS. A. Bank adheres to the highest
standards of fabric, fit and construction. Our expert staff of professional sales
executives are always available to help you with your wardrobe needs.

JOSBANK.COM



NOW ACCEPTING *PayPal* IN OUR RETAIL STORES



Prices in this mailer valid Aug. 13 - Aug. 14, 2012; however, some items may continue to be offered at the same
or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than
regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other
offer or with a Corporate Card discount. Not applicable at Factory Outlet stores, nor through Catalog or Internet.
For store information, visit us at www.josbank.com.

190397



*Monday, August 13*
*& Tuesday, August 14, 2012*

We will be open extended hours for your convenience!

Please bring this invitation with you to our store
to take advantage of these savings.

Entire Stock of Suits & Sportcoats

# 50% OFF   2nd FREE

That's 2 for 1/2 the price of one!
(MIX 'N MATCH)

## 50% OFF
Everything else in the store!
(Excluding Watches, Shoes, Rentals and Gift Cards)

## EXTRA 50% OFF
Clearance Dress Shirts, Ties,
Sportshirts, Polos & Pants

## EXTRA 25% OFF
Clearance Suits & Sportcoats

*Bring a co-worker and
we'll sign him/her up, too.*

*regular price  ** equal or lesser value*



# JOS. A. BANK
ESTABLISHED 1905

## Entire Stock
Suits & Sportcoats'

**3**

## FOR THE PRICE OF ONE
*REGULAR PRICE
2ND AND 3RD EQUAL OR LESSER VALUE

– August 20 through August 26, 2012 –

MIX 'N MATCH!

## All Pants, Shirts and Ties

**40% OFF 1st  60% OFF 2nd**



'regular price ' ' equal or lesser value. Prices in this mailer valid August 20 through August 26, 2012; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores or through Catalog. For store information visit us at www.josbank.com.



Post Office Box 8428,
Greensboro, NC 27419-0428



Presorted
First Class Mail
U.S. Postage
PAID
JoS. A. Bank
Clothiers

josbank.com

– Friday, Aug. 31 - Monday, Sept. 3, 2012 –
OPEN 8 AM FRIDAY & SATURDAY IN MOST STORES

— LABOR DAY WEEKEND —



# EVERYTHING⁺
## IN THE STORE

# BUY 1*
# GET 2**
# FREE



⁺EXCLUDING WATCHES, SHOES, RENTALS AND GIFT CARDS
*REGULAR PRICE **EQUAL OR LESSER VALUE



BUY 1°
GET 2◊◊
FREE⁺

— Friday, Aug. 31 • Monday, Sept. 3, 2012 —

OPEN 8 AM FRIDAY & SATURDAY IN MOST STORES

— LABOR DAY WEEKEND —

# EVERYTHING IN THE STORE⁺

MIX 'N MATCH



ᴶᴼˢ. A.
BANK

ESTABLISHED 1905

Post Office Box 8428,
Greensboro, NC 27419-0428



NOW ACCEPTING *PayPal* IN OUR RETAIL STORES

josbank.com



Pmt. Std.
U.S. Postage
PAID
JOS.A. Bank
Clothiers

*Excluding watches, shoes, rentals and gift cards. "regular price" equal or lesser value. Prices in this mailer valid Friday, Aug. 31 through Monday, Sept. 3, 2012; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores or through Catalog. For store information visit us at **www.josbank.com**.



# all SUITS & SPORTCOATS



# BUY 1*
# GET 2**
# FREE

Mix 'n Match

- STOREWIDE -
SAVINGS INSIDE

THURSDAY, SEPT. 13
- through -
SUNDAY, SEPT. 23, 2012



LOOK INSIDE
*for an*
EXTRA
$50
OFF!

*Regular Price.
Excludes Works Collection
** Equal or Lesser Value



# *all* SUITS & SPORTCOATS

# BUY 1*

# GET 2**

# FREE

Mix 'n Match

## TRADITIONAL FIT

our standard cut

- Traditional Lapel
- Roomier Through The Body
- Traditional Rise
- Traditional Leg

*Regular Price. Excludes Works Collection * * Equal or Lesser Value



# *all* DRESS SHIRTS & TIES

## BUY 1 GET 1 FREE Mix 'n Match

Choose from our entire collection, including our famous all-cotton, wrinkle-free dress shirts

- Spread, Buttondown & Point Collars
- Traditional Fit & Tailored Fit
- 48 Sizes in Exact Sleeve Length





*all*
# SPORTSHIRTS, POLOS & CASUAL PANTS

**BUY 1° GET 1°°** FREE Mix 'n Match



*Regul.



*all*
# SPORTCOATS
## & SUITS

BUY 1* **FREE** Mix 'n
GET 2** Match

## BUSINESS
### *casual*

THE JOS. A. BANK
SPORTCOAT IS THE
MUST-HAVE BUSINESS
ESSENTIAL

*Regular Price. Excludes Works Collection * * Equal or Lesser Value



*all*
# DRESS SHIRTS
## & TIES

Prsrt. Std.
U.S. Postage
PAID
JOS. A. Bank
Clothiers

# BUY 1*
## GET 1**
# FREE

Mix 'n Match



Postmaster please deliver in home Sept. 10-12, 2012

*all* SUITS &
# SPORTCOATS

# BUY 1*
## GET 2**
# FREE

Mix 'n Match

STOREWIDE -
SAVINGS INSIDE

**LOOK INSIDE**
*for an*
**EXTRA**
$50 OFF!





JOS. A. BANK
ESTABLISHED 1905

Post Office Box 8428,
Greensboro, NC 27419-0428

josbank.com

*Regular Price, Excludes Works Collection. **Equal Or Lesser Value. Prices in this mailer valid Thursday, Sept. 13 through Sunday, Sept. 23, 2012; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores, nor through Catalog or Internet. For store information, visit us at www.josbank.com.



*all* SUITS &
SPORTCOATS

BUY 1*
GET 2** FREE

FINAL DAYS

ENDS SUNDAY, OCT. 14, 2012



JoS. A.
BANK
ESTABLISHED 1905

*We Fit Everyone*
• TRADITIONAL FIT • TAILORED FIT • SLIM FIT

+Excluding Works Collection *Regular price **Equal or lesser value

50% OFF*
3rd ITEM**
FREE

DRESS SHIRTS, TIES, PANTS,
SPORTSHIRTS, SWEATERS, LEATHER
JACKETS, TOPCOATS & MORE+

| THURSDAY, OCT. 11 | OPEN 8 AM |
| THROUGH | FRIDAY & SATURDAY |
| SUNDAY, OCT. 14, 2012 | IN MOST STORES |

*Regular price. **Equal or lesser value. +Excluding Works Collection, shoes, watches, rentals and gift cards. Prices valid 10/11 -10/14, 2012; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores, nor through Catalog or Internet. For store information, visit us at www.josbank.com.



JoS. A.
BANK
ESTABLISHED 1905

Post Office Box 8428,
Greensboro, NC 27419-0428



 PayPal

josbank.com

Presorted
First Class Mail
U.S. Postage
PAID
JoS. A. Bank
Clothiers



**Friday, Oct. 19, 2012**

**OPEN EXTENDED HOURS
FOR YOUR CONVENIENCE**



Dear _____,

As a valued **Corporate Card member**, you are cordially invited to preview the new **Fall and Holiday Collections** of fine menswear at JoS. A. Bank. But hurry—you only have **two days** to enjoy the following **special offers**. And be sure to **see the reverse side** for details on even more all-store offers!

## *all* SUITS & SPORTCOATS
# 50%off* 2ND FREE°°
## THAT'S 2 FOR 1/2 THE PRICE OF 1
### *MIX AND MATCH*

*Regular price, excludes Works Collection • °°Equal or lesser value

## *We Fit Everyone*
• TRADITIONAL FIT • TAILORED FIT • SLIM FIT



AN *EXCLUSIVE* OFFER FOR
*CORPORATE CARD MEMBERS* **ONLY**

# 2 FREE *SILK* TIES°°°

WITH ANY SUIT OR SPORTCOAT PURCHASE
*WITH THIS COUPON*

EXCLUDING WORKS COLLECTION

°°°$104.50 or less



JoS. A. BANK
ESTABLISHED 1905

Friday, Oct. 19, 2012

·····························

OPEN EXTENDED HOURS
FOR YOUR CONVENIENCE



# *EVERYTHING* ELSE
## *~in the~STORE*⁺

# 1ˢᵗ ITEM 50%off·

# 2ⁿᵈ ITEM 60%off·

# 3ʳᵈ ITEM 70%off·





·Excluding suits, sportcoats, Works Collection, shoes, watches, rentals, gift cards. ⁺Regular price. ⁺⁺Equal or lesser value. Prices valid 10/18-10/19, 2012; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores, nor through Catalog or Internet. For store information, visit us at www.josbank.com.



# 2 FREE
## *SILK* TIES⁺⁺⁺

### WITH ANY SUIT OR SPORTCOAT PURCHASE
### *WITH THIS COUPON*

EXCLUDING WORKS COLLECTION

⁺⁺⁺$104.50 or less

LIMIT ONE COUPON PER PURCHASE. LIMIT ONE COUPON PER CUSTOMER. Valid 10/18-10/19, 2012. Coupon must be presented and relinquished at time of purchase. Valid only in the U.S. Void where prohibited, taxed or otherwise restricted by law. Coupon not transferable, including via electronic means; void if copied, altered, transferred, purchased or sold. May be redeemed only at participating JoS. A. Bank retail stores. May not be used at Factory Outlet stores or for Catalog or Internet purchases. Not redeemable for cash. Any other use constitutes fraud. Redemption subject to review and verification. Cash value 1/50 cent.



**JOS. A. BANK**
ESTABLISHED 1905

THE EXPERT IN
MEN'S APPAREL

# CORPORATE DAY

## Thursday, October 18 & Friday, October 19, 2012

October 6, 2012

Dear Business Professional:

**Please share this information with your employees, co-workers and members!**

Your organization is a valued member of the Jos. A. Bank Corporate Discount Card Program. You and your associates are invited to our Corporate Discount Event on <u>Thursday, October 18 & Friday, October 19, 2012</u>!

**Display the enclosed poster with complete offer details in a popular employee gathering spot to spread the news. You may also email this offer to your associates by visiting www.MyJosBank.com/Oct12CD**

To receive this member offer, your personnel simply need to visit a store, provide a business card, work ID, or this notice and a discount card will be issued to them immediately. For a store nearest you, call 1-800-285-BANK or visit us online at www.JOSBANK.com

If you'd like to receive future announcements of our exclusive Corporate Discount offers electronically, visit **www.MyJosBank.com/Oct12CD** and provide the requested information.

Thank you,

Nick Rizzi,
VP of Corporate Sales

**THE JOS. A. BANK CORPORATE CARD PROGRAM**
Shop 24/7 online @ www.josbank.com | Store Locations: 1.800.285.BANK | Corporate Program: 1.800.827.3921



Friday, Oct. 19, 2012

..............................

OPEN EXTENDED HOURS
FOR YOUR CONVENIENCE



Dear _____,

As a valued **Corporate Card member**, you are cordially invited to
preview the new **Fall and Holiday Collections** of fine menswear
at JoS. A. Bank. But hurry—you only have **two days** to enjoy the
following **special offers**. And be sure to **see the reverse side** for
details on even more all-store offers!

*all* SUITS *&* SPORTCOATS

# 50%off* 2ND FREE**

THAT'S 2 FOR 1/2 THE PRICE OF 1

*MIX AND MATCH*

*Regular price, excludes Works Collection • **Equal or lesser value

*We Fit Everyone*

• TRADITIONAL FIT • TAILORED FIT • SLIM FIT



AN *EXCLUSIVE* OFFER FOR
*CORPORATE CARD MEMBERS* ONLY

# 2 FREE SILK TIES***

WITH ANY SUIT OR SPORTCOAT PURCHASE
*WITH THIS COUPON*

EXCLUDING WORKS COLLECTION

***$104.50 or less



# CORPORATE DAY

OPEN EXTENDED HOURS
FOR YOUR CONVENIENCE

**Thursday, October 18 & Friday, October 19, 2012**
In our retail stores with this invitation. Not available to the general public.

*all* SPORTCOATS & SUITS

# 50% off*

That's 2 for **1/2** the Price of One!

*plus* 2ND FREE**

MIX AND MATCH

*we fit! everyone*

+ 2 FREE Ties†
with the purchase of any suit or sportcoat*

*EVERYTHING* ELSE
*-in the-* STORE‡

1st ITEM 50%off*

2nd ITEM* 60%off*

3rd ITEM** 70%off*

MIX AND MATCH

**TUXEDO RENTALS**  FIRST TIME EVER!

Exclusively for our Corporate Card Customers
*20% Off* Select Tuxedo Rental Packages***

Take an *extra* 25%off
ALL CLEARANCE

Scan the code to receive these offers via email or simply visit www.MyJosBank.com/OCT12CDP



*Regular Price, Excludes Works Collection  **Of Equal Or Lesser Value  †Up To $104.50 Each
‡Excludes Shoes, Watches, Rentals, Gift Cards & Works Collection  ***Valid on packages priced at $139 and above.
May not be combined with any other discount or offer. Excludes a la carte rentals and purchase items



THURSDAY,
**SATURDAY, OCT. 27, 2012**
*OPEN 8 A.M. IN MOST STORES*

## ~ *entire store* ~
# 70%off**



~ *plus* ~ *GET A*
# FREE
# Android™
## Smartphone
with any purchase!

New two-year activation required.
Other terms & conditions apply.
Must select phone and carrier by Nov. 3, 2012.
See back for details.



*Excludes Works Collection, shoes, watches, gift cards and rentals **Regular price

---

~ *entire store* ~
# 70%off

~ *plus* ~ *GET A*
# FREE Android™
## Smartphone *with any purchase!*
New two-year activation required. Other terms & conditions
apply. Must select phone and carrier by Nov. 3, 2012.

# 3 DAYS ONLY
**THURSDAY, OCT. 25 THROUGH
SATURDAY, OCT. 27, 2012**
*OPEN 8 A.M. IN MOST STORES*

Phone terms & conditions: Free phone offer is only available with select service plans, data and messaging features and a new two-year subscriber agreement. Price valid for primary and secondary lines only. Offer is subject to identity, credit and/or eligibility check, and may require a deposit. Contract renewal and upgrade options may also be available for existing eligible customers; however, price may vary. Service may not be available in all markets or on all wireless carriers. Activation fees, early termination fees and additional restrictions apply. Must be 18 or older to qualify. Void where restricted or prohibited by law. Not valid with any other offer or for business accounts. Limited time offer that is subject to change and only valid in the United States. See full offer for details. Offers for wireless products and services are fulfilled by Simplexity, LLC, an authorized agent for the featured wireless service providers. Promotion executed by PageMaster Corporation, Thousand Oaks, Ca.

*Excludes Works Collection, shoes, watches, gift cards and rentals. **Regular price. Offer valid 10/25-27, 2012; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big and tall prices will be slightly higher than regular size prices. Offers are not accepted on prior purchases and may not be combined with any other offers or with a Corporate Card discount. Not applicable at Factory Outlet stores, nor through Catalog.


Post Office Box 8428,
Greensboro, NC 27419-0428



josbank.com

Presorted
First Class Mail
U.S. Postage
PAID
JoS. A. Bank
Clothiers

**ENTIRE STOCK OF
SUITS AND SPORTCOATS**

# 50%
## OFF*

*mix 'n match*

*Plus*
**2ND**** FREE

That's 2 for 1/2 the price of 1!

**WEDNESDAY, DEC. 5
& THURSDAY, DEC. 6, 2012
OPEN 9 AM IN MOST STORES**



*EXCLUSIVELY
FOR CORPORATE
CARD MEMBERS*

# 70%
## OFF*

Everything
Else⁺ in
the Store

**Scan the code to receive these offers via email, or simply visit www.MyJosBank.com/DEC12CDP**



*Regular price, excludes Works Collection. **Equal or lesser value. +Excludes Works Collection, watches, shoes, rentals and gift cards. Prices valid 12/5/12-12/6/12; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Regal prices will be slightly higher than regular size prices. Offers in this poster not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores, nor through Catalog.

*Don't miss our*

# SUPER TUESDAY EVENT

*MONDAY, DEC. 10 & TUESDAY, DEC. 11*
*Open 8 a.m. - 10 p.m. in most stores*

*All Suits*

# BUY 1*
# GET 3**
# *FREE*



*Everything else+*

# BUY 1*
# GET 2**
# *FREE*

## PLUS, USE THE ENCLOSED GIFT DOLLARS TO SAVE UP TO $100 MORE.

*Regular price, excludes Works Collection  **Equal or lesser value  +Excludes shoes, watches and gift cards*

**JOS. A. BANK**
ESTABLISHED 1905

**HUGE SELECTION OF SUITS & SPORTCOATS**
**BUY 1***
**GET 2** ** **FREE**
MIX & MATCH

*PLUS* **3 SILK TIES⁺ FREE**

**FRIDAY, JAN. 25 & SATURDAY, JAN. 26**

*Regular price. **Equal or lesser value. +Up to $104.50.

**70%** OFF*
*All Outerwear*
*Huge Selection of Sweaters*

**40% OFF***
**MOST EVERYTHING* IN THE STORE**

**FRIDAY, JAN. 25 & SATURDAY, JAN. 26**

*Regular price. +Excluding shoes, rentals and gift cards. Prices valid 1/25/13 -1/26/13; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Advertised prices do not include accessories shown. Big/Tall and Regal size prices will be slightly higher than Regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores, nor through Catalog or Internet. For store information, visit us at josbank.com.



**JOS. A. BANK**
ESTABLISHED 1905

Post Office Box 8428
Greensboro, NC 27419-0428

    

josbank.com

Presorted
First Class Mail
U.S. Postage
PAID
JoS. A. Bank
Clothiers



BUY 1*
GET 1** FREE

ENTIRE STOCK OF
DRESS SHIRTS
& SPORTSHIRTS

MIX & MATCH

BUY 1*
GET 1** FREE

ENTIRE STOCK OF
SWEATERS

BUY 1*
GET 1** FREE

ENTIRE STOCK OF
DRESS PANTS
& CASUAL PANTS

MIX & MATCH

Wednesday, Dec. 26 through Tuesday, Jan. 1, 2013 • Open 9 a.m. Wednesday through Saturday in most stores

*Regular price, excludes Works Collection. **Equal or lesser value. Prices valid 12/26/12-1/1/13, unless otherwise noted. Some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Regal prices will be slightly higher than regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores, nor through Catalog or Internet. For store information, visit us at **josbank.com**.



Post Office Box 8428
Greensboro, NC 27419-0428

 

NOW ACCEPTING PayPal IN OUR RETAIL STORES

Prsrt. Std.
U.S. Postage
PAID
JOS. A. Bank
Clothiers

josbank.com



**50%** OFF*

ALL BLAZERS**,
SPORTCOATS**, OUTERWEAR
& WOOL SWEATERS

**40%** OFF*

DRESS SHIRTS**, TIES,
SPORTSHIRTS**, POLOS, PANTS**
& ALL OTHER SWEATERS

**30%** OFF*

ALL SOCKS,
BELTS &
UNDERWEAR

*Exclusively for Corporate Card
members with this postcard.*

**EXTRA 25% OFF**

ALL CLEARANCE

THURSDAY, FEB. 21 *through* SATURDAY, FEB. 23, 2013

*Regular prices. **Excludes Traveler Products & Clearance. Prices valid 2/21/13-2/23/13; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Regal prices will be slightly higher than Regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores, nor through Catalog. For store information, visit us at josbank.com.



Post Office Box 8428
Greensboro, NC 27419-0428



josbank.com

Prsrt. Std.
U.S. Postage
PAID
J°S. A. Bank
Clothiers










FRIDAY, MARCH 15 *through*
SUNDAY, MARCH 17, 2013

# ALL SUITS⁺ & SPORTCOATS⁺

**1ST**    **50%** OFF*

**2ND****    **60%** OFF*

**3RD****    **70%** OFF*

**40%** OFF*    ALMOST EVERYTHING ELSE* IN THE STORE



JOS. A. BANK
ESTABLISHED 1905

*See back for special value pricing on Traveler products*

⁺Excludes Traveler products & Clearance. *Regular price. **Equal or lesser value.

# THE *BEST* BUSINESS-CASUAL SOLUTIONS

## ···· TRAVELER ····

SPORTCOATS
*$200 NOW*

DRESS PANTS
*$90 NOW*

SPORTSHIRTS
*2 FOR $95 NOW*

COTTON
TWILL PANTS
*$60 NOW*

---

# SPECIAL VALUE PRICES
## WE'RE MAKING IT
# WORK FOR YOU

## ···· TRAVELER ····

DRESS SHIRTS
*2 FOR $95 NOW*

"BEST OVERALL"
WRINKLE-FREE DRESS SHIRT
*Wall Street Journal*

## ···· TRAVELER ····

SUITS

THE MOST COMFORTABLE SUIT
YOU WILL EVER OWN
*$275 NOW*

Prices valid 3/15/13-3/17/13; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Regal prices will be slightly higher than Regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores, nor through Catalog. For store information, or to purchase online, visit us at josbank.com.



Post Office Box 8428
Greensboro, NC 27419-0428

 

josbank.com

Prsrt. Std.
U.S. Postage
PAID
JOS. A. Bank
Clothiers

FINAL DAYS
*ENDS SATURDAY, APRIL 13, 2013*

*ALMOST ALL*
SUITS+ ON SALE

BUY 1* | GET 2ND**
FOR $99

GET 3RD** *FREE*



See back for additional great offers

*Excludes Traveler suits. *Regular price. **Equal or lesser value.

# FRIDAY & SATURDAY ONLY!

## 40-60% OFF*

### ALMOST EVERYTHING ELSE** IN THE STORE

## ALMOST ALL SUITS+ ON SALE

### BUY 1*   GET 2ND* FOR $99*

### GET 3RD* FREE

+Excludes Traveler suits. *Regular price. **Equal or lesser value. ++Excludes shoes, rentals, gift cards and Traveler products. Prices valid 4/12/13–4/13/13; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Regal prices will be slightly higher than Regular size prices. Advertised prices do not include accessories shown. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores, nor through Catalog. For store information, or to purchase online, visit us at **josbank.com**.



JoS. A. BANK
ESTABLISHED 1905

Post Office Box 8428
Greensboro, NC 27419-0428



josbank.com

Prsrt. Std.
U.S. Postage
PAID
JoS. A. Bank
Clothiers



APRIL 17 - APRIL 20 ONLY

# ALL EXECUTIVE

SPORTCOATS, PANTS & SHIRTS ON SALE

Executive Blazers *$179.99*
Executive Gabardine Dress Pants *$79.99*
Executive Dress Shirts *$29.99*
Executive Polos *$29.99*

Prsrt. Std.
U.S. Postage
PAID
JOS. A. Bank
Clothiers

# ALL CLEARANCE

DRESS SHIRTS, TIES,

SPORTSHIRTS & CASUAL PANTS:

## 2ND* FOR $15

LOOK FOR CLEARANCE TAGGED ITEMS

*Equal or lesser value. Prices valid 4/17/13-4/27/13, unless otherwise indicated. Some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Regal prices will be slightly higher than Regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores or through Catalog or Internet. For store information, visit us at josbank.com.



ESTABLISHED 1905

Post Office Box 8428
Greensboro, NC 27419-0428





josbank.com

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 91 of 260



## Final 8 Hours! - Buy 1 Suit, Get 3 FREE with FREE SHIPPING
1 message

**Jos. A. Bank** < josabank@shop.josbank.com>                    Sat, May 4, 2013 at 6:23 PM



FINAL DAY! Buy 1 Suit, GET "3" FREE! Plus 50% OFF Everything Else* & FREE Shipping! SHOP NOW

The Expert in Men's Apparel

Trouble Viewing? View this email on a mobile device or in a browser          FORWARD TO A FRIEND

# FREE SHIPPING! On All Orders $50 or more

**FINAL DAY!** Saturday, May 4 - Until Midnight PT

Get 4 Suits *for the Price of 1*



ALMOST
*All Suits*†

BUY 1
GET 3
FREE

MIX 'N MATCH

MOST EVERYTHING ELSE *online*‡



## MAY 10 – MAY 27, 2013

Buy Almost Any*
Jos. A. Bank Suit**
*and get*
a 2nd Suit⁺ *FREE*

*plus*

2 Dress Shirts *FREE*

*plus*

2 Silk Ties⁺⁺ *FREE*

That's 1 *FREE* Suit, plus *FREE* Shirts
and Ties valued up to $560!

Choose from fine, Traditional
and Trim Fit Wool Suits.

*See back for special value pricing on Traveler products*

*Excludes Traveler & Poplin suits. **Regular price.
⁺Equal or lesser value. ⁺⁺Up to $140 each.

# SPECIAL VALUE PRICES

## WE'RE MAKING IT WORK FOR YOU

Work hard and make it look easy with the lasting comfort and performance of our Traveler's Collection

## ···· TRAVELER ····
### SUITS

THE MOST COMFORTABLE SUIT YOU WILL EVER OWN

*$275 SPECIAL VALUE NOW*

## ···· TRAVELER ····
### DRESS SHIRTS

"BEST OVERALL" WRINKLE-FREE DRESS SHIRT

*Wall Street Journal*

*2 FOR $95 SPECIAL VALUE NOW*



JOS. A. BANK
ESTABLISHED 1905

Post Office Box 8428
Greensboro, NC 27419-0428




josbank.com

Prices valid 5/10/13-5/27/13; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Regal prices will be slightly higher than Regular size prices. Advertised prices do not include accessories shown. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores, nor through Catalog. For store information, or to purchase online, visit us at josbank.com.



Prsrt. Std.
U.S. Postage
PAID
JOS. A. Bank
Clothiers



*MAY 10 – MAY 27, 2013*

Buy Almost Any*
Jos. A. Bank Suit**

*and get*

a 2nd Suit⁺ *FREE*

*plus*

2 Dress Shirts *FREE*

*plus*

2 Silk Ties*** *FREE*

That's 1 *FREE* Suit, plus *FREE* Shirts
and Ties valued up to $560!

Choose from fine, Traditional
and Trim Fit Wool Suits.

*See back for special value pricing on Traveler products*

*Excludes Traveler & Poplin suits. **Regular price.
⁺Equal or lesser value. ***Up to $140 each.

JOS. A. BANK
ESTABLISHED 1905
JOSBANK.COM

SPECIAL VALUE PRICES

WE'RE MAKING IT
WORK
FOR YOU

Work hard and make it look
easy with the lasting comfort
and performance of our
Traveler's Collection

········ TRAVELER ········
SUITS

THE MOST
COMFORTABLE
SUIT YOU WILL
EVER OWN

$275 SPECIAL VALUE NOW

········ TRAVELER ········
DRESS SHIRTS

"BEST OVERALL"
WRINKLE-FREE
DRESS SHIRT
*Wall Street Journal*

2 FOR $95 SPECIAL VALUE NOW

Prices valid 5/10/13-5/27/13; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Regal prices will be slightly higher
than Regular size prices. Advertised prices do not include accessories shown. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card
discount. Not applicable at Factory Outlet stores, nor through Catalog. For store information, or to purchase online, visit us at **josbank.com**.

J°S. A.
BANK
ESTABLISHED 1905

Post Office Box 8428
Greensboro, NC 27419-0428



josbank.com

Prsrt. Std.
U.S. Postage
PAID
J°S. A. Bank
Clothiers



A SPECIAL
GIFT
$100
IN GIFT DOLLARS
JUST IN TIME FOR
FATHER'S DAY
See inside for details
JoS. A.
BANK
ESTABLISHED 1905

JoS. A. BANK
ESTABLISHED 1905

**For a store near you, visit josbank.com.**

Offers in this mailer valid June 10-16, 2013. Offers in this mailer not accepted on prior purchases and not applicable at Factory Outlet stores, Catalog or Internet.

# $100

IN GIFT DOLLARS ENCLOSED
TO SAY THANK YOU FOR
YOUR BUSINESS.

*Valid Monday, June 10 through Sunday, June 16, 2013,
only in our retail stores.*

## JUST IN TIME FOR FATHER'S DAY!

Your Gift Dollars are good on purchases of any sale or regular price
merchandise throughout the store! No exclusions except gift cards.
Save a total of $100 on any purchase of $600 or more!
Must present Gift Dollar certificate to receive discount.

*For your convenience, tailoring is available on the premises.*

---

## DON'T MISS OUR
## SUPER TUESDAY SALE
### TUESDAY, JUNE 11

OPEN 9 A.M. - 10 P.M. IN MOST STORES

## 50% OFF* ALMOST EVERYTHING+ IN THE STORE
## PLUS 2ND SUIT** OR SPORTCOAT** ONLY $99!

### USE YOUR GIFT DOLLARS TO SAVE UP TO $100 MORE!

Want to avoid the crowds on Tuesday? Shop Monday, June 10,
and we will honor all SUPER TUESDAY SALE offers!

*Regular price. +Excludes shoes, gift cards, rentals and Traveler Products.
**Equal or lesser value, excludes Traveler Products.











# SPECIAL VALUE PRICES

## WE'RE MAKING IT WORK FOR YOU

Work hard and make it look easy with the lasting comfort and performance of our Traveler's Collection

········ TRAVELER ········
SUITS

THE MOST COMFORTABLE SUIT YOU WILL EVER OWN

$275 SPECIAL VALUE NOW

········ TRAVELER ········
DRESS SHIRTS

"BEST OVERALL"
WRINKLE-FREE
DRESS SHIRT
*Wall Street Journal*

2 FOR $95 SPECIAL VALUE NOW

Prices valid 6/28/13-6/30/13, unless otherwise indicated. Some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Regal prices will be slightly higher than Regular size prices. Advertised prices do not include accessories as shown. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores or through Catalog or Internet. For store information, visit us at **josbank.com.**

JOS. A. BANK
ESTABLISHED 1905

Post Office Box 8428
Greensboro, NC 27419-0428



josbank.com

Prst. Std.
U.S. Postage
PAID
JOS. A. Bank
Clothiers





# TUESDAY ONLY!

## JULY 16, 2013

### OPEN 8 A.M. - 10 P.M. IN MOST STORES

# BUY 1*
# GET 2** FREE

## ALMOST EVERYTHING*
## IN THE STORE



JOSBANK.COM

Want to avoid the crowds on Tuesday?
Shop Monday, July 15, and we will honor
**ALL TUESDAY ONLY SALE** offers!

*Regular price. **Equal or lesser value. *Excludes watches, shoes, rentals, gift cards & Traveler products.



# ALL EXECUTIVE
### DRESS SHIRTS & TIES
## 5 FOR $100
MIX-N-MATCH



# EXTRA 30% OFF
# ALL CLEARANCE

Prices valid 7/16/13, unless otherwise indicated. Some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Regal prices will be slightly higher than Regular size prices. Advertised prices do not include accessories shown. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores or through Catalog or Internet. For store information, visit us at **josbank.com.**



JOS. A.
BANK
ESTABLISHED 1905

Post Office Box 8428
Greensboro, NC 27419-0428

   

josbank.com

Prsrt. Std.
U.S. Postage
PAID
JOS. A. Bank
Clothiers




WEDNESDAY, JULY 31 - SATURDAY, AUGUST 3, 2013. OPEN 8 A.M. - 10 P.M. IN MOST LOCATIONS

# ALL EXECUTIVE
## DRESS SHIRTS & SILK TIES

# 5 FOR $100

## MIX & MATCH

# 50% OFF*
# 4TH ITEM FREE!**

*ALMOST ALL†*
## SPORTSHIRTS, POLOS, SHORTS & PANTS

## MIX & MATCH

*Regular price. **Equal or lesser value. +Excludes Traveler products. Prices valid 7/31/13-8/3/2013 unless otherwise indicated. Some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Regal prices will be slightly higher than Regular size prices. Advertised prices do not include accessories shown. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores or through Catalog or Internet. For store information, visit us at josbank.com.



Post Office Box 8428
Greensboro, NC 27419-0428




josbank.com



Prsrt. Std.
U.S. Postage
PAID
JOS. A. Bank
Clothiers



WE'RE MAKING IT WORK FOR YOU!

THE LUXURY OF OUR
*Signature* SUITS, BLAZERS
& GABARDINE PANTS
AT THE BEST
VALUE PRICES ANYWHERE!

JOS. A. BANK
ESTABLISHED 1905

Prices on this mailer are valid starting Aug. 4, 2013. Big Fit and Regal size prices are like slightly higher than Regular size prices. Advertised prices do not include accessories shown. Offers in #PA mailer not completed on prior purchases and may not be combined with any other offer or coupon. Available only in Corporate Card discount. Not applicable at factory Outlet stores. Not applicable online, and for store information visit JosBank.com.

| | | | |
|---|---|---|---|
| **HUGE SELECTION** **CLEARANCE** | **HUGE SELECTION** **CLEARANCE** | **HUGE SELECTION** **CLEARANCE** | **HUGE SELECTION** **CLEARANCE** |
| Polos & Cotton Casual Pants **$24.98 ea.** Original price $74.50 – $89.50 | Shirts & Ties **$29.98 ea.** Original price $79.50 – $135 | Sportcoats **$138** Original price $450 – $495 | Suits **$178** Original price $395 |

JOS. A. BANK
BANK

Greensboro, NC 27404-5419
First-Class Mail Rate RATE

[icons]

JosBank.com

Presorted
U.S. Postage
**PAID**
Jos. A. Bank
Clothier



## Wardrobe Staple with a Touch of Luxury

### *Signature* BLAZERS

**$225** *now*

- The best comfort & performance at a fantastic value price
- Classic Superfine Worsted 100% Wool
- Lightweight Premier Bemberg® lining provides soft, silky feel & comfort
- Sleeves constructed for the addition of Working Buttonholes for a custom tailored look
- Big/Tall & Regal sizes available at slightly higher prices

---

## J°S. A. BANK

ESTABLISHED 1905

### WORK HARD. AND MAKE IT LOOK EASY.

To take your success to a new level, we are now offering the luxury of our

*Signature*

Suits, Blazers and Gabardine Pants; and we continue to offer the lasting comfort and performance of our famed

TRAVELER

Suits and Dress Shirts

— all at incredible value prices.

josbank.com



# The Most Comfortable Suit You Will Ever Own

## TRAVELER SUITS

### $275 now

- The best comfort & performance at a fantastic value price
- 100% Natural Stretch Wool for refined comfort
- Wrinkle & stain resistant
- Stretch linings for optimal range of movement
- Waistband with self-adjusting stretch for comfort
- 5 interior coat pockets designed for travel
- Traditional, Tailored or Slim Fit styles
- Big/Tall & Regal sizes available at slightly higher prices

# Your Business Wardrobe Essential

## TRAVELER DRESS SHIRTS

### 2 for $95 now

- Our most popular shirts now at a fantastic value price
- All cotton & wrinkle free
- Shrink, fade & pucker resistant
- 47 sizes in exact neck & sleeve lengths
- Extra durable buttons
- Button-down, spread & point collars
- Traditional, Tailored or Slim Fit styles
- Big/Tall sizes available at slightly higher prices



## Professional Style with Ultra-Soft Comfort

*Signature* GABARDINE DRESS PANTS

**2 for $175 now**

- We think this is the best pants value anywhere
- 100% Superfine Wool with an easy drape & superior comfort & luxury
- Pleated or plain front
- Premium cotton pocketing
- Half-lined to the knee
- Button-through back Besom Pocket
- Unfinished bottoms for altering ease to your exact length
- Big/Tall & Regal sizes available at slightly higher prices

## Classic Styling in Luxury You Deserve

*Signature* SUITS

**$325 now**

- We think this is the best fine suit value anywhere
- 100% Luxurious, Superfine Merino Wool for exceptional softness & an uncompromising fit
- Lightweight Premier Bemberg® lining provides soft, silky feel & comfort
- Sleeves constructed for the addition of Working Buttonholes for a custom tailored look (for an additional charge)
- Also available in Suit Separates to mix & match coat & pant sizes for the perfect fit
- Big/Tall & Regal sizes available at slightly higher prices

AUGUST 19 - 20, 2013

HUGE SELECTION OF SUITS & SPORTCOATS

1/2 OFF*

PLUS

# GET BACK
# WHAT YOU SPEND

IN MERCHANDISE**
THROUGHOUT THE STORE

EXAMPLE

Executive Suit Reg. $650, Sale $325.
Get $325 to spend on merchandise**
of your choice throughout the store!



JOS. A. BANK

JOSBANK.COM

*Regular price.  **Regular price, excludes gift cards & resale.



# EXTRA 40% OFF ALL CLEARANCE!

**HUGE SELECTION**

## Suits
CLEARANCE
$178
NOW
**$106.80**
ORIGINAL: $595

**HUGE SELECTION**

## Sportcoats
CLEARANCE
$138
NOW
**$82.80**
ORIGINAL: $450 - $495

**HUGE SELECTION**

## Shirts & Ties
CLEARANCE
$29.98 ea.
NOW
**$17.99**
ORIGINAL: $79.50 - $135

**HUGE SELECTION**

## Polos & Cotton Casual Pants
CLEARANCE
$24.98 ea.
NOW
**$14.99**
ORIGINAL: $79.50 - $89.50

Prices valid 8/19/13-8/20/13; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Regal prices will be slightly higher than Regular size prices. Advertised prices do not include accessories shown. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores or through Catalog or Internet. For store information, visit us at **josbank.com**.

## JOS. A. BANK
ESTABLISHED 1905

Post Office Box 8428
Greensboro, NC 27419-0428

    

josbank.com

Prst. Std.
U.S. Postage
PAID
JOS. A. Bank
Clothiers



# WE'RE MAKING IT WORK FOR YOU SPECIAL VALUE PRICES

## HUGE SELECTION
### SIGNATURE
SUITS

100% LUXURIOUS,
SUPERFINE MERINO WOOL

NOW
3 FOR $800
$325 EACH

## TRAVELER
DRESS SHIRTS & LONG-SLEEVE
SPORTSHIRTS

ALL COTTON. WRINKLE-RESISTANT.
TRADITIONAL &
TAILORED FIT STYLES.

NOW
3 FOR $99
2 FOR $95

## SIGNATURE
DRESS PANTS

PROFESSIONAL STYLE WITH
ULTRA-SOFT COMFORT

NOW
3 FOR $229
2 FOR $175

Prices valid 10/10/13–10/14/13; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Regal prices will be slightly higher than Regular size prices. Advertised prices do not include accessories shown. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores or through Catalog or Internet. For store information, visit us at josbank.com.



JºS. A.
BANK
ESTABLISHED 1905

Post Office Box 8428
Greensboro, NC 27419-0428





josbank.com

Prsrt. Std.
U.S. Postage
PAID
Jos. A. Bank
Clothiers







# SPECIAL VALUE PRICES

## TRAVELER
### SUITS

*TRADITIONAL & TRIMMER FIT STYLES*

2 FOR $500 NOW

## TRAVELER
### DRESS SHIRTS

*ALL COTTON. WRINKLE-RESISTANT. TRADITIONAL & TAILORED FIT STYLES.*

2 FOR $95 NOW

## WE'RE MAKING IT
# WORK FOR YOU

Work hard and make it look easy.



JOS. A. BANK
ESTABLISHED 1905

Post Office Box 8428
Greensboro, NC 27419-0428



josbank.com

Prices valid 10/24/13-10/27/13; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Regal prices will be slightly higher than Regular size prices. Advertised prices do not include accessories shown. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores or through Catalog or Internet. For store information, visit us at josbank.com.



Prsrt. Std.
U.S. Postage
PAID
JOS. A. Bank
Clothiers



*All DOORBUSTERS Available Early*

# FIRST TIME EVER!

**J⁰S. A. BANK** ESTABLISHED 1905

*Preferred Customer Private Preview Day*

## WEDNESDAY, NOV. 27, 2013

NOT AVAILABLE TO THE PUBLIC. YOU MUST HAVE THIS CARD TO RECEIVE THESE PRICES ON WEDNESDAY.

## OVER 30 BLACK FRIDAY DOORBUSTERS!

**INCREDIBLE BLACK FRIDAY PRICES ON YOUR FAVORITE MENSWEAR**

| | REG. | NOW |
|---|---|---|
| **SWEATERS** | | |
| Signature Pima Cotton Sweaters *Entire Stock* | $89.50 - 109.50 | 3 for $60 |
| Joseph Cotton/Cashmere Sweaters *Entire Stock* | $125 | $29.99 |
| Executive Cashmere Sweaters *Entire Stock* | $250 - 295 | $79 |
| **SHIRTS & TIES** | | |
| Traveler Dress Shirts & Sportshirts *Entire Stock* | $87.50 | 3 for $99 |
| Executive Dress Shirts & Sportshirts *Entire Stock* | $59.50 - 87.50 | 3 for $60 |
| Executive Silk Ties *Entire Stock* | $79.50 | 3 for $60 |
| Signature Silk Ties *Entire Stock* | $99.50 | $29.99 |
| **ACCESSORIES** | | |
| Fine Socks *Huge Selection* | $18 - 21 | 3 for $19.99 |
| Cashmere Scarves *Entire Stock* | $120 - 130 | $29.99 |
| Lambskin Leather Gloves *Entire Stock* | $69.50 - 89.50 | $29.99 |
| **SPORTCOATS & PANTS** | | |
| Signature Sportcoats *Entire Stock* | $595 - 695 | $179 |
| Fleece-Rich Wool Sportcoats *Entire Stock* | $450 | $99 |
| Executive Camel Hair Blazers *Entire Stock* | $450 | $99 |
| Executive Dress Pants *Entire Stock* | $185 | $49.99 |
| **OUTERWEAR** | | |
| Merino Wool Topcoats *Entire Stock* | $450 | $99 |
| Executive Wool Peacoats *Entire Stock* | $495 | $99 |
| **SUITS** | | |
| Executive Traditional Fit Wool Suits *Entire Stock* | $650 | $139 |
| Slim Fit Wool Suits *Huge Selection* | $650 | $139 |

SEE STORE ASSOCIATE FOR MORE DOORBUSTERS

**PUBLIC HOURS FOR DOORBUSTERS BEGIN 8 P.M. THURSDAY**
**THURSDAY 8 P.M. – 1 A.M. AND FRIDAY 6 A.M. – 1 P.M. IN MOST STORES.**

# INCREDIBLE VALUE GIFT ITEMS

·········· PRICED RIGHT AND AVAILABLE RIGHT NOW – *Entire Stock* ··········

| | | | |
|---|---|---|---|
| Traveler Wool Sportcoats | $175 ea. | Traveler Cashmere Sweaters | $135-150 ea./2 for $200 |
| Traveler Camel Hair Blazers | $200 ea. | Signature Wool Dress Pants | $105 ea./2 for $175 |
| Signature Wool Blazers | $225 ea. | Traveler Wool Dress Pants | $90 ea./2 for $150 |
| Traveler Wool Suits | $275 ea./2 for $500 | Traveler Cotton Twill Pants | $60 ea./2 for $100 |
| Signature Wool Suits | $325 ea./2 for $600 | Traveler Cotton Long-Sleeve Polos | $40 ea./2 for $70 |

## PUBLIC HOURS FOR DOORBUSTERS BEGIN 8 P.M. THURSDAY

THURSDAY 8 P.M. – 1 A.M. AND FRIDAY 6 A.M. – 1 P.M. IN MOST STORES.

Prices valid 11/27/13-11/29/13 at 1 p.m.; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Regal prices will be slightly higher than Regular size prices. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores. For store information, visit us at josbank.com.

## JOS. A. BANK
ESTABLISHED 1905

Post Office Box 8428
Greensboro, NC 27419-0428



josbank.com


Prst. Std.
U.S. Postage
PAID
JOS. A. Bank
Clothiers



Offers in this mailer valid December 9-19, 2013. Big/Tall and Regal size prices will be slightly higher than Regular size prices. Offers in this mailer not accepted on prior purchases and not applicable at Factory Outlet stores or through Catalog.

JOS. A. BANK
ESTABLISHED 1905

Over 620 stores nationwide.
For a store near you visit josbank.com

JOS. A.
BANK
ESTABLISHED 1905

*A GIFT FOR YOU*

A heritage of fine quality workmanship
and an expert staff of sales professionals. We offer an extensive
selection of beautifully made, classically styled Tailored,
Business Casual, and Casual clothing.

Tailoring is available
on the premises and we're extending our holiday
shopping hours, for your convenience.

# $100 IN GIFT DOLLARS ENCLOSED TO *THANK YOU* FOR YOUR PATRONAGE

*Valid Monday, December 9 through Thursday,
December 19, 2013 only in our retail stores.*

## JUST IN TIME FOR THE HOLIDAYS!

Your Gift Dollars are good on purchases of any regular
or sale price merchandise throughout the store! No exclusions except
gift cards. Save a total of $100 on any purchase of $500 or more!
Must present Gift Dollar certificate to receive discount.

EVERYONE AT JOS. A. BANK WISHES YOU A SAFE AND HAPPY
HOLIDAY SEASON, AND A HAPPY NEW YEAR!




## TWO DAYS ONLY!
### SUPER TUESDAY EVENT
**MONDAY, DEC. 9 & TUESDAY, DEC. 10**
*Open 8 a.m. - 10 p.m. in most stores*

*All Suits*

# BUY 1*
# GET 3**
# FREE



*Everything else*

# BUY 1*
# GET 2**
# FREE

**PLUS, USE THE ENCLOSED GIFT DOLLARS TO**
**SAVE UP TO $100 MORE.**

*Regular price  **Equal or lesser value
+Excludes shoes, rentals, gift cards, Traveler products and some Signature products*



$25 *Gift Dollars*

SAVE $25 OFF ANY PURCHASE OF $125 OR MORE.
SALE OR REGULAR PRICE MERCHANDISE.

Save a total of $100 when you combine all four Gift Dollars.



$25 *Gift Dollars*

SAVE $25 OFF ANY PURCHASE OF $125 OR MORE.
SALE OR REGULAR PRICE MERCHANDISE.

Save a total of $100 when you combine all four Gift Dollars.

$25 *Gift Dollars*

SAVE $25 OFF ANY PURCHASE OF $125 OR MORE.
SALE OR REGULAR PRICE MERCHANDISE.

Save a total of $100 when you combine all four Gift Dollars.



$25 *Gift Dollars*

SAVE $25 OFF ANY PURCHASE OF $125 OR MORE.
SALE OR REGULAR PRICE MERCHANDISE.

Save a total of $100 when you combine all four Gift Dollars.





# NOW *THROUGH* THURSDAY, DEC. 19, 2013

Open 8 a.m. in most stores

## Most Everything+
### IN THE STORE

MIX & MATCH

# BUY1 GET2 FREE

PLUS, for preferred customers only,
visit www.josbank.com/GFY
for Gift Dollars to save an

## EXTRA $100!

$25 *Gift Dollars*

|  | Reg. | Now |
|---|---|---|
| Executive Suit | $650.00 | $650.00 |
| Executive Suit | $650.00 | $0.00 |
| Joseph Slim Fit Suit | $650.00 | $0.00 |
| Total | $1,950.00 | $650.00 |
| 4 Gift Dollars |  | Less $100.00 |
| Final Total |  | $550.00 |

That's a Total Savings of $1,400.00!

+Excludes shoes, rentals, gift cards, Traveler products & some Signature products. *Regular price. **Equal or lesser value. Prices valid NOW-12/19/13; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Regal prices will be slightly higher than Regular size prices. Advertised prices do not include accessories shown. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores. For store information, visit us at josbank.com.

JOS. A. BANK
ESTABLISHED 1905

Post Office Box 8428
Greensboro, NC 27419-0428



josbank.com

Prstt. Std.
U.S. Postage
PAID
JOS. A. Bank Clothiers

**For Preferred Customers Only**

# PRIVATE EVENT
## THURSDAY, FEB. 27

FRIDAY, FEB. 28 *through* SUNDAY, MAR. 2, 2014
OPEN 9 A.M. THURSDAY – SATURDAY IN MOST STORES

**ALL EXECUTIVE, JOSEPH
& SIGNATURE GOLD SUITS**

# BUY 1 SUIT*⁺
# GET 3**⁺ SUITS⁺
# FREE

*Including Slim Fit Styles*

*See back for additional great offers!*



**JOSBANK.COM**

*Regular price. +Excludes clearance suits. **Equal or lesser value.

# ALL SIGNATURE SUITS
## 3 for $799

**ALSO**

# ALL TRAVELER SUITS
## 3 for $649

ALL EXECUTIVE, JOSEPH & SIGNATURE GOLD SUITS

# BUY 1 SUIT* GET 3 SUITS FREE*

### FRIDAY, FEB. 28 *through* SUNDAY, MAR. 2, 2014

*Regular price. +Excludes clearance suits. **Equal or lesser value. Prices valid 2/27/14-3/2/14; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Regal prices will be slightly higher than Regular size prices. Advertised prices do not include accessories shown. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores. For store information, visit us at josbank.com.



Post Office Box 8428
Greensboro, NC 27419-0428






josbank.com

Prsrt. Std.
U.S. Postage
PAID
JOS. A. Bank
Clothiers

**THURSDAY, APRIL 3**
THROUGH
**SATURDAY, APRIL 19, 2014**



JOSBANK.COM

**BUY 1* SUIT+**
**GET 2** SUITS FREE**

+Excludes Traveler & Signature suits.   *Regular price.   **Equal or lesser value.

**INCLUDING TRADITIONAL & SLIM FIT STYLES**



APRIL 3 *through* APRIL 19, 2014

# BUY 1* SUIT+ GET 2** SUITS FREE

APRIL 3 *through* APRIL 6, 2014 ONLY!

## HUGE SELECTION OF SHIRTS+, TIES, PANTS+ AND ACCESSORIES++

# BUY 2* GET 1** FREE

+Excludes Traveler products & some Signature products. ++Excludes shoes. *Regular price. **Equal or lesser value. Prices valid 4/3/14-4/19/14 unless otherwise indicated; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Regal prices will be slightly higher than Regular size prices. Advertised prices do not include accessories shown. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores. For store information, visit us at **josbank.com.**




Post Office Box 8428
Greensboro, NC 27419-0428





josbank.com

Prsrt. Std.
U.S. Postage
PAID
JOS. A. Bank Clothiers





HUGE SELECTION OF SUITS[+]
SLIM FIT • TRADITIONAL FIT • SUMMER SUITS

BUY 1* GET 2**

FREE

MIX & MATCH

PRIVATE SALE: THURSDAY, MAY 8, 2014
FRIDAY, MAY 9 — MONDAY, MAY 26, 2014

JOS. A. BANK

JOSBANK.COM

+Excludes Traveler & Signature Gold suits. *Regular price. **Equal or lesser value.

*SUPREME LUXURY*

FINEST FABRICS IN THE WORLD

**ALMOST ALL⁺**

**SIGNATURE GOLD SUITS**

*$495 NOW*

*WRINKLE FREE*

**TRAVELER DRESS SHIRTS**

IN TRADITIONAL, TAILORED
OR SLIM FIT STYLES

*2 FOR $99 NOW*

⁺Excludes Centocinquanta Collection. Prices valid 5/8/14-5/26/14; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. Big/Tall and Regal prices will be slightly higher than Regular size prices. Advertised prices do not include accessories shown. Offers in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores. For store information, visit us at **josbank.com**.



Post Office Box 8428
Greensboro, NC 27419-0428



josbank.com

Prsrt. Std.
U.S. Postage
PAID
JoS. A. Bank
Clothiers



Offers in this mailer valid June 9-15, 2014, unless otherwise indicated. Big/Tall and Regal size prices will be slightly higher than Regular size prices. Offers in this mailer not accepted on prior purchases and not applicable at Factory Outlet stores or Catalog.

1065250

F01R03-0072723

JoS. A. BANK
ESTABLISHED 1905

Over 630 stores nationwide.
For a store near you, visit josbank.com.

*A SPECIAL*

# GIFT

# $100

IN GIFT DOLLARS
JUST IN TIME FOR
*FATHER'S DAY*

*See inside for details*

JoS. A. BANK
ESTABLISHED 1905

# A HERITAGE OF
# FINE QUALITY WORKMANSHIP
and an expert staff of sales professionals.
We offer an extensive selection of beautifully made, classically
styled Office Wear, Casual Wear and Sportswear.

*Tailoring is available*
on the premises for your convenience.

$100 IN GIFT DOLLARS
ENCLOSED TO SAY *THANK YOU*
FOR YOUR BUSINESS

Your Gift Dollars can be used on the purchase of any sale or regular price
merchandise throughout the store! No exclusions except gift cards.

*Valid Monday, June 9 through
Sunday, June 15, 2014*

*Just in time for*
# Father's Day!

Save a total of $100 on any purchase of $500 or more!
Must present Gift Dollar certificates to receive discount.



**JOS A BANK**

GIFT DOLLARS

VALID JUNE 9-15, 2014

On merchandise only in Jos. A. Bank retail stores.
$25 Gift Dollars per $125 purchase.

May apply a total of $100 Gift Dollars on a purchase of $500 or more. Gift Dollars are not redeemable for cash, and cannot be applied toward gift cards or prior purchases. Not applicable at Factory Outlet stores or through Catalog. Must present Gift Dollar certificate to receive discount.

**JOS A BANK**

GIFT DOLLARS

VALID JUNE 9-15, 2014

On merchandise only in Jos. A. Bank retail stores.
$25 Gift Dollars per $125 purchase.

May apply a total of $100 Gift Dollars on a purchase of $500 or more. Gift Dollars are not redeemable for cash, and cannot be applied toward gift cards or prior purchases. Not applicable at Factory Outlet stores or through Catalog. Must present Gift Dollar certificate to receive discount.

**JOS A BANK**

GIFT DOLLARS

VALID JUNE 9-15, 2014

On merchandise only in Jos. A. Bank retail stores.
$25 Gift Dollars per $125 purchase.

May apply a total of $100 Gift Dollars on a purchase of $500 or more. Gift Dollars are not redeemable for cash, and cannot be applied toward gift cards or prior purchases. Not applicable at Factory Outlet stores or through Catalog. Must present Gift Dollar certificate to receive discount.

**SUPER TUESDAY EVENT**

**TUESDAY, JUNE 10**

Open 9 a.m. – 10 p.m. in most stores

Shop **Monday, June 9**
and we'll honor all SUPER TUESDAY sale offers!

**JOS A BANK**



# JUST IN TIME FOR
# FATHER'S DAY!

**THURSDAY, JUNE 12 – SUNDAY, JUNE 15, 2014**

JOSBANK.COM



## 70% OFF*
VIP polos – camp shirts – shorts



## 50% OFF* Dress Shirts† & Ties
David Leadbetter & Stays Cool sportshirts – polos – pants – shorts



**PLUS, SAVE AN EXTRA $100!**
For Preferred Customers only
visit **www.josbank.com/GFY** for Gift Dollars
(see back for details)

*Regular Price. †Excluding Traveler Dress Shirts.



**GOING ON NOW**

**HUGE SELECTION†**
**SUITS & SPORTCOATS**

**BUY 1 GET 2***
**FREE**

**PLUS, SAVE AN EXTRA $100!**
visit www.josbank.com/GFY
for Gift Dollars

*Save an Extra $25 on a purchase of $125 or more!*
*Save a Total of $100 on a purchase of $500 or more!*

*Regular price. **Equal or lesser value. †Excludes Traveler & Signature Gold Suits, Traveler Sportcoats & select Signature products. Gift Dollars are not redeemable for cash, and cannot be applied toward gift cards. Prices valid 6/12/14 - 6/15/14; however, some items may continue to be offered at the same or other prices. Intermediate price reductions may have been offered. BigTall and Regal prices will be slightly higher than Regular size prices. Advertised prices do not include accessories shown. Offer in this mailer not accepted on prior purchases and may not be combined with any other offer or with a Corporate Card discount. Not applicable at Factory Outlet stores. For store information, visit us at josbank.com.

Prsrt. Std.
U.S. Postage
PAID
Jos. A. Bank
Clothiers

JoS. A. BANK
ESTABLISHED 1905

Post Office Box 8428
Greensboro, NC 27419-0428

    

josbank.com

# EXHIBIT 2

ATTORNEY GENERAL OF THE STATE OF NEW YORK
WESTCHESTER REGIONAL OFFICE
--------------------------------------------------------------------------------X

In the Matter of the

investigation by ELIOT SPITZER,
Attorney General of the State of
New York, of

**JOS. A. BANK CLOTHIERS, INC.**

<div align="right">-----X</div>

<div align="center">

**ASSURANCE OF DISCONTINUANCE
PURSUANT TO EXECUTIVE LAW
SECTION 63, SUBDIVISION 15**

</div>

Pursuant to the provisions of Article 22-A of the General Business Law ("GBL") and

§63 (12) of the Executive Law, **ELIOT SPITZER**, Attorney General of the State of New York,

caused an investigation to be made into the advertisement and retail sale practices of **JOS. A.**

**BANK CLOTHIERS, INC.** (hereinafter "Jos. A. Bank"), and based upon that investigation

makes the following findings:

<div align="center">

**FINDINGS**

</div>

1.      Jos. A. Bank is a Delaware corporation, authorized to do business in New York,

with corporate offices located at 500 Hanover Pike, Hampstead, MD 21074. The company is a

designer, retailer and direct marketer of men's tailored and casual clothing and accessories and

owns and operates two hundred fourteen retail stores nationwide. Jos. A. Bank has operated

stores in the State of New York since at least 1986 and currently operates 12 stores within the

State. In 2003, Jos. A. Bank, a publicly held corporation, had net sales of $299,666,000 and

spent $109,699,000 on sales and marketing. In New York State, Jos. A. Bank had in-store sales

of $17,611,400 in 2003 and spent $1,684,412 on retail marketing.

2      Jos. A. Bank markets its merchandise to consumers through a variety of means including direct mail, email, Internet, print, radio and television advertising, and in-store signage. In its promotional and solicitation material, Jos. A. Bank specifies merchandise that is being offered "on sale" at a discounted price, lower than the stated "regular price."

### Attorney General's Position

3      It is the Attorney General's position that Jos. A. Bank does not actually offer for sale or sell this merchandise at the "regular price." Instead, Jos. A. Bank conducts "sale" after "sale." Because the merchandise is perpetually "on sale," the so-called "sale price" is actually the price at which Jos. A. Bank regularly offers for sale and sells the merchandise.

4.      Less than 1% of all sales of Jos. A. Bank's suits, formal wear, trousers, and blazers were made at the "regular price" during 2003. Indeed, three of the company's best selling items - - the Signature, Executive, and Trio Suits - - have been continually on sale since January 2003, with the exception of just a few days. Out of thousands of these suits that have been sold by Jos. A. Bank since then, only a handful were sold at the "regular price." In addition, only 10% of dress shirts were sold at regular price.

5      Furthermore, each advertised sale is described as being of limited duration, thus creating the false impression that the price will increase back to the "regular price" if a consumer does not make a purchase by the end of the sale. In fact, the price does not increase back to the regular price at the conclusion of a sale, as each "sale" is followed by another one.

6.      For example, between February 25 and July 31, 2004, Jos. A. Bank promoted and

2

advertised that certain merchandise was "on sale" at least 22 times. As a result, with the exception of only a few days, the merchandise was continually "on sale" during that time.

7.     Moreover, to increase a consumer's sense of urgency about the expiration of a sale, many of Jos. A. Bank's advertisements use expressions such as "Final Days", "Final 3 Days", "5-day Spring Sale", etc. In fact, however, there are no "final days" to sales offered by Jos. A. Bank, as the company places merchandise back "on sale" immediately after a given sale ends. And because prices vary during these sales, a consumer who rushes to buy an item before the expiration of a sale may pay more than a consumer who purchases after the deadline when another sale is in effect that offers a lower price.

8.     The following chart sets forth Jos. A. Bank's advertised sales for various merchandise during the period from February 25 - July 31, 2004. It is apparent that the "sales" were nearly constant:

| Start Date of Sale | End Date of Sale | Descriptive Language |
|---|---|---|
| February 25 | February 29 | "Up to 60% off-Million $ Savings Event" |
| March 2 | March 15 | "Bonus Card Sale" |
| March 16 | March 22 | "Half Off Sale" |
| March 23 | March 23 | "Preferred Customer Day! 50% Off Reg. Price All Suits" |
| March 24 | March 29 | "Million Dollar Savings Sale! 50% OFF" |
| March 30 | April 21 | "The BIG $199 SALE" |
| April 22 | April 26 | "5-Day Spring Sale!" |
| April 27 | April 27 | "50% off Elite Customer Event" |
| April 28 | May 1 | **"URGENT NOTICE** 4 DAYS ONLY! **50% OFF"** |
| May 2 | May 17 | "PASSPORT to Savings UP TO $300 OFF!" |
| May 18 | May 24 | "EVERY SUIT IS ON SALE! 50% OFF OR MORE" |
| May 25 | May 25 | "Preferred Customer Day!One Day Only 50% Reg.Price" |
| May 26 | May 31 | "All Suits, Sportcoats & Blazers 50% OFF!" |
| June 1 | June 5 | "Summer Values!" |
| June 6 | June 14 | "Father's Day BONUS CARD *Sale*!" |
| June 15 | June 20 | **"Special Event for E-mail Customers Only!50%Off Orig.Price"** |
| June 21 | June 23 | "A Gift For You!" |

3

| | | |
|---|---|---|
| June 25 | July 5 | "4th of July Sale! Up to 70% OFF!" |
| July 8 | July 12 | **"URGENT NOTICE FOUR DAYS ONLY"** |
| July 14 | July19 | "Midsummer Clearance Sale!" |
| July 22 | July 23 | "Preferred Customer Event-2 Days Only!" |
| July 27 | July 31 | "Express Letter Sale- Up to an Additional 50% off Clearance' |

9.    The Attorney General believes that the promotional material and advertising campaign utilized by Jos. A. Bank  is misleading and deceptive and has the capacity to mislead consumers to believe that they are being offered a discount from the company's regular prices when, in fact, they are not.  By reason of the foregoing, Jos. A. Bank has engaged in conduct that violates (i) GBL §349, which prohibits deceptive business practices, (ii) GBL §350, which prohibits false advertising, and (iii) Part 233 of Title 16 of the Code of Federal Regulations, the FTC's "Guides Against Deceptive Pricing," which prohibits the practice of falsely describing a price as a regular price.

10.    By reason of the foregoing, Jos. A. Bank has also engaged in repeated fraudulent and illegal acts, and demonstrated persistent fraud and illegality in the carrying on, conducting or transaction of business, in violation of Executive Law §63(12).

**Jos. A. Bank's Position**

1    Jos. A. Bank does not believe that it has engaged in any illegal, deceptive, fraudulent or inappropriate business practices.

12.    IT NOW APPEARS that Jos. A. Bank is willing to enter into this Assurance without admitting to the Attorney General's finding or to any violation of law, and that the Attorney General is willing to accept this Assurance pursuant to Executive Law §63(15) in lieu of commencing a statutory proceeding.

4

## PARTIES SUBJECT TO ASSURANCE

IT IS HEREBY AGREED that this Assurance shall extend to Jos. A. Bank, its officers, directors, agents, employees and assignees, and any individual or entity through which Jos. A Bank may now or hereafter act.

## DECEPTIVE ACTS AND PRACTICES PROHIBITED

IT IS FURTHER AGREED that Jos. A. Bank shall not engage in any deceptive acts and practices or false advertising in violation of GBL §§ 349 and 350.

IT IS FURTHER AGREED that Jos. A. Bank shall not advertise, or offer to sell, any item at a "sale" or discount from a purported "regular" or comparably-termed price unless that price is the actual, bona fide price at which the item was openly, actively and regularly offered for sale by Jos. A. Bank, for a reasonably substantial period of time, in the recent, regular course of its business, and not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based.  Compliance with the requirements of 16 C.F.R. 233.1 shall be deemed compliance with the requirements of this section.

IT IS FURTHER AGREED by Jos. A. Bank that it shall comply with all provisions of 16 C.F.R. 233

## MISCELLANEOUS

IT IS FURTHER AGREED that the acceptance of this Assurance by the Attorney General shall not be deemed or construed as an approval by the Attorney General of any of the activities of Jos. A. Bank, and Jos. A. Bank shall not make any representations to the contrary.

5

## PENALTIES AND COSTS

IT IS FURTHER AGREED that Jos. A. Bank shall pay the State of New York at the time of the execution of this Assurance the sum of four hundred and twenty-five thousand dollars ($425,000.00) as civil penalties, and the sum of fifty thousand dollars ($50,000.00) as costs, by certified check for the aggregate sum of four hundred and seventy-five thousand dollars ($475,000.00), delivered to Eliot Spitzer, Attorney General of the State of New York, c/o Yasmin R. Kutty, Assistant Attorney General, 101 East Post Road, White Plains, NY 10601-5008.

## COMPLIANCE REPORT TO THE ATTORNEY GENERAL

IT IS FURTHER AGREED that Jos. A. Bank shall file with the Attorney General, no later than thirty days after executing this Assurance, an affidavit, sworn to by a knowledgeable employee of Jos. A. Bank, demonstrating that it has devised policies and procedures to effect compliance with the terms of this Assurance.

IT IS FURTHER AGREED that Jos. A. Bank shall also file with the Attorney General, no later than one hundred and twenty days after executing this Assurance, an affidavit, sworn to by a knowledgeable employee of Jos. A. Bank, demonstrating that it is operating in full compliance with the terms of this Assurance.

## ENFORCEMENT

IT IS FURTHER AGREED that evidence of a violation of this Assurance shall constitute *prima facie* proof of violation of Executive Law §63(12) in any civil action or proceeding thereafter commenced by the Attorney General.

6

## PRIVATE RIGHTS

IT IS FURTHER AGREED that nothing contained herein shall be construed to deprive

any person, corporation, association or other entity of any private right under the law.

Dated: White Plains, New York
         September _____, 2004

                                          **JOS. A. BANK CLOTHIERS, INC.**

                                          By:_____
                                          R. Neal Black
                                          Executive Vice President
                                          Jos. A. Bank Clothiers, Inc.


                                          **ELIOT SPITZER**
                                          Attorney General of the State of New York

                                          By:_____
                                          Yasmin R. Kutty
                                          Assistant Attorney General
                                          Westchester Regional Office

CORPORATE ACKNOWLEDGMENT

STATE OF MARYLAND
COUNTY OF CARROLL    )ss.

R. Neal Black, being duly sworn, deposes and says:

I am the Executive Vice President of Jos. A. Bank Clothiers, Inc., the respondent described herein, and which executed the foregoing Assurance of Discontinuance.  I have executed the foregoing instrument with the consent and authority of Jos. A. Bank Clothiers, Inc. and those responsible for the acts of said entity duly acknowledge the same.

<div style="margin-left:50%">

_____

R. Neal Black
Executive Vice President
Jos. A. Bank Clothiers, Inc.

</div>

Sworn to before me this____ day
of September, 2004.


_____

Notary Public

8

# EXHIBIT 3

Case 2:16-cv-02786-JAM-AC    Document 1    Filed 11/23/16    Page 147 of 260

10-K 1 josbfy201110-k.htm JOS. A. BANK CLOTHIERS, INC. FISCAL YEAR 2011 FORM 10-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**
**FORM 10-K**

**(Mark One)**

þ   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXHANGE ACT OF 1934**
**For the fiscal year ended January 28, 2012.**

o   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from to .**

**Commission File Number 0-23874**
**JOS. A. BANK CLOTHIERS, INC.**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **36-3189198** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **500 Hanover Pike, Hampstead, MD** | **21074** |
| (Address of principal executive offices) | (Zip Code) |
| Registrant's telephone number, including area code | **(410) 239-2700** |

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $0.01 par value per share | The NASDAQ Global Select Stock Market LLC |

Securities registered pursuant to Section 12(g) of the Act: Rights to purchase units of Series A Junior Participating Preferred Stock

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes o No þ

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes o No þ

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes þ No o

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes þ No o

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§232.405) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. o

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act:

| | |
|---|---|
| Large accelerated filer þ | Accelerated filer o |
| Non-accelerated filer o  (Do not check if a smaller reporting company) | Smaller reporting company o |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act): Yes o No þ

The aggregate market value of the voting and non-voting common equity held by nonaffiliates of the registrant, based upon the closing price of shares of Common Stock on the National Association of Securities Dealers Automated Quotation ("NASDAQ") Global Select Market at July 30, 2011 was approximately $1,004.7 million. The determination of the "affiliate" status for purposes of this report on Form 10-K shall not be deemed a determination as to whether an individual is an "affiliate" of the registrant for any

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 148 of 260

other purposes.

The number of shares of Common Stock outstanding on March 21, 2012 was 27,827,837.

DOCUMENTS INCORPORATED BY REFERENCE: The Company will disclose the information required under Part III, Items 10-14 either by (a) incorporating the information by reference from the Company's definitive proxy statement if filed by May 28, 2012 (the first business day following 120 days from the close of its fiscal year ended January 28, 2012) or (b) filing an amendment to this Form 10-K which contains the required information by May 28, 2012.

# JOS. A. BANK CLOTHIERS, INC. AND SUBSIDIARIES

| | Page No. |
|---|---|
| **PART I** | |
| Item 1. Business | 2 |
| Item 1A. Risk Factors | 11 |
| Item 1B. Unresolved Staff Comments | 18 |
| Item 2. Properties | 18 |
| Item 3. Legal Proceedings | 18 |
| Item 4. Mine Safety Disclosure | 19 |
| **PART II** | |
| Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 19 |
| Item 6. Selected Financial Data | 21 |
| Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | 22 |
| Item 7A. Quantitative and Qualitative Disclosures About Market Risk | 31 |
| Item 8. Financial Statements and Supplementary Data | 31 |
| Item 9. Changes In and Disagreements with Accountants on Accounting and Financial Disclosure | 31 |
| Item 9A. Controls and Procedures | 31 |
| Item 9B. Other Information | 33 |
| **PART III** | |
| Item 10. Directors, Executive Officers and Corporate Governance | 36 |
| Item 11. Executive Compensation | 36 |
| Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 36 |
| Item 13. Certain Relationships and Related Transactions, and Director Independence | 36 |
| Item 14. Principal Accounting Fees and Services | 36 |
| **PART IV** | |
| Item 15. Exhibits, Financial Statement Schedules | 37 |
| Report of Independent Registered Public Accounting Firm | F-1 |
| Consolidated Balance Sheets as of January 29, 2011 and January 28, 2012 | F-2 |
| Consolidated Statements of Income for the Years Ended January 30, 2010, January 29, 2011 and January 28, 2012 | F-3 |
| Consolidated Statements of Stockholders' Equity for the Years Ended January 30, 2010, January 29, 2011 and January 28, 2012 | F-4 |
| Consolidated Statements of Cash Flows for the Years Ended January 30, 2010, January 29, 2011 and January 28, 2012 | F-5 |

**CAUTIONARY STATEMENT FOR PURPOSES OF THE "SAFE HARBOR" PROVISIONS OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND OTHER INFORMATION**

This Annual Report on Form 10-K includes and incorporates by reference certain statements that may be deemed to be forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. The Private Securities Litigation Reform Act of 1995 provides a "safe harbor" for certain forward-looking statements so long as such information is identified as forward-looking and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those projected in the information. When used in this Annual Report on Form 10-K, the words "estimate," "project," "plan," "will," "anticipate," "expect," "intend," "outlook," "may," "believe," "assume," and other similar expressions are intended to identify forward-looking statements and information.

Actual results may differ materially from those forecasted due to a variety of factors outside of our control that can affect our operating results, liquidity and financial condition. Such factors include risks associated with economic, weather, public health and other factors affecting consumer spending, including negative changes to consumer confidence and other recessionary pressures, higher energy and security costs, the successful implementation of our growth strategy, including our ability to finance our expansion plans, the mix and pricing of goods sold, the effectiveness and profitability of new concepts, the market price of key raw materials such as wool and cotton, seasonality, merchandise trends and changing consumer preferences, the effectiveness of our marketing programs, including compliance with relevant legal requirements, the availability of suitable lease sites for new stores, doing business on an international basis, the ability to source product from our global supplier base, legal and regulatory matters and other competitive factors. The identified risk factors and other factors and risks that may affect our business or future financial results are detailed in our filings with the Securities and Exchange Commission, including, but not limited to, those described under Part I, Item 1A. "Risk Factors" and Part II, Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" of this Annual Report. These risks should be carefully reviewed before making any investment decisions. These cautionary statements qualify all of the forward-looking statements we make herein. We cannot assure you that the results or developments anticipated by us will be realized or, even if substantially realized, that those results or developments will result in the expected consequences for us or affect us, our business or our operations in the way we expect. We caution you not to place undue reliance on these forward-looking statements, which speak only as of their respective dates. We do not undertake an obligation to update or revise any forward-looking statements to reflect actual results or changes in our assumptions, estimates or projections.

1

**PART I**

**Item1.**     *BUSINESS.*

**General**

      Jos. A. Bank Clothiers, Inc., a Delaware corporation organized on June 22, 1982 (herein referred to as the "Company," "Jos. A. Bank," "our company," first person pronouns such as "we," "us," or "our," or similar terms), is a nationwide designer, manufacturer, retailer and direct marketer (through stores, catalog call center and Internet) of men's tailored and casual clothing and accessories and is a retailer of tuxedo rental products. We sell substantially all of our products exclusively under the Jos. A. Bank label through 556 retail stores (as of January 28, 2012, which includes 25 Outlet and Factory stores and 15 Franchise stores) located throughout 43 states and the District of Columbia in the United States, as well as through our nationwide catalog call center and Internet (www.josbank.com) operations.

      Our products are targeted at the male career professional and emphasize the Jos. A. Bank brand of high quality tailored and casual clothing and accessories. Our products are offered at "Three Levels of Luxury," which range from the original Jos. A. Bank Executive collection to the more luxurious Jos. A. Bank Signature collection to the exclusive Jos. A. Bank Signature Gold collection. We purchase the majority of our merchandise as finished product, with the manufacturer or supplier responsible for purchasing all components of the product, including fabric (also known as piece goods or raw materials), although we may designate which components to use. We purchase certain of our merchandise (including almost all suit separates and top coats) on a cut, make and trim basis, whereby we supply the piece goods. We source substantially all of our merchandise from suppliers and manufacturers or through buying agents using Jos. A. Bank designs and specifications.

      We operate on a 52-53 week fiscal year ending on the Saturday closest to January 31. The following fiscal years ended or will end on the dates indicated and will be referred to herein by their fiscal year designations:

| | |
|---|---|
| Fiscal year 2005 | January 28, 2006 |
| Fiscal year 2006 | February 3, 2007 |
| Fiscal year 2007 | February 2, 2008 |
| Fiscal year 2008 | January 31, 2009 |
| Fiscal year 2009 | January 30, 2010 |
| Fiscal year 2010 | January 29, 2011 |
| Fiscal year 2011 | January 28, 2012 |
| Fiscal year 2012 | February 2, 2013 |

      Each fiscal year noted above consists of 52 weeks except fiscal years 2006 and 2012, which consist of 53 weeks.

**Strategy**

      The Company, established in 1905, has reinvented itself since 1999 by focusing on its "Four Pillars of Success," which consist of:

1.   Quality;

2.   Service;

3.   Inventory In-stock; and

4.   Product Innovation.

      We instill these four factors into all aspects of our operation and believe they help create a unique specialty retail environment that develops customer loyalty. Examples of our commitment to this strategy include:

- continually increasing the already high level of quality of our products by developing and maintaining stringent design and manufacturing specifications;

- further developing our multi-channel retailing concept by opening more stores and enhancing direct selling through the catalog call center and Internet operations, thus offering multiple convenient channels for customers to shop;

- providing outstanding customer service and emphasizing high levels of inventory fulfillment for our customers;

- expanding our product assortment, including further developing the "Three Levels of Luxury" and continuing to add innovative new products; and

- increasing our product design and development capabilities while eliminating middlemen in the sourcing of our products.

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 153 of 260

2

*The Brand.* Our branding emphasizes very high levels of quality in all aspects of our interactions with customers, including merchandise and service. We have developed very stringent specifications in our product designs to ensure consistency in the fit and quality of our products. The merchandise assortment has "Three Levels of Luxury" and one unwavering level of quality. The "Three Levels of Luxury" range from the original Jos. A. Bank Executive collection to the more luxurious Jos. A. Bank Signature collection to the exclusive Jos. A. Bank Signature Gold collection. Examples of the different levels of luxury include a range of superfine qualities of wool used in suits, sport coats and slacks.

We emphasize customer service in all aspects of our business. Sales associates focus on developing close business relationships with their customers to help serve all of the customers' clothing needs. Inventory availability is a key focus to ensure customers can purchase merchandise when requested, whether in the stores or through the Internet or catalog call center. A tailor is staffed in substantially all Full-line stores to ensure prompt, high-quality alteration services for our customers.

*Multi-Channel Retailing.* Our strategy is to operate our three sales channels as an integrated business and to provide the same personalized service to our customers regardless of whether merchandise is purchased through our stores, the Internet or the catalog call center. We believe the synergy between our stores, the Internet site and the catalog call center offers an important convenience to our customers and a competitive advantage. We leverage the three sales channels by promoting these channels together to create brand awareness. For example, the Internet site can be used by our sales associates to increase the product available to store customers, provide store location listings and can be used as a promotional source for the stores and catalog call center. We also use our catalog to communicate the Jos. A. Bank image, to provide customers with fashion guidance in coordinating outfits and to generate store and Internet traffic.

As a customer convenience, customers may purchase, return or exchange in a store all products that are offered in the catalog and through the Internet.

*Store Growth.* We had 556 stores as of fiscal year-end 2011, which included 516 Company-owned Full-line stores (as defined below under "Segments"), 25 Company-owned Outlet and Factory stores (as defined below under "Segments-Corporate and Other") and 15 stores operated by franchisees ("Franchise stores"). As a result of implementing our store growth plan, we have opened 191 stores in the past five years including 48 new stores in fiscal year 2007, 40 new stores in fiscal year 2008, 14 new stores in fiscal year 2009, 36 new stores in fiscal year 2010, and 53 new stores (including 39 Full-line stores, 13 Factory stores and one Franchise store) in fiscal year 2011. We intend to open new stores primarily in core markets which may allow us to leverage our existing advertising, management, distribution and sourcing infrastructure. We also intend to continue to open new stores in less mature markets such as western states, where we are developing a critical mass of stores to gain leverage.

We plan to open approximately 45 to 50 stores in fiscal year 2012 including approximately 10 Factory stores. Currently, we believe that we can grow the chain to approximately 600 Full-line stores and 50 to 75 Factory stores in the United States, depending on our performance over the next several years and the development of the Factory store concept, among other factors. Based on the results of the stores opened in the past several years and our analysis of the U.S. real estate market, among other factors, we expect to update the estimate of future store opening opportunities sometime in 2012.

*Product Design and Sourcing.* We design and set the specifications for substantially all of our products. The designs are provided to a world-wide vendor base which manufactures to our specifications. In most cases, we have eliminated the middlemen (e.g. importers and resellers) in our sourcing process and contract directly with our manufacturers. We used a buying agent through which we sourced approximately 57% of our total product purchases in fiscal year 2011 and expect to continue this relationship in fiscal year 2012. The primary goal of our product design and sourcing strategies is to get the best possible prices at the high quality levels that we demand.

## Segments

We have two reportable segments: Stores and Direct Marketing. The Stores segment includes all Company-owned stores excluding Outlet and Factory stores ("Full-line stores"). The Direct Marketing segment includes the catalog call center and the Internet. We have included information with regard to these segments for each of our last three fiscal years in Note 12 to our Consolidated Financial Statements.

3

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 155 of 260

*Stores.* The Stores segment consists of 516 Full-line stores. We opened 39 Full-line stores (and closed three stores) in fiscal year 2011 and plan to open approximately 35 to 40 Full-line stores and to close one or more Full-line stores in fiscal year 2012. Our real estate strategy focuses primarily on stores located in high-end, specialty retail centers with the proper co-tenancy that attract customers with demographics that are similar to our target customer. These specialty centers include, but are not limited to, outdoor lifestyle centers, malls and downtown/street front/business districts. As of fiscal year-end 2011, the store mix of the 516 Full-line stores consisted of 168 outdoor lifestyle centers, 84 malls, 64 downtown/street front/business districts and 200 strip centers, power centers or freestanding stores.

Our current store prototype was introduced in March 2001 in Charlottesville, Virginia and has been continually improved. The design emphasizes an open shopping experience that coordinates our successful corporate casual and sportswear with our suits, shirts, ties and other products. The store design is based on the use of wooden fixtures, numerous tables to feature fashion merchandise, carpet and abundant accent lighting and is intended to promote a pleasant and comfortable shopping environment. Approximately 80% of the space in stores that were opened in the last three fiscal years is dedicated to selling activities, with the remainder allocated to stockroom, tailoring and other support areas. The Full-line stores averaged approximately 4,600 square feet at fiscal year-end 2011. The Full-line stores opened in fiscal years 2010 and 2011 averaged approximately 4,200 and 4,350 square feet, respectively.

The cost to open a new store is based primarily on store size and landlord construction allowance. In fiscal year 2011, the average build-out cost for a new Full-line store was approximately $500,000, including leasehold improvements, fixtures, point-of-sale equipment and tailor shop equipment. We expect to be reimbursed by landlords an average of approximately $115,000 of the new store build-out cost for the Full-line stores opened in fiscal year 2011. New stores also require an inventory investment, which varies based on the season in which the store opens. Although amounts vary, in fiscal year 2011, new Full-line store openings required an average initial investment of approximately $325,000. The inventory levels in a new store are typically increased as the store's sales grow.

Substantially all Full-line stores have a tailor shop, which provides a range of tailoring services as a convenience to customers. The stores are designed to utilize Company-owned regional tailor shops which allow the use of smaller tailor shops within each store. These regional facilities receive customers' goods from Full-line stores. The goods are altered at the regional facilities and returned to the selling store for customer pickup. In addition, the store managers and certain additional store staff have been trained to fit tailored clothing for alterations. We guarantee all of the tailoring work performed.

We launched a tuxedo rental initiative late in fiscal year 2009 to a small test group of our Full-line stores and rolled out this new business on a company-wide basis by the end of the second quarter of fiscal year 2010. Fiscal year 2011 was the first full year of operation for this business and to date, we are pleased with its performance. In order to limit our risk and initial investment through the early stages of this business, we have contracted with a national distributor that owns the tuxedo rental inventory. When a customer orders a tuxedo rental from us, we place an order with this national distributor and the product is delivered to our stores, typically within several days of intended use. This distributor charges us for each rental and delivery.

4

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 156 of 260

At January 28, 2012, we had 556 retail stores (consisting of 516 Full-line stores, 25 Outlet and Factory stores and 15 Franchise stores) in 43 states and the District of Columbia. The following table sets forth the stores that were open at that date.

## JOS. A. BANK STORES

| State | Total # Of Stores | State | Total # Of Stores |
|---|---|---|---|
| Alabama [a][b] | 16 | Missouri [b] | 10 |
| Arizona | 7 | Nebraska | 2 |
| Arkansas | 4 | Nevada | 3 |
| California | 30 | New Hampshire | 2 |
| Colorado | 9 | New Jersey [b] | 30 |
| Connecticut | 13 | New Mexico | 1 |
| Delaware | 2 | New York | 25 |
| Florida [b] | 38 | North Carolina [a] | 22 |
| Georgia [a][b] | 25 | Ohio [b] | 23 |
| Idaho | 1 | Oklahoma [b] | 5 |
| Illinois [a] | 31 | Pennsylvania [b] | 30 |
| Indiana | 10 | Rhode Island | 2 |
| Iowa | 3 | South Carolina [a] | 11 |
| Kansas [b] | 5 | South Dakota | 1 |
| Kentucky | 6 | Tennessee [a] | 12 |
| Louisiana [a] | 7 | Texas [b] | 55 |
| Maine [b] | 1 | Utah | 3 |
| Maryland [b] | 22 | Virginia [b] | 26 |
| Massachusetts | 18 | Washington | 5 |
| Michigan | 15 | Washington, D.C. | 5 |
| Minnesota | 7 | West Virginia | 2 |
| Mississippi [a] | 4 | Wisconsin [b] | 7 |
| | | Total | 556 |

————————————

(a) Includes one or more Franchise store(s)

(b) Includes one or more Outlet or Factory store(s)

    *Direct Marketing.* The Direct Marketing segment, consisting of the Internet and catalog call center channels, is a key part of our multi-channel concept. This segment is driven primarily by the Internet channel as the catalog call center channel has declined over time with the increasing popularity of the Internet. In fiscal year 2011, the Direct Marketing segment accounted for approximately 10% of our net sales and recorded a sales increase of 14.7%. The Direct Marketing segment offers potential and existing customers convenience in ordering our merchandise. In fiscal years 2010 and 2011, we distributed approximately 9.6 million and 9.7 million catalogs, respectively.

    The Internet site and the catalog call center offer potential and existing customers an easy way to order the full range of Jos. A. Bank products. They are significant resources used to communicate our high-quality image, provide customers with guidance in coordinating outfits, generate store traffic and provide useful market data on customers. We believe our customers are very confident purchasing traditional business attire through our Internet site and catalog call center, as suits represented approximately 25% of sales in the Direct Marketing segment in fiscal year 2011.

    To make catalog and online shopping as convenient as possible, we maintain a toll-free telephone number accessible 24 hours a day, seven days a week. Catalog call center sales associates can help customers select merchandise and can provide detailed information regarding size, color, fit and other merchandise features. In some cases, sample merchandise is available for catalog call center sales associates to view, thereby allowing them to better assist customers. Merchandise purchased from the catalog call center or online may be returned through any of our stores or by mail.

    We upgraded the existing Internet infrastructure during fiscal year 2009 to meet increasing capacity needs and to add certain

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 157 of 260

features to further enhance the customer shopping experience. The enhanced Internet site has many customer-friendly features such as larger images and product photos with zoom-in functionality that allows fine details to be seen. This site also

5

has advanced product search functionality, such as searching by size, that makes shopping more efficient. In addition, the site accepts alternative forms of payment such as Paypal and Bill Me Later. Customers may request to have their orders shipped to an address of their choice or to any JoS. A. Bank store for convenient pick up. The enhanced site also supports many of the creative promotional and sale events that were previously offered only in our Full-line stores. Since the update, the site has enabled us to be responsive to trends and has thereby afforded us an opportunity to increase sales.

During fiscal year 2010, we launched a new website dedicated exclusively to the products offered under our Big and Tall customer category. As part of this new website, we expanded our product offerings to add or broaden such items as suits and suit separates including portly sizes, dress shirts, extra long ties and sportshirts. During fiscal year 2011 we continued to broaden our Big and Tall product assortment and we expect to expand this assortment further in fiscal year 2012. Also, during fiscal year 2010, we launched a new website dedicated to the products offered under our new Factory store concept.

In fiscal year 2011, we expanded our Internet platform by adding international shipping. We utilize a third-party provider to facilitate the checkout of international orders and to export and deliver the orders to international destinations. Orders may be placed directly by international customers or by U.S. customers who wish to deliver their orders to international addresses. Customers can shop the JoS. A. Bank website in their selected currencies and see their complete order totals, including shipping fees, customs, tariffs and taxes when they check out. The third-party provider manages all aspects of the international order life cycle, including multi-currency pricing and payment processing, landed cost calculation, customs clearance and international logistics.

In addition to expanding our overall product offerings over the Internet channel, these new websites and the international functionality further leverage the e-commerce platform we developed and implemented in fiscal year 2009.

We have experienced strong growth in Internet sales over the past five fiscal years. To help drive Internet traffic, we affiliate with other Internet companies. These affiliates link potential customers from their web platforms to our websites where the customer may ultimately make a purchase. We typically pay a fee to these affiliates based on a percentage of net sales generated by them. At the end of fiscal year 2011, we had approximately 2,300 affiliate arrangements. We expect to continue to pursue affiliate arrangements to help fuel future Internet sales increases.

To process catalog orders, sales associates enter orders online into a computerized catalog order entry system, while Internet orders are placed by the customer and are linked to the same order entry system. After an order is placed, it updates files and permits us to measure the response to individual catalog mailings and Internet email promotions. Computer processing of orders is performed by the warehouse management system which permits orderly picking of inventory from the warehouses. Our order entry and fulfillment systems permit the shipment of most orders no later than the day after the order is placed (assuming the merchandise is in stock). Orders are shipped primarily by ground delivery to arrive at a customer's home in two to five business days or, if requested, by expedited delivery services, typically using United Parcel Service as the delivery company. Sales and inventory information is available to our merchants the day after the sales transaction.

*Corporate and Other*. In addition to the corporate office and the distribution centers, our "Corporate and Other" segment consists of 15 Franchise locations and see these stores below. Generally, a franchise agreement between the Company and the franchisee provides for a ten-year term with an option, exercisable by the franchisee under certain circumstances, to extend the term for an additional ten-year period. Franchisees pay us an initial fixed franchise fee and then a percentage of the net sales. Franchisees are required to maintain and protect our reputation for high quality, classic clothing and customer service. Generally, the franchisees have the rights within certain geographical territories to operate stores, which prohibits us from opening stores within these territories without first giving the franchisees the right of first refusal. We opened one new Franchise store in fiscal year 2011 and do not expect to open a significant number of Franchise stores in the future. Franchisees purchase substantially all merchandise offered for sale in their stores from us at an amount above our cost.

Prior to fiscal year 2010, we had 7 Outlet stores which served to liquidate excess merchandise and offer certain first quality products at a reduced price ("Outlet stores"). During fiscal year 2010, we launched a new Factory store concept initiative to target a unique customer base that we believe has limited overlap with the customer base in our Full-line stores ("Factory stores"). To test the initiative, we opened 5 Factory stores in fiscal year 2010 and 13 Factory stores in fiscal year 2011. New merchandise offerings were developed that cater to this customer's needs. Additionally certain of these product offerings were also introduced into the Outlet stores. The results achieved by the 18 Factory stores opened in fiscal years 2010 and 2011 met our expectations. As a result, we plan to open approximately 10 additional Factory stores in fiscal year 2012. Also, we expect, over time, to convert the 7 Outlet stores to Factory stores. If the stores opened/operated under this new initiative continue to perform to our expectations, we believe there is a long-term opportunity to operate 50 to 75 Factory stores in the U.S.

The Outlet and Factory stores averaged approximately 4,150 square feet at fiscal year-end 2011. The Factory stores opened in fiscal years 2010 and 2011 averaged approximately 4,000 and 3,900 square feet, respectively.

In fiscal year 2011, the average build-out cost for a new Factory store was approximately $340,000, including leasehold improvements, fixtures, point-of-sale equipment and tailor shop equipment. We expect to be reimbursed by landlords an average of approximately $110,000 of the new store build-out cost for the stores opened in fiscal year 2011. These new stores also required an average initial inventory investment of approximately $265,000.

**Merchandising**

We believe that our business fills a niche of providing upscale classic, professional men's clothing with superior quality at a reasonable price. Our merchandising strategy focuses on achieving an updated classic look with extreme attention to detail in quality materials and workmanship. We offer a distinctive collection of clothing and accessories necessary to dress the career man from head to toe, including formal, business, business casual, sportswear and golf apparel, substantially all of which is sold under the Jos. A. Bank label. Our product offerings include tuxedos, suits, shirts, vests, ties, sportcoats, pants, sportswear, overcoats, sweaters, belts and braces, socks and underwear, among other items. We also sell branded shoes from several vendors, representing approximately 3% of total net sales, which are substantially the only products we sell not using the Jos. A. Bank brand.

Our branding emphasizes very high levels of quality in all aspects of our interactions with customers, including merchandise and service. We have developed very stringent specifications in our product designs to ensure consistency in the fit and quality of the product. The merchandise assortment has "Three Levels of Luxury" and one unwavering level of quality. The "Three Levels of Luxury" range from our original Jos. A. Bank Executive collection to the more luxurious Jos. A. Bank Signature collection to the exclusive Jos. A. Bank Signature Gold collection. An example of the different levels of luxury includes a range of superfine qualities of wool used in suits, sport coats and slacks.

We believe that our merchandise offering is well positioned to meet the changing trends of business dress for our target customers. Suits accounted for over 30% of our merchandise sales in fiscal year 2011 and serve as the foundation of our extensive offering of other products. As the corporate work environment trended to casual over the past decade, our product offerings were modified to meet the needs of the Jos. A. Bank customer.

We have many unique products to serve our customers' needs and believe that continued development of innovative products is one of our "Four Pillars of Success." For example, we offer the "Separates" collection, a concept for purchasing suits that allows customers to customize their suits by selecting separate, but perfectly matched, jackets and pants from one of three coat styles, plain front or pleated pants, and numerous updated fabric choices including superfine wool and natural stretch wool. The Separates line allows a customer to buy a suit that will fit his unique body size with minimum alterations, for a custom fit. Jos. A. Bank is one of the few retailers in the country that has successfully developed this concept in better quality suits, which we believe is a competitive advantage.

We also have a very successful line of wrinkle resistant, all cotton dress shirts and sportshirts and in fiscal year 2007 introduced the slimmer cut "Tailored Fit" model to our dress shirt offering. We offer the Vacation-in-Paradise ("VIP") line of casual vacation wear and David Leadbetter golf apparel, which includes sportshirts, sweaters and casual trousers, in our sportswear category.

In fiscal year 2004, we introduced a wrinkle resistant, stain resistant traveler cotton pique polo shirt and machine washable traveler wool pants, as part of our successful "Traveler" collection of products. In late fiscal year 2004, we introduced a wrinkle resistant, stain-resistant suit as part of our Separates collection. The Traveler Suit Separates program is designed to take advantage of our expertise in suit separates with perfectly matched suit coats and pants sold in the customer's size for a better fit. The 100% wool Traveler Suit Separates are stain resistant and made with stretch comfort waist bands and stretch linings and include extra interior pockets. In fiscal year 2007, we also added a selection of wrinkle and stain resistant cashmere sweaters to our line of Traveler products. During fiscal year 2010, we further expanded the Traveler collection with the introduction of a Tailored Fit suit product which offers customers a narrower, more contemporary fit.

In fiscal year 2005, we introduced the "Stays Cool" suit, which features innovative fabrics and linings using a variety of technologies to keep the customer cool and comfortable in a warm climate. We have continued to add products using the "Stays Cool" features during the past several years.

In fiscal year 2010, we introduced the "Classic" collection, a line of products developed exclusively for our new Factory stores. This line of products emphasizes traditional, classic styling at a superior value to the Factory store customer.

Also in fiscal year 2010, with the launch of our new Big and Tall website, we further expanded the Big and Tall product offerings to add or broaden such items as suits and suit separates including portly sizes, dress shirts, extra long ties and sportshirts. Prior to fiscal year 2010, we had certain limited Big and Tall product offerings which included dress shirts and tailored clothing such as suits and suit separates, sportcoats, dress pants and formalwear.

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 162 of 260

Because of the classic character of our merchandise and aggressive store clearance promotions, historically we have been able to sell substantially all of our products through our Full-line stores, catalog call center, Internet site and Outlet and Factory stores and have not been required to sell significant amounts of inventory to third-party liquidators.

## Design and Purchasing

Jos. A. Bank merchandise is designed through the coordinated efforts of our merchandising and planning staff, working in conjunction with suppliers, manufacturers and buying agents around the world. The process of creating a new garment begins up to 18 months before the product's expected in-stock date. Substantially all products are made to our rigorous specifications, thus ensuring consistent fit and feel for the customer. The merchandising staff oversees the development of each product's style, color and fabrication. Our planning staff is responsible for providing each channel of business with the correct amount of products.

We believe that we gain an advantage over many of our competitors in terms of quality and price by designing our tailored and other products, selecting and, in certain cases, purchasing raw materials (finished wool fabric) and then having merchandise manufactured to our own specifications by third party contract manufacturers. Since our designs are focused on updated classic clothing, we expect to experience much less fashion risk than other retailers that offer fashions that change more frequently. Substantially all products manufactured must conform to our rigorous specifications with respect to standardized sizing and quality.

Approximately 2% of the total product purchases (including piece goods) in fiscal year 2011 were sourced from United States suppliers, and approximately 98% were sourced from suppliers in other countries. In fiscal year 2011, approximately 33% of the total product purchases were from suppliers in China (including Hong Kong), 23% in Mexico, 8% in Bangladesh, 8% in Malaysia, 7% in India and 6% in Sri Lanka. Of the remaining 13% of total purchases, no other country represented more than 5% of total product purchases in fiscal year 2011. These percentages reflect the countries where the suppliers are primarily operating or manufacturing, which may not always be where the suppliers are actually domiciled.

We use a single buying agent to source a significant portion of our products from various companies that are located in or near Asia (China, including Hong Kong, Malaysia, Bangladesh, India, Sri Lanka and Indonesia). Purchases through this buying agent represented approximately 57% of the total product purchases in fiscal year 2011. No other buying agent represented more than 5% of total product purchases in fiscal year 2011.

Four individual suppliers each provided over 5% of our product purchases in fiscal year 2011 for a combined total of approximately 38% of our total product purchases. No other supplier represented more than 5% of total product purchases in fiscal year 2011. We buy shirts from leading shirt manufacturers who also supply shirts to many of our competitors.

The total product purchases discussed above include direct purchases of raw materials that are subsequently sent to manufacturers for cutting and sewing. We purchase the raw materials for approximately 9% of our finished products, of which five vendors accounted for approximately 69% of the raw materials purchased directly by us in fiscal year 2011. The remainder of our finished products are purchased as finished units, with the vendor responsible for the acquisition of the raw materials based on our specifications.

We transact substantially all of our business on an order-by-order basis and do not maintain any long-term or exclusive contracts, commitments or arrangements to purchase from any finished goods supplier, piece goods vendor or contract manufacturer. We ordinarily place orders for the purchase of inventory approximately 6 to 12 months in advance.

We have not experienced any significant difficulties as a result of any foreign political, economic or social instabilities. We believe that we have good relationships with our piece goods vendors, finished goods suppliers, contract manufacturers and buying agents and that there will be adequate sources to produce a sufficient supply of quality goods in a timely manner and on satisfactory economic terms, but we cannot make any assurances of such results. We do business with all of our vendors in U.S. currency. As a result, we are affected by the value of the U.S. dollar against the foreign currencies of our suppliers' countries. We attempt to mitigate these risks through aggressive price negotiation and resourcing. A devaluation of the U.S. dollar against these currencies may impact our results as an increase in the cost of goods sold.

## Marketing, Advertising and Promotion

*Strategy.* We have historically used mass media advertising (such as local radio, national cable television and direct mail marketing) and promotional activities in support of our store and catalog call center/Internet operations. We also send email promotions to our store and Internet customers. The basis of each marketing campaign, while primarily promotional, is the identification of the Jos. A. Bank name as synonymous with high quality, upscale, classic clothing offered at a value. We maintain a database of names of people who have previously made a purchase from one of our retail stores, the Internet site or catalog call center or have requested a catalog or other information from us. As of the end of fiscal 2011, we maintain approximately 5.5 million names in this customer database. Of these names, approximately 3.6 million represent individuals who have made such purchases or information requests in the past 24 months, compared to the 3.2 million of such customers as

Case 2:16-cv-02786-JAM-AC    Document 1    Filed 11/23/16    Page 164 of 260

of fiscal year-end 2010. We evaluate our database for our mailings and select names based on expectations of response to specific promotions, which allows us to efficiently use our marketing dollars.

During fiscal year 2004, we began testing national cable television advertising as a method to increase our brand awareness and to drive customers to our stores. We have increasingly expanded our use of television advertising in the past seven years and expect to continue marketing through television advertising in fiscal year 2012.

We employ a "high-low" product pricing strategy and run targeted promotional events throughout the year based on market conditions and customer preferences and demands. As part of the "high-low" strategy, we promote specific items or categories at prices that are below the retail price regularly offered to customers. We also conduct clearance sales throughout the year, especially at the end of each of the two seasons, primarily to manage our seasonal inventory levels.

*Corporate Card Program.* Certain organizations and companies can participate in our corporate card program, through which all of their employees are eligible to receive a 20% discount off regularly-priced Jos. A. Bank merchandise and for whom we develop specific marketing events throughout the year. The card is honored at all Full-line stores, as well as for catalog call center and Internet purchases. At year-end fiscal 2011, over 472,000 companies nationally, from small privately-owned companies to large public companies, were members of the program, representing an increase of approximately 8% over the approximately 439,000 member companies at year-end fiscal 2010. Participating companies are able to promote the card as a free benefit to their employees. As the number of participants in the corporate card program has increased significantly in the past several years, sales to these customers have become a substantial portion of total sales.

*Apparel Incentive Program.* Jos. A. Bank Clothiers apparel incentive gift certificates are used by various companies as a reward for employee achievement or for employee recognition. We also redeem proprietary gift certificates and gift cards marketed by major premium/incentive companies.

## Distribution

We use a centralized distribution system, under which all merchandise is received, processed and distributed through three distribution facilities located in Maryland. Two distribution facilities are located in Hampstead, Maryland (one owned— "DC1" and one leased—"DC2"). The third distribution facility ("DC3") is leased and is located in Eldersburg, Maryland. The facilities are designed to handle different product types. We handle "flat" goods (such as shirts, sweaters, ties, etc.) in DC1 and DC3 and handle primarily "hanging" goods (such as suits, dress pants, coats, etc.) in DC2. DC3 was put into operation during the third quarter of fiscal year 2011. DC1 and DC2 contain corporate office functions as well as distribution center functions and are adjacent to each other. DC3 contains distribution center functions only.

A portion of the merchandise received at the distribution centers is inspected to ensure expected quality in workmanship and conformity to our specifications. The merchandise is then allocated to individual stores or to warehouse stock (to support the Direct Marketing segment and to replenish store inventory as merchandise is sold). Merchandise allocated to stores is then packed for delivery and shipped, principally by common carrier. Each store generally receives a shipment of merchandise one to five times a week from the distribution centers, depending on a store's size or sales volume and the time of the year. Inventory of basic merchandise in stores is replenished regularly based on sales tracked through point-of-sale terminals. Shipments to customers purchasing through the Direct Marketing segment are also made from the central distribution facilities and, less frequently, from stores.

To support new store growth, we have upgraded our distribution centers several times over the past ten years. In late fiscal year 2004, we increased our distribution center capacity by leasing and equipping approximately 289,000 square feet of space in DC2. This second distribution center became fully operational in early fiscal year 2005. With this fiscal year 2005 expansion, the distribution center facilities were designed to support approximately 500 stores plus the Direct Marketing segment. To accommodate our latest plans to expand the store base to approximately 650 to 675 total stores, we added another 126,000 square feet in DC2 in fiscal year 2010, of which 114,000 square feet was dedicated to distribution and 12,000 square feet was dedicated to office space. The expansion in fiscal year 2010 primarily increased our capacity for hanging products. To support our capacity needs for flat products, we added approximately 45,000 square feet of mezzanine space in DC1 during fiscal year 2011 and added DC3. To support our continued growth, we may add additional space in fiscal year 2012 and/or beyond through either lease or acquisition.

9

## Management Information Systems

In fiscal year 1998, we installed and implemented the then-current version of our merchandising, warehouse, sales audit, accounts payable and general ledger system. While several newer updates of this system have been released by the software vendor but not installed, the system meets our current business needs. In fiscal year 1999, we replaced our point-of-sale ("POS") system and upgraded this system in fiscal years 2005 and 2007. In fiscal year 2007, we added a wide-area network to our POS system, which, among other functionality, enables electronic orders to be placed from the stores by a sales associate to our centralized fulfillment center. We outsource to a third party the storage and maintenance of our customer relationship management ("CRM") database. We can access the CRM database which we use to select names for customer promotions. By using these systems, we are able to capture greater customer data and increase our marketing efficiency. We upgraded our proprietary customer database systems in fiscal year 2010 with a new outsourced vendor, which should enable us to enhance the productivity of our customer database.

In fiscal year 2000, we upgraded our catalog call center order processing system to the then-current version, which was again updated in fiscal year 2007. During fiscal year 2009, we upgraded our existing Internet infrastructure in order to meet the increasing capacity needs and to add certain features to further enhance the customer shopping experience. In fiscal year 2010, we expanded our Internet platform to include two additional e-sites: Factory and Big and Tall. The Factory site allows customers to buy Factory goods online, whereas the Big and Tall site allows customers to buy extended-size goods online. In fiscal year 2011, we expanded our Internet platform, by adding international shipping and outsourcing our new mobile site with full checkout functionality.

In fiscal year 2007, we implemented a new system that increased our ability to communicate design specifications to our worldwide vendor base, which replaced a system installed in fiscal year 2003. We also implemented a new financial reporting system in fiscal year 2007. In fiscal year 2004, we developed systems that allow increased management and reporting of pricing elements such as gross margins.

## Competition

We compete primarily with specialty retailers of men's apparel, department stores, Internet retailers and other catalogers engaged in the retail sale of men's apparel and to a lesser degree with other retailers of men's apparel. We are one of only a few national multi-channel retailers focusing exclusively on men's apparel, which we believe provides a competitive edge. We believe that we maintain a competitive position based not only on our ability to offer high quality career clothing at reasonable prices, but also on a broad selection of in-stock merchandise, friendly customer service, convenient locations and product innovation as part of our "Four Pillars of Success." Our competitors, include, among others, Brooks Brothers, Macy's, Lands End, Men's Wearhouse and Nordstrom, as well as local and regional competitors in each store's market. Many of these competitors are considerably larger and have substantially greater financial, marketing and other resources.

## Trademarks

We are the owner or exclusive licensee in the United States of the marks JOS. A. BANK®, JOS. A. BANK V.I.P.®, JOS. A. BANK VACATION IN PARADISE®, VACATION IN PARADISE®, THE MIRACLE COLLECTION® and TRAVELER CREASE® (collectively, the "Jos. A. Bank Marks"). These trademarks are registered in the United States Patent and Trademark Office. A Federal registration is renewable indefinitely if the trademark is still in use at the time of renewal. Our rights in the Jos. A. Bank Marks are a material part of our business. Accordingly, we intend to maintain our use of the Jos. A. Bank Marks. We are not aware of any claims of infringement or other material challenges to our right to use the Jos. A. Bank Marks in the United States.

In addition, we have registered "josbank.com" and various other Internet domain names. We intend to renew our registration of domain names from time to time for the conduct and protection of our e-commerce business.

## Seasonality

Our net sales, net income and inventory levels fluctuate on a seasonal basis and therefore the results for one quarter are not necessarily indicative of the results that may be achieved for a full fiscal year. The increased customer traffic during the holiday season and our increased marketing efforts during this peak selling time have resulted in sales and profits generated during the fourth quarter becoming a larger portion of annual sales and profits as compared to the other three quarters. Seasonality is also impacted by growth as more new stores have historically been opened in the second half of the year. During the fourth quarters of fiscal years 2009, 2010 and 2011, we generated approximately 36%, 37% and 35%, respectively, of our annual net sales and approximately 50%, 48% and 45%, respectively, of our annual net income.

10

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 166 of 260

**Employees**

As of March 21, 2012, we had approximately 5,883 employees, consisting of 4,236 full-time employees and 1,647 part-time employees. Approximately 352 of our employees work in the Hampstead, Maryland tailoring overflow shop and distribution centers, most of whom are represented by the Mid-Atlantic Regional Joint Board, Local 806. Our collective bargaining agreement with the Mid-Atlantic Regional Joint Board, Local 806, which was originally scheduled to expire on February 28, 2012, has been extended to April 30, 2012. The Company is currently negotiating a new collective bargaining agreement with the union. The Company does not anticipate any work disruption during the contract negotiations.

Approximately 98 of our sales associates in New York City and four surrounding New York counties are represented by Local 340, New York New Jersey Regional Joint Board, Workers United. Our most recent collective bargaining agreement covering these employees ends on April 30, 2013.

As there have been no work stoppages in more than 20 years, we believe that relations are good with both of the unions that represent segments of our employees. We also believe that our relations with our non-union employees are good.

**Available Information**

Our principal executive offices are located at 500 Hanover Pike, Hampstead, Maryland 21074. Our telephone number is (410) 239-2700 and our website address is www.josbank.com. We make our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to these reports available on our website free of charge as soon as practicable after they are filed with, or furnished to, the Securities and Exchange Commission ("SEC"). In addition, the public may read and copy any materials filed or furnished by us with the SEC at the SEC's public reference room at 100 F Street, N.E., Washington D.C. 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. Also, the SEC maintains an Internet site (www.sec.gov) that contains reports, proxy and information statements and other information regarding issuers that file electronically.

**Item 1A.   *RISK FACTORS***

You should consider carefully the risks described below, together with the other information contained in this report. If any of the identified risks actually occurs, or is adversely resolved, our consolidated financial statements could be materially adversely impacted in a particular fiscal quarter or year and our business, financial condition and results of operations may suffer materially. As a result, the market price of our common stock could decline and you could lose all or part of your investment in our stock. The risks described below are not the only risks we face. Additional risks and uncertainties, including those not currently known to us or that we currently deem to be immaterial also could materially adversely affect our business, financial condition and results of operations.

*If we are not able to continue profitably opening new stores due to general economic conditions or otherwise, our growth may be adversely affected.*

A significant portion of our growth has resulted and is expected to continue to result from the opening of new stores. The deterioration in the U.S. economic environment, the disruption and significant tightening in the U.S. credit and lending markets and reduced consumer spending, among other things, can slow the development of new shopping malls and retail centers which can restrict our ability to find suitable locations for new stores. We believe that quality real estate opportunities are available in the marketplace, but such economic troubles could lead to adjustments to our expansion program in fiscal year 2012 and beyond. While we believe that we will continue to be able to obtain suitable locations for new stores, negotiate acceptable lease terms, hire qualified personnel and open and operate new stores on a timely and profitable basis, we cannot assure you that we will be able to meet these objectives. As we continue our expansion program, the proposed expansion will place increased demands on our operational, managerial and administrative resources. These increased demands could cause us to operate our business less effectively, which could cause deterioration in our financial performance. The opening of new stores may adversely affect Direct Marketing sales and profits. In addition, the opening of new stores in existing markets may adversely affect sales and profits of established stores in those markets.

The results achieved by our existing stores may not be indicative of longer term performance or the potential market acceptance of stores in other locations. We cannot assure you that any new store that we open will have similar operating results to those of prior stores. New stores commonly take up to five years to reach desired operating levels due to development typically associated with new stores such as growing the customer base, increasing brand awareness and the development of the store's sales team. The failure of the existing or the new stores to perform as predicted could negatively impact our business, financial condition and results of operations.

11

We expect to fund our expansion through use of existing cash, short-term investments and cash flows from operations. However, if we experience limitations on our ability to utilize these sources of liquidity, our performance declines or other factors so dictate, we may slow or discontinue store openings. If we fail to successfully implement our expansion program, our business, financial condition and results of operations could be materially adversely affected.

***We face significant competition and may not be able to maintain or improve our competitive position or profitability.***

The retail apparel business is highly competitive and we expect it to remain so. We compete primarily with specialty retailers of men's apparel, department stores, Internet retailers and other catalogers engaged in the retail sale of men's apparel and to a lesser degree with other retailers of men's apparel. Many of these competitors are much larger than we are and have significantly greater financial, marketing and other resources. In many cases, our primary competitors sell their products in stores that are located in the same shopping malls or retail centers as our stores. In order to better compete, we may need to increase the number of promotional sales, which could reduce our margins and affect our profitability. Moreover, in addition to competing for sales, we compete for favorable site locations and lease terms in shopping malls and retail centers. We believe that our emphasis on classic styles make our business less vulnerable to changes in merchandise trends than many apparel retailers; however, our sales and profitability depend upon the continued demand for our classic styles. We face a variety of competitive challenges including:

- anticipating and quickly responding to changing consumer demands;
- maintaining favorable brand recognition and effectively marketing our products to consumers in several diverse market segments;
- developing innovative, high-quality new products and/or product/brand extensions in sizes, colors and styles that appeal to consumers of varying age groups and tastes;
- competitively pricing our products and achieving value for our customers; and
- providing strong and effective marketing support.

Increased competition or our failure to meet these competitive challenges could result in price reductions, increased marketing expenditures and loss of market share, any of which could have a material adverse effect on our business, financial condition and results of operations.

***Our business is tied to consumer spending for discretionary items and negative changes to consumer confidence and other recessionary pressures brought on by, among other things, general economic conditions, could have an adverse effect on our business.***

Our business is sensitive to a number of factors that influence the levels of consumer spending, including political and economic conditions, consumer confidence and the levels of disposable consumer income which are impacted by consumer debt, interest rates, unemployment levels, changes in financial markets, reductions in personal net worth, residential real estate values, tight credit markets, taxation, and gasoline and energy costs, among other factors. Consumer confidence also may be adversely affected by national and international security concerns such as war, terrorism or the threat of war or terrorism. In addition, because apparel and accessories generally are discretionary purchases, declines in consumer spending patterns may impact us more negatively as a specialty retailer and could have a material adverse effect on our business, financial condition and results of operations.

Ongoing economic problems in the United States have resulted in a high unemployment rate, lower consumer confidence, shortages of consumer credit, recessionary pressures and overall slowing in the growth in the retail sector which may continue to be negatively affected for the foreseeable future. Consumer spending for higher value discretionary items generally declines faster than for other retail purchases during recessionary periods and other periods where disposable income is adversely affected. We cannot assure you that government responses to the disruptions in the financial markets or any stimulus plans will have a positive impact on the current economic situation. If the current unfavorable economic conditions continue, consumer purchases of our merchandise could be adversely affected, which could have a material adverse effect on our business, financial condition and results of operations.

***Tight credit markets may have a negative effect on our business.***

Distress in the financial markets, such as the distress experienced by the United States economy since late fiscal year 2008, may result in diminished liquidity and credit availability, and there can be no assurance that our liquidity will be unaffected by changes in the financial markets and the global economy. In fiscal year 2010, we elected not to renew our credit facility and a tightening of the credit markets could make it more difficult for us to access funds through new credit facilities or through the issuance of our securities.

12

Our immediate cash requirements, which fluctuate daily, are deposited at financial institutions and exceed federally insured limits. If the financial environment causes these financial institutions to become unstable or fail, we may experience losses on these deposit accounts.

***Our cash investment strategies may have a negative effect on our business.***

At present, we invest most of our cash in money market accounts and overnight federally-sponsored agency notes and U.S. Treasury bills with original maturities of 90 days or less. Our short-term investments consist primarily of U.S. Treasury bills with maturities of less than one year. The returns on these investments effectively reflect current market interest rates. As a result, market interest rate changes may negatively impact our net interest income or expense. We may invest in other types of securities such as municipal or corporate debt instruments or other types of potentially higher yielding securities, the value of which could be negatively impacted by changing liquidity conditions, credit rating downgrades, changes in market interest rates or a deterioration of the underlying entities' financial condition, among other factors. As a result, the value or liquidity of our cash/investments could decline and result in a material impairment, which could have a material adverse effect on our financial condition and operating results.

***Our success is dependent on our key personnel and our ability to attract and retain key personnel.***

We believe that we have benefited substantially from the contributions of our senior management team. In addition, our ability to anticipate and effectively respond to changing merchandise trends depends in part on our ability to attract and retain key personnel in our design, merchandising, marketing and other departments. We face intense competition in hiring and retaining these personnel. If we fail to retain and motivate our current personnel and attract new personnel, our business, financial condition and results of operations could be materially adversely affected. Also, the achievement of our expansion plans will depend, in part, on our ability to attract and retain additional qualified personnel as we expand.

***We rely heavily on a limited number of key suppliers, the loss of any of which could cause a significant disruption to our business and negatively affect our business.***

Historically, we have purchased a substantial portion of our products from a limited number of suppliers throughout the world. During fiscal year 2011, approximately 57% of our total product purchases were sourced through a single buying agent and we expect to continue this relationship in fiscal year 2012 and beyond. In addition, four individual suppliers each provided over 5% of our product purchases in fiscal year 2011 for a combined total of approximately 38% of our total product purchases. The loss of this buying agent or any of these key suppliers or any significant interruption in our product supply, such as manufacturing problems or shipping delays, could have an adverse effect on our business due to lost sales, cancellation charges, excessive markdowns or delays in finding alternative sources, and could result in increased costs. In addition, the current economic conditions, including decreased access to credit, may result in financial difficulties leading to restructurings, liquidations and other unfavorable events for industry suppliers. Key vendors may also be affected by natural disasters such as earthquakes, tsunamis and flooding which could adversely impact their operations. These suppliers may not be able to overcome any such difficulties which could lead to interruptions in our product supply and could also lead to increases in the costs that we pay for our products as any surviving suppliers could be in better positions to increase their prices. Although we have not experienced any material disruptions in our sourcing in the past several years, any significant disruption of supply from any of these sources or supplier failures could have a material adverse effect on our business, financial condition and results of operations.

***Our reliance on foreign sources of production exposes us to a number of risks of doing business on an international basis.***

We expect to continue our sourcing from suppliers throughout the world, which may result in additional concentration of our sources. As a result, we face a variety of risks generally associated with doing business in foreign markets and importing merchandise from abroad, including:

- political instability of foreign countries;

- imposition of new legislation or rules relating to imports that may limit the quantity of goods which may be imported into the United States from countries or regions;

- obligations associated with being an importer of record, including monitoring and complying with all legal requirements;

- imposition of duties, taxes and other charges on imports;

- local business practice and political issues, including strikes and other work stoppages and issues relating to compliance with domestic or international labor standards which may result in adverse publicity;

- migration and development of manufacturers, which can affect where our products are or will be produced;

13

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 169 of 260

- potential delays or disruptions in shipping and related pricing impacts, including delays or disruptions due to security considerations;

- volatile fuel supplies and costs; and

- since we transact all business in the U.S. dollar, the devaluation of the U.S. dollar against the foreign currencies of our suppliers' countries could adversely affect our product costs.

Any significant disruption of production from any of these sources could have a material adverse effect on our business, financial condition and results of operations.

***Our business could be adversely affected if the foreign manufacturers of our products do not use acceptable labor practices.***

Our business could be adversely affected if the foreign manufacturers of our products do not use acceptable labor practices. Recent California legislation mandates disclosures with respect to a company's supply chain policies and similar proposed legislation in other jurisdictions reflects a growing attention to this area which may require us to implement additional policies and procedures in the future.

We require the third-party manufacturers of the goods that we sell to operate in compliance with our policies as well as applicable laws and regulations. Our staff , buying agents and an independent testing service periodically visit and audit the operations of a majority of the manufacturers with which we contract for goods. We do not control these manufacturers or their labor practices. The violation of our policies or labor or other laws by these independent manufacturers could interrupt, or otherwise disrupt, the shipment of products. The divergence of an independent manufacturer's labor practices from our policies or those generally accepted as ethical in the United States could damage our reputation, which may result in a decrease in customer traffic to our stores, as well as purchasing through our catalog call center and Internet site or cause us to seek alternative suppliers with higher costs, all of which could adversely affect our sales, net earnings, business, financial condition and results of operations.

***Our business could be adversely affected by increased costs of the raw materials and other resources that are important to our business.***

Our products are manufactured using several key raw materials, including wool and cotton, which are subject to fluctuations in price and availability. The prices for these raw materials can be volatile due to the demand for fabrics, weather conditions, supply conditions, government regulations, economic, climate and other unpredictable factors. We purchase the raw materials for approximately 9% of our finished products. Five vendors accounted for over 69% of the raw materials purchased directly by us in fiscal year 2011. The remainder of our finished products are purchased as finished units, with the vendor responsible for the acquisition of the raw materials. Some of these finished unit vendors purchase raw materials from the same suppliers as us. Changes in raw materials costs, such as wool and cotton, to the vendors or to us may impact the long-term cost of our finished products. The prices on these commodities, as well as other costs in the supply chain, remain volatile and have a significant impact on our product costs which could potentially have a negative impact on our gross profit in fiscal year 2012 and beyond. Other costs such as fuel costs, labor costs and healthcare costs could also have an adverse impact on our vendors' manufacturing costs and on our freight costs, sales and marketing expenses and general and administrative expenses. Any significant fluctuations in price or availability of our raw materials and other resources or any significant increase in the price or decrease in the availability of the raw materials and other resources that are important to our business could have a material adverse impact on our business, financial condition and results of operations.

***Our success depends, in part, on our ability to meet the changing preferences of our customers.***

We must successfully gauge merchandise trends and changing consumer preferences to succeed. Our success is dependent upon our ability to gauge the tastes of our customers and to provide merchandise that satisfies customer demand in a timely manner. The retail clothing business fluctuates according to changes in consumer preferences dictated, in part, by fashion, performance, luxury and seasonality. To the extent the market for our merchandise weakens, whether due to a decrease in demand resulting from the troubled economy or otherwise, sales will be adversely affected and the markdowns required to move the resulting excess inventory will adversely affect our business, financial condition and results of operations.

Fluctuations in the demand for tailored and casual clothing and accessories affect our inventory levels. As our business is seasonal, we must purchase and carry a significant amount of inventory prior to peak selling seasons. We issue purchase orders for the purchase and manufacture of merchandise well in advance of the applicable selling season. As a result, we are vulnerable to demand and pricing shifts and to suboptimal selection and timing of merchandise purchases. In addition, lead times for many of our purchases are long, which may make it more difficult for us to respond rapidly to new or changing merchandise trends or consumer acceptance for our products. As a result, our business, financial condition and results of operations could be materially adversely affected.

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 171 of 260

***Our success depends, in part, on the volume of traffic in the retail centers in which our stores are located and the availability of suitable lease space.***

Many of our stores are located in retail centers where sales are affected in part by the volume of customer traffic. Customer traffic may be adversely affected by the current economic environment and as a result we may experience reduced sales and store closings. In addition, a decline in the desirability of the shopping environment in a retail center, or a decline in the popularity of a retail center among our target consumers, could adversely affect our business, financial condition and results of operations.

Part of our future growth is significantly dependent on our ability to operate stores in desirable locations with capital investment and lease costs that allow us to maintain our profitability. We cannot be sure as to when or whether desirable locations will become available at reasonable costs. In addition, we must be able to renew our existing store leases on terms that meet our financial targets. Our failure to secure favorable locations and lease terms initially, and upon renewal, could result in our loss of market share and could have an adverse effect on our business, financial condition and results of operations.

***Our advertising, marketing and promotional activities are highly regulated.***

Our operations are subject to various federal and state consumer protection laws and regulations related to our advertising, marketing and promotional activities. We continue to be subject to a consent decree entered into in 2004 mandating certain advertising practices relating to sales promotions in the state of New York (the "Existing Assurance"). We received from the New York Office of the Attorney General (the "New York OAG") a letter dated April 25, 2011, requesting certain documents needed to evaluate our compliance with New York state law and the Existing Assurance. By letter dated November 15, 2011, the New York OAG proposed to resolve its investigation by having the Company enter into a new assurance of discontinuance (the "Proposed Assurance") which would, among other things, mandate certain more specific advertising practices relating to sales promotions in the state of New York. We have communicated to the New York OAG our response to the Proposed Assurance. It is possible that any resolution which we may reach with the New York OAG may materially impact our current marketing program. In addition, we have received an investigative demand from the state of Georgia requiring the production of certain items in connection with an investigation being conducted on behalf of the Administrator of the Georgia Fair Business Practices Act.

We endeavor to monitor and comply with all applicable laws and regulations (including the Existing Assurance) to ensure that our advertising, marketing and promotional activities comply with all applicable legal requirements, many of which involve subjective judgments. Any changes in such laws or regulations, or how the laws or regulations are enforced (including our potentially entering into the Proposed Assurance or other action by New York or Georgia), or any failure to comply with such laws or regulations could have a material adverse effect on our business, financial condition and results of operations.

***Our dependence on third party delivery services exposes us to business interruptions and service issues that are beyond our control.***

Our success is impacted by the timely delivery of merchandise from our distribution facilities to our stores and customers. Third party transportation companies deliver substantially all of our merchandise to our stores and our customers. Some of these third parties employ union labor. Disruptions in the delivery of merchandise or work stoppages by employees of any of these third parties could delay the timely delivery of merchandise, which could result in cancelled sales, a loss of loyalty to our brand and excess inventory. We may be required to respond in a number of ways, many of which could decrease our gross profits and net income and our business, financial condition and results of operations could be materially adversely affected.

***Effects of war, terrorism, public health events, natural disasters and other catastrophes.***

War, terrorism, public health events (including severe infectious diseases and insect infestation), natural disasters and other catastrophes (or the threat of any of these) in the United States or elsewhere could damage or disrupt the national or global economy and the sourcing, production, receipt or shipment of our merchandise and could lead to lower customer traffic in our stores. These catastrophes could also disrupt operations in our offices, distribution centers and stores. Any of the foregoing could result in decreased sales that would have a material adverse impact on our business, financial condition and results of operations.

***Our dependence on our three distribution centers (two located in Hampstead, Maryland and one located in Eldersburg, Maryland) exposes us to the risk of a substantial disruption to our business.***

We concentrate the distribution of our products in three distribution centers —DC1 and DC2 (located in Hampstead, Maryland) and DC3 (located in Eldersburg, Maryland). Substantially all of the merchandise that we purchase is shipped directly to these distribution centers, where the merchandise is prepared for shipment to our stores and our customers. If these distribution centers were to shut down or lose significant capacity for any reason, such as due to fire or other catastrophic event or natural disaster, our operations would likely be seriously disrupted. As a result, we could incur longer lead times associated

15

with distributing our products to our stores and customers and significantly higher operating costs during the period prior to and after our reopening or replacing these distribution centers. Although we maintain business interruption and property insurance, we cannot assure you that insurance proceeds, if any, will be sufficient or be timely paid, in the event our distribution centers or systems are shut down for any reason. These shut-downs could result in a material adverse effect on our business, financial condition and results of operations.

***Our business could be adversely affected by increased paper, printing and mailing costs.***

Increases in postal rates, paper costs or printing costs would affect the cost of producing and distributing our catalog and promotional mailings and sales and marketing expenses. We rely on discounts from the basic postal rate structure, such as discounts for bulk mailings and sorting by zip code and carrier routes. The unavailability of these discounts, as well as increases in future paper, printing and postal costs could adversely impact our earnings if we are unable to offset these increases by raising prices or by implementing more efficient printing, mailing, delivery and order fulfillment systems. This could result in a material adverse effect on our business, financial condition and results of operations.

***Our efforts to protect and enforce our intellectual property rights or protect ourselves from the claims of third-parties may not be effective.***

Our trademarks are important to our success and competitive position. We are the owner or exclusive licensee in the United States of the marks JOS. A. BANK®, JOS. A. BANK V.I.P.®, JOS. A. BANK VACATION IN PARADISE®, VACATION IN PARADISE®, THE MIRACLE COLLECTION® and TRAVELER CREASE ®, each of which is registered in the United States Patent and Trademark Office. We are susceptible to others imitating our products and infringing on our intellectual property rights. Imitation or counterfeiting of our products or other infringement of our intellectual property rights could diminish the value of our brands or otherwise adversely affect our revenues. The actions we have taken to establish and protect our trademarks may not be adequate to prevent imitation of our products by others or to prevent others from seeking to invalidate our trademarks or to block sales of our products alleged to be in violation of the trademarks and intellectual property rights of others. In addition, others may assert rights in, or ownership of, our trademarks and other intellectual property rights or in marks that are similar to the marks that we license and we may not be able to successfully resolve these types of conflicts to our satisfaction. In some cases, there may be trademark owners who have prior rights to our marks because the laws of certain foreign countries may not protect intellectual property rights to the same extent as do the laws of the United States. In other cases, there may be holders who have prior rights to similar marks. Our failure to adequately protect and enforce our intellectual property rights or protect ourselves from the claims of third parties could result in a material adverse effect on our business, financial condition and results of operations.

***We are exposed to a number of risks involving the acceptance and processing of credit cards, the occurrence of which could substantially harm our business, financial condition and results of operations.***

Our acceptance of credit cards at our stores and through our catalog call center and Internet channels necessarily involves the gathering and storage of sensitive, personal information regarding our customers. Although we believe our systems are sound, no system is completely invulnerable to attack or loss of data. A loss of such data could subject us to financial and legal risks, as well as diminish our reputation and customer loyalty. Further, our continued ability to accept and process credit cards is dependent, in part, on our contractual relationships with our acquiring bank (i.e. the bank at which we maintain our account for collecting credit card payments from customers) and our credit card processor (i.e. the third party that submits on our behalf credit card transactions to our acquiring bank). Any disruption or change in these contractual relationships could interrupt our business or increase our costs. The occurrence of any of the foregoing risks, or other risks associated with the acceptance and processing of credit cards, could have a material adverse effect on our business, financial condition and results of operations.

***We face a number of risks relating to the maintenance of our information systems and our use and storage of product, consumer and employee information.***

In managing our operations, we rely heavily on computer systems and electronic communications ("Information Systems"), including point-of-sale, retail, financial, sourcing, merchandising, back-up systems and the Internet. Without limiting the generality of the foregoing, the Internet is our primary source of communication for processing sales made in our stores and in our Direct Marketing segment. Our Information Systems include the electronic storage of merchandise, financial, operational, customer, employee and other data. It is critical that we maintain uninterrupted access to and operation of our Information Systems. Our Information Systems may be subject to interruption or damage from a variety of causes, including power outages, computer and communications failures, system capacity constraints, catastrophic events (such as fires, tornadoes and other natural disasters), cyber risks, computer viruses and security breaches. Over time, our Information Systems will require upgrading or replacing. If our Information Systems cease to function properly, are damaged or are subject to unauthorized access, we may suffer interruptions in our operations, be required to make significant investments to fix or replace systems and/or be subject to fines, penalties or lawsuits (and the expense and damage to our reputation or brand associated therewith). In addition, our ability to continue to operate our business without significant interruption in the event of a disaster

or other disruption depends in part on the ability of our Information Systems to operate in accordance with our disaster recovery plan. The realization of any of these risks could have a material adverse effect on our business, financial condition and results of operations.

Our customer information is part of our Information Systems and is therefore subject to all of the risks set forth above. Our customer information is also subject to various governmental and private restrictions. Since our customer information is a critical component of our marketing efforts, any limitation on our ability to collect, maintain or use our customer information could have a material adverse effect on our future marketing activity and therefore could have a material adverse effect on our business, financial condition and results of operations.

***Our business has become increasingly dependent on promotional activity and a strong holiday season.***

Our net sales, net income and inventory levels fluctuate on a seasonal basis and therefore the results for one quarter are not necessarily indicative of the results that may be achieved for a full fiscal year. During the fourth quarters of fiscal years 2009, 2010 and 2011, we generated approximately 36%, 37% and 35%, respectively, of our annual net sales and approximately 50%, 48% and 45%, respectively, of our annual net income, which resulted, in part, from increased customer traffic during the holiday season and our increased marketing efforts during this peak selling time. Any decrease in the effectiveness of our increased promotional activity could adversely affect our sales. The current economic climate, including recessionary pressures, may cause such decreases to net sales. Any reduction in retail traffic in and around our store locations could also adversely affect our sales. Any decrease in sales or margins, especially during the fourth quarter, could have a disproportionate effect on our business, financial condition and results of operations. In addition, major storms could negatively impact our sales and result in a material adverse effect on our business, financial condition and results of operations.

***We will face a number of risks if we pursue growth by acquisitions or other strategic opportunities.***

We may from time to time hold discussions and negotiations regarding strategic opportunities, including with (i) potential investors who express an interest in making an investment in or acquiring us, (ii) potential joint venture partners looking toward the formation of strategic alliances and (iii) companies that represent potential acquisition or investment opportunities. We cannot assure you that any definitive agreement will be reached regarding the foregoing, nor do we believe that any such agreement is necessary to implement successfully our strategic plans. Pursuing growth by acquisitions or other strategic opportunities will expose us to the various risks that arise therefrom, which could result in a material adverse effect on our business, financial condition and results of operations.

***Our stock price has fluctuated substantially in the past and may continue to do so.***

The market price of our common stock has fluctuated substantially in the past and may continue to do so in the future. The following, among other factors, may cause the market price of our common stock to fluctuate:

- Our sales and profitability results and those of others in the retail industry;
- Anticipation regarding our future operating results and those generally operating in the retail industry; and
- Changes in earnings estimates by research analysts.

In addition, the stock market has experienced price and volume fluctuations that have affected the market price of our common stock, as well as that of other companies, including our competitors, and which may be unrelated to our operating performance or the operating performance of these other companies.

***Our charter documents, our Rights Agreement and Delaware law may inhibit a takeover that stockholders may consider favorable.***

Provisions in our restated certificate of incorporation, our amended and restated by-laws, our Rights Agreement and Delaware law could delay or prevent a change of control or change in management that would provide stockholders with a premium to the market price of their common stock. Our Rights Agreement has significant anti-takeover effects by causing substantial dilution to a person or group that attempts to acquire us on terms not approved by our Board of Directors. In addition, the authorization of undesignated preferred stock gives our Board of Directors the ability to issue preferred stock with voting or other rights or preferences that could impede the success of any attempt to change control of the Company. If a change of control or change in management is delayed or prevented, premiums to the market price of our stockholder's common stock may not be realized or the market price of our common stock could decline.

***Rights of our stockholders may be negatively affected if we issue any of the shares of preferred stock which are authorized and available for issuance under our restated certificate of incorporation.***

After giving effect to the authorized but unissued shares of preferred stock designated as Series A Junior Participating

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 176 of 260

Preferred Stock which are reserved for potential issuance pursuant to our Rights Agreement, we have available for issuance 50,000 shares of preferred stock, $1.00 par value per share. Our Board of Directors is authorized to issue any or all of these

17

50,000 shares, in one or more series, without any further action on the part of stockholders. The rights of our stockholders may be negatively affected if we issue a series of preferred stock in the future that has preference over our common stock with respect to the payment of dividends or distribution upon our liquidation, dissolution or winding up.

***Litigation or legal proceedings could expose us to significant liabilities and could divert our management's attention and thus negatively affect our financial results.***

We are subject to various litigation and legal proceedings and claims, including those identified in Part I, Item 3, "Legal Proceedings." Although we intend to defend the identified matters vigorously, we are unable to predict the outcome of these matters. Accordingly, we cannot determine whether our insurance coverage, if any, would be sufficient to cover the costs or potential losses, if any. Regardless of their merit, the legal matters may result in a diversion of our management's attention and resources and could be disruptive to our operations. In addition, costs and potential losses associated with these legal matters could adversely affect our business, financial condition and results of operations.

**Item 1B.**   ***UNRESOLVED STAFF COMMENTS.***

None.

**Item 2.**   ***PROPERTIES.***

We own one facility located in Hampstead, Maryland (DC1), which contains, among other things, our principal executive offices and a distribution center. We lease another facility located in Hampstead, Maryland (DC2) and one facility located in Eldersburg, Maryland (DC3). We believe that our existing facilities are well maintained and in good operating condition. The table below presents certain information relating to our properties as of March 21, 2012:

| Location | Gross Square Feet | Owned/Leased | Primary Function |
|---|---|---|---|
| Hampstead, Maryland (DC1) | 360,000 | Owned | Offices, distribution center, Direct Marketing order and fulfillment and regional tailoring overflow shop |
| Hampstead, Maryland (DC2) | 415,000 | Leased | Offices, distribution center, Direct Marketing order and fulfillment (For 70% of the space, lease expires September 30, 2014, with option to renew through September 30, 2019 and for the remainder 30% of the space, lease expires January 31, 2013 with options to renew through September 30, 2019) |
| Eldersburg, Maryland (DC3) | 121,200 | Leased | Distribution center and fulfillment (Lease expires May 31, 2012 with options to renew through May 31, 2014) |

We also lease three tailoring facilities in Atlanta, Georgia, Kansas City, Kansas and Houston, Texas. In fiscal year 2010, the Atlanta and Houston facilities were relocated and expanded. Additional office space of approximately 3,200 square feet is leased in Florida.

As of January 28, 2012, we had 556 stores (consisting of 516 Full-line stores, 25 Outlet and Factory stores and 15 Franchise stores). All Full-line stores are leased, with the exception of one store which is located on property owned by the Company. The Full-line stores average approximately 4,600 square feet as of fiscal year-end 2011, including selling, storage, tailor shop and service areas. The Full-line stores range in size from approximately 1,400 square feet to approximately 18,900 square feet. In most cases we pay a fixed annual base rent plus a pro rata share of common area maintenance costs, real estate taxes and insurance. Certain store leases require contingent rental fees based on sales in addition to or in the place of annual rental fees. Most our leases provide for an increase in fixed rental payments at various times during the lease term.

**Item 3.**   ***LEGAL PROCEEDINGS***

On March 16, 2012, Neil Holmes, a former employee of the Company, individually and on behalf of all those similarly situated, filed a Complaint against the Company in the Superior Court of California, County of Santa Clara, Case No. 112CV220780 alleging various violations of California wage and labor laws. The Complaint seeks, among other things, certification of the case as a class action, injunctive relief, monetary damages, penalties, restitution, other equitable relief, interest, attorney's fees and costs. We intend to defend this lawsuit vigorously.

In addition to the litigation discussed above, we are a party to routine litigation matters that are incidental to our business. From time to time, additional legal matters in which we may be named as a defendant are expected to arise in the normal course of our business activities.

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 178 of 260

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 179 of 260

The resolution of our litigation matters cannot be accurately predicted and we have not estimated the costs or potential losses, if any, associated with these matters. Accordingly, we cannot determine whether our insurance coverage, if any, would be sufficient to cover such costs or potential losses, if any, and we have not recorded any provision for cost or loss associated with these actions. It is possible that our consolidated financial statements could be materially impacted in a particular fiscal quarter or year by an unfavorable outcome or settlement of any of these actions.

**Item 4.**   *MINE SAFETY DISCLOSURE.*

Not applicable.

## PART II

**Item 5.**   *MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.*

**Market Information**

Our Common Stock is listed on The Nasdaq Global Select Market under the trading symbol "JOSB." The following table sets forth, for the periods indicated, the range of high and low sales prices for the Common Stock, as reported on the Nasdaq Global Select Market.

|  | High | Low |
|---|---|---|
| 1st Quarter fiscal 2012 (through March 21, 2012) | $   55.00 | $   47.31 |

|  | Fiscal Year 2010 | | Fiscal Year 2011 | |
|---|---|---|---|---|
|  | High | Low | High | Low |
| 1st Quarter | $   43.73 | $   26.33 | 53.19 | 41.26 |
| 2nd Quarter | 43.23 | 35.01 | 57.14 | 45.10 |
| 3rd Quarter | 47.36 | 36.40 | 55.86 | 40.46 |
| 4th Quarter | 45.73 | 39.29 | 56.43 | 45.78 |

On March 21, 2012, the closing sale price of the Common Stock was $53.96.

**Holders of Record of Common Stock**

As of March 21, 2012, there were 51 holders of record of our Common Stock.

**Dividend Policy**

We intend to retain our earnings to finance the development and expansion of our business and other strategic opportunities and for working capital purposes, and therefore do not anticipate paying any cash dividends in the foreseeable future. On June 17, 2010, our Board of Directors declared a stock split in the form of a 50% stock dividend which was distributed on August 18, 2010 to stockholders of record as of July 30, 2010. All share and per share amounts of common shares included in this Annual Report on Form 10-K have been adjusted to reflect this stock dividend. We did not declare or pay any cash dividends in fiscal year 2011.

19

**Performance Graph**

The graph below compares changes in the cumulative total stockholder return (change in stock price plus reinvested dividends) for the period from February 2, 2007 through January 27, 2012 of an initial investment of $100 invested in (a) Jos. A. Bank's Common Stock, (b) the Total Return Index for the NASDAQ Stock Market (U.S.) (NASDAQ U.S.) and (c) the Total Return Index for NASDAQ Retail Trade Stocks (NASDAQ Retail). The measurement date for each point on the graph is the last trading day of the fiscal year noted on the horizontal axis. Total Return Index values are provided by NASDAQ and prepared by the Center for Research in Security Prices at the University of Chicago. The stock price performance is not included to forecast or indicate future price performance.



|  | Jos. A. Bank Clothiers, Inc. | Total Return Index NASDAQ Stock Market (U.S.) | Total Return Index NASDAQ Retail Trade Stocks |
|---|---|---|---|
| February 2, 2007 | 100.00 | 100.00 | 100.00 |
| February 1, 2008 | 87.06 | 96.58 | 88.54 |
| January 30, 2009 | 87.73 | 60.33 | 56.94 |
| January 29, 2010 | 133.90 | 88.06 | 84.50 |
| January 28, 2011 | 201.04 | 111.88 | 105.35 |
| January 27, 2012 | 230.32 | 120.02 | 127.60 |

This information shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference in such filing.

20

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 181 of 260

**Item 6.**       *SELECTED FINANCIAL DATA.*

The following selected consolidated financial data as of January 28, 2012 and January 29, 2011 and for the three fiscal years ended January 28, 2012 have been derived from our audited consolidated financial statements and the related notes included elsewhere in this report. The historical consolidated financial data at January 30, 2010, January 31, 2009 and February 2, 2008 and for the fiscal years ended January 31, 2009 and February 2, 2008 have been derived from our audited consolidated financial statements and the related notes that have not been included in this report. All fiscal years, included and not included in these financial statements, end on the Saturday closest to January 31 of the respective year. Fiscal years 2007, 2008, 2009, 2010 and 2011 consisted of 52 weeks. The information should be read in conjunction with the Consolidated Financial Statements and Notes thereto that appear elsewhere in this Annual Report on Form 10-K and Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

|  | Fiscal Year | | | | |
|---|---|---|---|---|---|
|  | 2007 | 2008 | 2009 | 2010 | 2011 |
|  | (In thousands, except per share information and stores) | | | | |
| Consolidated Statements of Income Information: | | | | | |
| Net sales | $ 604,010 | $ 695,908 | $ 770,316 | $ 858,128 | 979,852 |
| Cost of goods sold | 225,364 | 264,954 | 298,193 | 320,585 | 371,577 |
| **Gross profit** | **378,646** | **430,954** | **472,123** | **537,543** | **608,275** |
| Operating expenses: | | | | | |
| Sales and marketing | 242,655 | 277,354 | 293,663 | 326,464 | 372,268 |
| General and administrative | 53,240 | 58,111 | 61,057 | 69,472 | 76,600 |
| Total operating expenses | 295,895 | 335,465 | 354,720 | 395,936 | 448,868 |
| **Operating income** | **82,751** | **95,489** | **117,403** | **141,607** | **159,407** |
| Total other income (expense) | 1,582 | 477 | (20) | 453 | 35 |
| Income before provision for income taxes | 84,333 | 95,966 | 117,383 | 142,060 | 159,442 |
| Provision for income taxes | 34,165 | 37,558 | 46,228 | 56,261 | 61,951 |
| **Net income** | **$ 50,168** | **$ 58,408** | **$ 71,155** | **$ 85,799** | **97,491** |
| Per share information—diluted [(a)]: | | | | | |
| **Net income per share** | **$ 1.82** | **$ 2.11** | **$ 2.56** | **$ 3.08** | **$ 3.49** |
| Diluted weighted average number of shares outstanding [(a)] | **27,630** | **27,668** | **27,785** | **27,851** | **27,961** |
| Consolidated Balance Sheet Information (as of end of fiscal year): | | | | | |
| Cash and cash equivalents | $ 82,082 | $ 122,875 | $ 21,853 | $ 80,979 | 87,230 |
| Short-term investments | — | — | 169,736 | 189,789 | 240,252 |
| Working capital | 187,134 | 246,127 | 323,260 | 408,151 | 500,849 |
| Total assets | 440,098 | 491,366 | 556,364 | 662,037 | 813,612 |
| Revolving and term debt | — | — | — | — | — |
| Total noncurrent liabilities (including debt) | 52,712 | 58,383 | 54,509 | 54,415 | 60,598 |
| Stockholders' equity | 261,165 | 321,813 | 393,310 | 482,676 | 584,934 |
| Capital expenditures | 27,696 | 35,105 | 16,333 | 29,352 | 37,531 |
| Other Data (as of end of fiscal year): | | | | | |
| Number of stores [(b)] | 422 | 460 | 473 | 506 | 556 |

(a) On June 17, 2010, the Company's Board of Directors declared a stock split in the form of a 50% stock dividend which was distributed on August 18, 2010 to stockholders of record as of July 30, 2010. Unless otherwise indicated, all historical weighted average share and per share amounts and all references to the number of common shares elsewhere in the Consolidated Financial Statements, and Notes thereto, have been restated to reflect the stock dividend.

(b) Includes Franchise stores.

Item 7.

Item 7.   *MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.*

The information that follows should be read in conjunction with the Consolidated Financial Statements and Notes thereto that appear elsewhere in this Annual Report on Form 10-K.

On June 17, 2010, our Board of Directors declared a stock split in the form of a 50% stock dividend which was distributed on August 18, 2010 to stockholders of record as of July 30, 2010. All share and per share amounts of common shares included in this Annual Report on Form 10-K have been adjusted to reflect this stock dividend.

**Overview**

Net income in fiscal year 2011 increased 13.6% to approximately $97.5 million, as compared with approximately $85.8 million in fiscal year 2010. The increased earnings in fiscal year 2011 were primarily attributable to:

- 14.2% increase in net sales, driven by a 13.3% increase in the Stores segment sales, which includes the impact of new stores opened, and a 14.7% increase in the Direct Marketing segment sales;

- 7.6% increase in comparable store sales;

- 50 basis point decrease in gross profit margin (gross profit as a percent of net sales) primarily as a result of higher markdowns;

- Sales and marketing costs as a percentage of sales were flat compared to fiscal year 2010 as the sales increases provided leverage on the occupancy costs which are primarily fixed, while advertising and marketing costs increased at a higher growth rate than sales; and

- 30 basis point decrease in general and administrative costs as a percentage of sales driven primarily by the leveraging of corporate compensation (which includes total company performance-based incentive compensation other than commissions) and other corporate overhead costs, partially offset by higher distribution center costs as a percentage of sales.

We had 556 stores as of the end of fiscal year 2011, consisting of 516 Company-owned Full-line Stores, 25 Company-owned Outlet and Factory stores and 15 stores owned and operated by franchisees. In the past five years, we have opened 191 stores. Specifically, there were 48 new stores opened in fiscal year 2007, 40 new stores opened in fiscal year 2008, 14 new stores opened in fiscal year 2009, 36 new stores opened in fiscal year 2010 and 53 new stores opened in fiscal year 2011. The lower number of store openings in fiscal year 2009 compared to the other years was due primarily to the impact of the national economic crisis that occurred during late 2008 and into 2009, which included, but was not limited to, slowed development of malls and retail centers which restricted our ability to find suitable locations for new stores.

We expect to open approximately 45 to 50 stores in fiscal year 2012, including approximately 10 new Factory stores. Currently, we believe that the chain can be grown to approximately 600 Full-line Stores and 50 to 75 Factory stores in the United States, depending on our performance over the next several years and the development of the Factory store concept, among other factors. Based on the results of the stores opened in the past several years and our analysis of the U.S. real estate market, among other factors, we expect to update the estimate of future store opening opportunities sometime in 2012.

Capital expenditures are expected to be approximately $35 million to $38 million in fiscal year 2012, primarily to fund the anticipated opening of approximately 45 to 50 new stores, the renovation and/or relocation of several stores, the expansion and maintenance of our distribution space and the implementation of various systems and infrastructure projects. In addition, these capital expenditures include payments for property, plant and equipment additions accrued at the end of fiscal year 2011 primarily related to stores opened in fiscal year 2011. The capital expenditures include the cost of the construction of leasehold improvements for new stores and the renovation or relocation of several stores, of which approximately $6 million to $7 million is expected to be reimbursed through landlord contributions.

From the end of fiscal year 2010 to the end of fiscal year 2011, inventory increased $71.3 million or 30.6% primarily as a result of the replenishment of units sold in fiscal 2010, new store openings, continued sales growth, higher inventory sourcing costs, a larger buildup of core product inventory levels, unsold cold weather inventory, higher piece goods and increased in-transit inventories. For fiscal year 2012, we expect total inventories to increase at a similar rate as fiscal year 2011 through at least the first half of the year due to new store openings, continued sales growth, higher inventory sourcing costs and carryover of cold weather inventory from fiscal year 2011 due to lower than planned sales as a result of the effects of the warmer winter weather. We are adjusting our future purchases of this cold weather inventory for the third and fourth quarters of fiscal year 2012. As a result, we expect the rate of inventory growth by the end of the year to be approximately 15% to 20%, depending on sales and other factors in

fiscal year 2012.

22

We ended fiscal year 2011 with $327.5 million in cash and cash equivalents and short-term investments and have had no debt outstanding since the end of fiscal year 2007. We generated $91.8 million of cash from operating activities in fiscal year 2011, which included $97.5 million of net income, $26.1 million of depreciation and amortization, a $35.1 million increase in accounts payable and accrued expense, partially offset by a $71.3 million increase in inventory levels. This cash from operating activities funded, among other things, the $37.5 million of capital expenditures.

**Critical Accounting Policies and Estimates**

In preparing the consolidated financial statements, a number of assumptions and estimates are made that, in the judgment of management, are proper in light of existing general economic and company-specific circumstances. For a detailed discussion of the application of these and other accounting policies, see Note 1 to the Consolidated Financial Statements in this Annual Report on Form 10-K.

*Inventory* — We record inventory at the lower of cost or market ("LCM"). Cost is determined using the first-in, first-out method. The estimated market value is based on assumptions for future demand and related pricing. We reduce the carrying value of inventory to net realizable value where cost exceeds estimated selling price less costs of disposal.

Management's sales assumptions regarding sales below cost are based on our experience that most of our inventory is sold through our primary sales channels, with virtually no inventory being liquidated through bulk sales to third parties. Our LCM estimates for inventory that have been made in the past have been very reliable as a significant portion of our sales (approximately two-thirds in fiscal year 2011) are of classic, traditional products that are part of on-going programs and that bear low risk of write-down below cost. These products include items such as navy and gray suits, navy blazers, white and blue dress shirts, etc. To limit the need to sell significant amounts of product below cost, all product categories are closely monitored in an attempt to identify and correct situations in which aging goals have not been, or are reasonably likely to not be, achieved. In addition, our strong gross profit margins enable us to sell substantially all of our products above cost.

To calculate the estimated market value of our inventory, we periodically perform a detailed review of all of our major inventory classes and stock-keeping units and perform an analytical evaluation of aged inventory on a quarterly basis. Semi-annually, we compare the on-hand units and season-to-date unit sales (including actual selling prices) to the sales trend and estimated prices required to sell the units in the future, which enables us to estimate the amount which may have to be sold below cost. Substantially all of the units sold below cost are sold in our Outlet and Factory stores, through the Internet websites and catalog call center or on clearance at the Full-line Stores, typically within 24 months of purchase. Our costs in excess of selling price for units sold below cost totaled approximately $1.2 million, $1.8 million and $1.6 million in fiscal years 2009, 2010 and 2011, respectively. We reduce the carrying amount of our current inventory value for products in inventory that may be sold below cost. If the amount of inventory which is sold below cost differs from the estimate, our inventory valuation adjustment could change.

*Asset Valuation* — Long-lived assets, such as property, plant and equipment subject to depreciation, are reviewed for impairment to determine whether events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to estimated undiscounted future cash flows expected to be generated by the asset. If the carrying amount of an asset exceeds our estimated future cash flows, an impairment charge is recognized in the amount by which the carrying amount of the asset exceeds the estimated fair value of the asset. The asset valuation estimate is principally dependent on our ability to generate profits at both the Company and store levels. These levels are principally driven by the sales and gross profit trends that we closely monitor. While we perform a quarterly review of our long-lived assets to determine if impairment exists, the fourth quarter is typically the most significant quarter to make such a determination since it provides the best indication of performance trends in the individual stores. During fiscal years 2009, 2010 and 2011, we recognized impairment charges of $1.6 million, $1.2 million and $0.3 million, respectively, relating to several stores within our Stores segment. The charges were included in "Sales and marketing" in the Consolidated Statements of Income. The aggregate fair value of the property plant and equipment recorded for the stores impaired in fiscal years 2009, 2010 and 2011 were estimated to be $0.3 million, $0.2 million and $0.3 million, respectively. The fair value measurements related to these assets are considered to fall under level 3 of the fair value hierarchy of ASC 820, "Fair Value Measurements and Disclosures," since the valuations are based on significant unobservable inputs. These valuations are based on discounted cash flow analyses with the significant unobservable inputs being the future projected cash flows which are reflective of our best estimates and the discount rates which we believe are representative of arms-length third-party required rates of return.

23

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 186 of 260

*Lease Accounting* — We use a consistent lease period (generally, the initial non-cancelable lease term plus renewal option periods provided for in the lease that can be reasonably assured) when calculating amortization of leasehold improvements and in determining straight-line rent expense and classification of a lease as either an operating lease or a capital lease. The lease term and straight-line rent expense commence on the date when we take possession and have the right to control the use of the leased premises. Funds received from the lessor intended to reimburse us for the costs of leasehold improvements are recorded as a deferred rent resulting from a lease incentive and are amortized over the lease term as a reduction to rent expense.

While we have taken reasonable care in preparing these estimates and making these judgments, actual results could and probably will differ from the estimates. Management believes any difference in the actual results from the estimates will not have a material effect upon our financial position or results of operations. These estimates, among other things, were discussed by management with our Audit Committee.

*Recently Issued Accounting Standards* — In October 2009, the FASB issued ASU 2009-13, "Multiple-Deliverable Revenue Arrangements" ("ASU 2009-13"). ASU 2009-13 addresses revenue recognition of multiple-element sales arrangements. It establishes a selling price hierarchy for determining the selling price of each product or service, with vendor-specific objective evidence ("VSOE") at the highest level, third-party evidence of VSOE at the intermediate level, and a best estimate at the lowest level. It replaces "fair value" with "selling price" in revenue allocation guidance. It also significantly expands the disclosure requirements for such arrangements. ASU 2009-13 is effective prospectively for sales entered into or materially modified in fiscal years beginning on or after June 15, 2010, with early adoption permitted. The adoption of ASU 2009-13 for fiscal year 2011 did not have a material impact on our consolidated financial statements.

In May 2011, the FASB issued ASU 2011-04, "Fair Value Measurement" ("ASU 2011-04"). ASU 2011-04 is intended to create consistency between GAAP and International Financial Reporting Standards ("IFRS") on the definition of fair value and on the guidance on how to measure fair value and on what to disclose about fair value measurements. ASU 2011-04 will be effective for financial statements issued for fiscal periods beginning after December 15, 2011, with early adoption prohibited for public entities. We are currently evaluating the impact ASU 2011-04 may have on our consolidated financial statements.

*Recently Proposed Amendments to Accounting Standards* — In August 2010, the FASB issued an exposure draft, "Leases" (the "Exposure Draft"), which would replace the existing guidance in ASC 840, "Leases." Under the Exposure Draft, a lessee's rights and obligations under all leases, including existing and new arrangements, would be recognized as assets and liabilities, respectively, on the balance sheet. In July 2011, the FASB decided to issue a revised exposure draft; however, deliberations are still ongoing and the timing of the issuance of the revised exposure draft and the issuance of a final standard are uncertain at this time. If this lease guidance becomes effective on the terms currently proposed by FASB, it will likely have a significant negative impact on our consolidated financial statements. However, as the standard-setting process is still ongoing, we are unable to determine at this time the impact this proposed change in accounting may have on our consolidated financial statements.

## Results of Operations

The following table is derived from our Condensed Consolidated Statements of Income and sets forth, for the periods indicated, the items included in the Condensed Consolidated Statements of Income expressed as a percentage of net sales.

| | Percentage of Net Sales | | |
| | Fiscal Year | | |
| | **2009** | **2010** | **2011** |
|---|---|---|---|
| **Net sales** | **100.0 %** | **100.0%** | **100.0%** |
| Cost of goods sold | 38.7 | 37.4 | **37.9** |
| **Gross profit** | **61.3** | **62.6** | **62.1** |
| Sales and marketing expenses | 38.1 | 38.0 | **38.0** |
| General and administrative expenses | 7.9 | 8.1 | **7.8** |
| Total operating expenses | 46.0 | 46.1 | **45.8** |
| **Operating income** | **15.2** | **16.5** | **16.3** |
| Total other income (expense) | — | 0.1 | — |
| Income before provision for income taxes | 15.2 | 16.6 | **16.3** |
| Provision for income taxes | 6.0 | 6.6 | **6.3** |
| **Net income** | **9.2 %** | **10.0%** | **9.9%** |

**Fiscal Year 2011 Compared to Fiscal Year 2010**

*Net Sales* — Net sales increased 14.2% to $979.9 million in fiscal year 2011, as compared with $858.1 million in fiscal year 2010. The Stores segment sales increased 13.3% in fiscal year 2011 due primarily to a 7.6% increase in comparable Store sales and the opening of 53 new stores (partially offset by the closing of three stores) as shown below. Comparable store sales include merchandise and tuxedo rental sales generated in all Company-owned stores that have been open for at least thirteen full months. The 7.6% increase in comparable store sales in fiscal year 2011 was driven primarily by increased traffic (as measured by number of transactions).

Comparing fiscal year 2011 to fiscal year 2010, Direct Marketing sales increased 14.7%, driven primarily by increases in sales in the Internet channel, which represents the major portion of this reportable segment. The increases in sales in the Internet channel were primarily the result of higher website traffic, partially offset by a lower conversion rate and a lower average order value. The Internet channel also benefited from the new Big and Tall website related to our Big and Tall product offerings which was launched during fiscal year 2010. The segment's sales for fiscal year 2011 were negatively impacted by a decrease in catalog call center sales. The ongoing trend for customers receiving catalogs is to place their orders over the Internet or go to one of our stores rather than place their orders through the call center.

With respect to the major product categories, dress shirts and suits generated strong unit sales increases, while sportswear and other tailored clothing (which includes sportcoats, blazers and dress pants) generated moderate unit sales growth in fiscal year 2011. Sales of the more luxurious Signature and Signature Gold products, which together represented over 30% of total merchandise sales in fiscal year 2011, increased by over 20% as compared to fiscal year 2010. For fiscal year 2011, suits represented over 30% of total merchandise sales. Merchandise sales exclude tailoring, tuxedo rental and franchise fee revenue.

The following table provides information regarding the number of stores opened and closed during fiscal years 2010 and 2011:

| | Fiscal Year 2010 | | Fiscal Year 2011 | |
|---|---|---|---|---|
| | Stores | Square Feet* | Stores | Square Feet* |
| Stores open at the beginning of the year | 473 | 2,131 | 506 | 2,282 |
| Stores opened | 36 | 160 | 53 | 221 |
| Stores closed | (3) | (9) | (3) | (29) |
| Stores open at the end of the year | 506 | 2,282 | 556 | 2,474 |

\* Square feet are presented in thousands and exclude the square footage of our Franchise stores. The square footage of the stores opened include a net increase of 14 square feet in fiscal year 2010 and a net increase of 1 square foot in fiscal year 2011 due to relocations or renovations in several stores.

*Gross profit* — Our gross profit represents net sales less cost of goods sold. Cost of goods sold primarily includes the cost of merchandise, tailoring and freight from vendors to the distribution center and from the distribution center to the stores. This gross profit classification may not be comparable to the classification used by certain other entities. Some entities include distribution (including depreciation), store occupancy, buying and other costs in cost of goods sold. Other entities (including us) exclude such costs from gross profit, including them instead in general and administrative and/or sales and marketing expenses.

Gross profit totaled $608.3 million or 62.1% of net sales in fiscal year 2011, as compared with $537.5 million or 62.6% of net sales in fiscal year 2010, an increase in gross profit dollars of $70.8 million and a decrease in the gross profit margin (gross profit as a percent of net sales) of 50 basis points. The decrease in the gross profit margin was primarily due to higher markdowns as compared to fiscal year 2010, partially offset by higher initial markups. The higher initial markups were driven by retail price increases in certain product categories, partially offset by higher sourcing costs. As stated in this Annual Report on Form 10-K, we are subject to certain risks that may affect our gross profit, including risks of doing business on an international basis, increased costs of raw materials and other resources and changes in economic conditions. We expect to continue to be subject to these gross profit risks in the future. Specifically, with respect to the costs of raw materials, our products are manufactured using several key raw materials, most notably wool and cotton. The prices of these commodities, as well as other costs in the supply chain, remain volatile and have a significant impact on our product costs which could potentially have a negative impact on our gross profit in fiscal year 2012. Additionally, our gross profit margin may be negatively impacted during the development phase of some of our new business initiatives such as the tuxedo rental business and the Factory store concept.

*Sales and Marketing Expenses* — Sales and marketing expenses which consist primarily of a) Full-line Store, Outlet and Factory store and Direct Marketing occupancy, payroll, selling and other variable costs (which include such costs as shipping

costs to customers and credit card processing fees) and b) total Company advertising and marketing expenses. Sales and marketing expenses increased to $372.3 million in fiscal year 2011 from $326.5 million in fiscal year 2010. As a percentage of net sales, sales and marketing expenses was 38.0% for each of fiscal year 2011 and fiscal year 2010. The flat level of costs as a percentage of net sales was driven primarily by the sales increases which provided leverage on the occupancy costs which are primarily fixed. The favorable impact of this leverage was offset by advertising and marketing costs increasing at a higher growth rate than sales due primarily to increased promotional activity and online advertising as compared to last year.

The $45.8 million increase in sales and marketing expenses relates primarily to expanded advertising programs (including increased online and tuxedo rental advertising), expenses supporting the opening of the 53 new stores in fiscal year 2011, a full year of costs from the 36 new stores opened in fiscal year 2010 and higher sales. The cost increases include a) $15.8 million of Stores and Direct Marketing payroll and benefits costs, b) $13.1 million of media advertising, catalog and other marketing costs, c) $9.3 million of occupancy costs, and d) $7.6 million of other variable selling costs, including shipping costs to customers. We expect sales and marketing expenses to increase in fiscal year 2012 primarily as a result of our anticipated opening of 45 to 50 new stores in fiscal year 2012, the full year operation of stores that were opened during fiscal year 2011, an increase in advertising expenditures, driven both by volume and price increases, and costs related to new business initiatives.

*General and Administrative Expenses* — General and administrative expenses ("G&A"), which consist primarily of corporate and distribution center costs, increased $7.1 million in fiscal year 2011 to $76.6 million from $69.5 million in fiscal year 2010. As a percentage of net sales, G&A expenses decreased to 7.8% in fiscal year 2011, as compared with 8.1% in fiscal year 2010. The decrease as a percentage of net sales was driven primarily by the leveraging of corporate compensation (which includes total company performance-based incentive compensation other than commissions) and other corporate overhead costs, partially offset by higher distribution center costs as a percentage of sales.

The net increase in corporate costs of $4.1 million was primarily driven by a) $1.8 million of higher corporate compensation (including total company performance-based incentive compensation other than commissions) and benefits costs, b) $1.9 million of higher other overhead costs, and c) $0.4 million of higher professional fees, including outsourced services. Continued growth in the Stores and Direct Marketing segments may result in further increases in G&A.

Distribution center costs increased $3.0 million in fiscal year 2011, primarily due to a) $2.1 million of higher payroll costs and b) $0.9 million of higher occupancy, supplies, postage and other miscellaneous costs. We expect distribution center costs to increase in fiscal year 2012 as we are expected to process an increasing amount of inventory to support future growth and increased costs related to adding more warehousing space.

*Other Income (Expense)* — Other income (expense) consists solely of net interest income (expense). Net other income (expense) for fiscal year 2011 was less than $0.1 million of net income as compared with $0.5 million of net income for fiscal year 2010. The decline from fiscal year 2010 was due primarily to lower market interest rates in fiscal year 2011 on cash and short-term investments and interest expenses related to tax obligations, partially offset by higher average cash and cash equivalents and short-term investment balances during the fiscal year 2011 period.

*Income Taxes* — The fiscal year 2011 effective income tax rate was 38.9%, as compared with 39.6% for fiscal year 2010. The decrease during fiscal year 2011 was primarily driven by lower state income taxes.

Significant changes to U.S. federal or state income tax rules could occur as part of future legislation. Such changes could influence our future income tax expense and/or the timing of income tax deductions. The impact of such changes on our business operations and financial statements remains uncertain. However, as the possibility of any enactment progresses, we will continue to monitor current developments and assess the potential implications of these tax law changes on our business and consolidated financial statements.

We file a federal income tax return and state and local income tax returns in various jurisdictions. The Internal Revenue Service ("IRS") has audited tax returns through fiscal year 2008, including its examination of the tax returns for fiscal years 2007 and 2008 which was finalized in October 2010. No material adjustments were required to these tax returns as a result of the examination by the IRS. For the years before fiscal year 2008, the majority of our state and local income tax returns are no longer subject to examinations by taxing authorities.

**Fiscal Year 2010 Compared to Fiscal Year 2009**

*Net Sales* — Net sales increased 11.4% to $858.1 million in fiscal year 2010, as compared with $770.3 million in fiscal year 2009. The Stores segment sales increased 9.4% in fiscal year 2010 due primarily to a 7.0% increase in comparable Store sales and the opening of 36 new stores (partially offset by the closing of three stores) as shown below. The 7.0% increase in comparable store sales in fiscal year 2010 was led by increased traffic and higher items per transaction, partially offset by lower dollars per transaction. Comparing fiscal year 2010 to fiscal year 2009, Direct Marketing sales increased 24.4%, driven primarily by increases in sales in the Internet channel, which represents the major portion of this reportable segment. The increases in the Internet channel

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 191 of 260

were primarily the result of higher website traffic. The Internet channel also benefited from the

26

new Big and Tall website related to our Big and Tall product offerings launched during fiscal year 2010. Additionally, the segment's sales for fiscal year 2010 were positively impacted by a slight increase in catalog call center sales.

With respect to the major product categories, dress shirts, other tailored clothing (particularly sportcoats, blazers and dress pants), sportswear and suits all generated strong unit sales increases in fiscal year 2010. Sales of the more luxurious Signature and Signature Gold products, which together represented over 25% of total merchandise sales in fiscal year 2010, increased by over 10% as compared to fiscal year 2009. For fiscal year 2010, suits represented over 30% of total merchandise sales.

The following table provides information regarding the number of stores opened and closed during fiscal years 2009 and 2010:

|  | Fiscal Year 2009 | | Fiscal Year 2010 | |
| --- | --- | --- | --- | --- |
|  | Stores | Square Feet* | Stores | Square Feet* |
| Stores open at the beginning of the year | 460 | 2,091 | 473 | 2,131 |
| Stores opened | 14 | 45 | 36 | 160 |
| Stores closed | (1) | (5) | (3) | (9) |
| Stores open at the end of the year | 473 | 2,131 | 506 | 2,282 |

\*   Square feet are presented in thousands and exclude the square footage of our Franchise stores. The square footage of the stores opened include a net decrease of 11 square feet in fiscal year 2009 and a net increase of 14 square feet in fiscal year 2010 due to relocations or renovations in several stores.

*Gross Profit* — Gross profit totaled $537.5 million or 62.6% of net sales in fiscal year 2010, as compared with $472.1 million or 61.3% of net sales in fiscal year 2009, an increase in gross profit dollars of $65.4 million and an increase in the gross profit margin of 130 basis points. The increases in the gross profit margin were mainly the result of higher initial markups as compared to the prior year period, driven primarily by improved sourcing. The improvement was also due in part to a change in the product mix with a lower proportion of clearance items sold as compared to fiscal year 2009. These increases were partially offset by higher markdowns as a result of increased promotional activity to drive sales, especially during the second half of fiscal year 2010.

*Sales and Marketing Expenses* — Sales and marketing expenses increased to $326.5 million in fiscal year 2010 from $293.7 million in fiscal year 2009. As a percentage of net sales, sales and marketing expenses decreased to 38.0% in fiscal year 2010, as compared with 38.1% in fiscal year 2009. The decrease as a percentage of net sales was driven primarily by the leveraging of occupancy costs and Stores and Direct Marketing payroll and benefits costs achieved primarily through strong sales growth and cost control initiatives. These improvements were partially offset by higher other variable selling costs as a percentage of sales due largely to higher shipping costs to customers driven by the strong Direct Marketing sales and lower shipping cost efficiency and higher advertising and marketing costs as a percentage of sales due primarily to increased promotional activity as compared to fiscal year 2009. The $32.8 million increase in sales and marketing expenses relates primarily to expanded advertising programs, expenses supporting the opening of the 36 new stores in fiscal year 2010, a full year of costs from the 14 new stores opened in fiscal year 2009 and higher sales. The cost increases include a) $11.6 million of other variable selling costs, including shipping costs to customers, b) $8.0 million of media advertising, catalog call center and other marketing costs, c) $7.4 million of Stores and Direct Marketing payroll and benefits costs, and d) $5.8 million of occupancy costs.

*General and Administrative Expenses* — G&A expenses increased $8.4 million in fiscal year 2010 to $69.5 million from $61.1 million in fiscal year 2009. As a percentage of net sales, G&A expenses increased to 8.1% in fiscal year 2010, as compared with 7.9% in fiscal year 2009. The increase as a percentage of net sales was driven primarily by higher other corporate overhead costs and professional fees. The increase in G&A expenses was primarily due to higher total corporate costs, including corporate compensation and benefits costs, taxes and other corporate overhead costs. The net increase in corporate costs of $6.8 million was primarily driven by a) $3.3 million of higher corporate compensation and benefits costs, b) $1.4 million of higher professional fees, including outsourced services, and c) $2.1 million of higher other overhead costs.

Distribution center costs increased $1.6 million in fiscal year 2010, primarily due to a) $0.9 million of higher payroll costs and b) $0.7 million of higher occupancy, supplies, postage and other miscellaneous costs.

*Other Income (Expense)* — Other income (expense) for fiscal year 2010 was $0.5 million of income as compared to less than $0.1 million of expense for fiscal year 2009. The improvement over fiscal year 2009 was due primarily to higher average cash and cash equivalents and short-term investment balances during the fiscal year 2010 period and lower financing fees in fiscal year 2010 due to the expiration of the Company's credit facility in the first quarter of fiscal year 2010.

*Income Taxes* — The fiscal year 2010 effective income tax rate was 39.6%, as compared with 39.4% for fiscal year 2009. The increase during fiscal year 2010 was largely related to higher state income taxes.

**Liquidity and Capital Resources**

Our principal sources of liquidity are our cash from operations, cash and cash equivalents and short-term investments. These sources of liquidity are used for our ongoing cash requirements. During the past several years and through the first quarter of fiscal year 2010, we maintained a $100 million credit facility with a maturity date of April 30, 2010. Based on our then current cash and short-term investment positions, and projected cash needs and market conditions, we elected not to negotiate a renewal or replacement of the credit facility. As a result, the credit facility expired on April 30, 2010 in accordance with its terms.

The following table summarizes our sources and uses of funds as reflected in the Condensed Consolidated Statements of Cash Flows:

|  | Fiscal Year | | |
|  | 2009 | 2010 | 2011 |
| --- | --- | --- | --- |
|  | (In Thousands) | | |
| Cash provided by (used in): |  |  |  |
| Operating activities | $        84,748 | $      106,239 | $      **91,816** |
| Investing activities (Including $169,736, $20,053 and $50,463 of net purchases of short-term investments in fiscal years 2009, 2010 and 2011, respectively) | (186,069) | (49,405) | **(87,994)** |
| Financing activities | 299 | 2,292 | **2,429** |
| Net increase (decrease) in cash and cash equivalents | $      (101,022) | $       59,126 | $        **6,251** |

Our cash and cash equivalents consist primarily of U.S. Treasury bills with original maturities of 90 days or less and overnight federally-sponsored agency notes. Our short-term investments consist of U.S. Treasury bills with remaining maturities of less than one year, excluding investments with original maturities of 90 days or less. Our cash and cash equivalents balance was $87.2 million and our short-term investments were $240.3 million, for a total of $327.5 million at the end of fiscal year 2011, as compared with a cash and cash equivalents balance of $81.0 million and short-term investments of $189.8 million, for a total of $270.8 million at the end of fiscal year 2010. We had no debt outstanding at the end of fiscal years 2011 and 2010 and have had no debt outstanding since the end of fiscal year 2007.

Cash provided by our operating activities of $91.8 million in fiscal year 2011 was primarily the result of net income of $97.5 million and depreciation and amortization and other non-cash items of $40.3 million, partially offset by an increase in net operating working capital and other operating items of $46.0 million. The increase in net operating working capital and other operating items included the following:

- an increase in inventory of $71.3 million primarily as a result of the replenishment of units sold in fiscal 2010, new store openings, continued sales growth, higher inventory sourcing costs, a larger buildup of core product inventory levels, unsold cold weather inventory, higher piece goods and increased in-transit inventories;

- an increase in accounts receivable of $6.4 million due primarily to higher credit card receivables from transactions through American Express, MasterCard and Visa as a result of increased sales near the end of the fiscal year 2011 as compared with the end of fiscal year 2010;

- an increase in prepaid and other assets of $1.4 million due primarily to increases in prepaid rent and landlord contributions as a result of the new store openings during 2011; and

- an increase in accounts payable of $35.2 million due primarily to the increases in inventory and the related timing of payments to vendors.

Accounts payable represent all short-term liabilities for which we have received a vendor invoice prior to the end of the reporting period. Accrued expenses represent all other short-term liabilities related to, among other things, vendors from whom invoices have not been received, employee compensation, federal and state income taxes and unearned gift cards and gift certificates.

Cash used in investing activities of $88.0 million for fiscal year 2011 relates to $37.5 million of payments for capital expenditures, as described below and $50.5 million of net purchases of short-term investments. The capital expenditures in fiscal year 2011 related to the opening of 53 stores, the renovation and/or relocation of several stores, the expansion of our distribution space and the implementation of various systems and infrastructure projects. In addition, capital expenditures for fiscal year 2011 included payments of property, plant and equipment additions accrued at year-end fiscal year 2010 but paid for in fiscal year 2011.

Cash provided by financing activities for fiscal year 2011 of $2.4 million relates primarily to net proceeds from the exercise of stock options (including the related tax benefits).

Cash provided by our operating activities of $106.2 million in fiscal year 2010 was primarily impacted by net income of $85.8 million and depreciation and amortization of $24.5 million and other non-cash items of $5.5 million, partially offset by an increase in net operating working capital and other operating items of $9.6 million. The increase in net operating working capital and other operating items included a) an increase in inventory of $15.0 million related largely to new store openings and our new business initiatives, b) an increase in accounts receivable of $3.7 million due primarily to higher credit card receivables from transactions through American Express, MasterCard and Visa as a result of increased sales near the end of fiscal year 2010 as compared with the end of fiscal year 2009, and c) an increase in prepaid and other assets of $3.5 million due primarily to an increase in landlord contributions as a result of the new store openings during 2010. Partially offsetting these cash outflows were a) an increase in accrued expenses totaling $1.7 million (excluding accrued property, plant and equipment) related primarily to increases in gift cards and certificates payable, accrued advertising and accrued compensation, partially offset by lower accrued income taxes, and b) an increase in accounts payable of $13.3 million due primarily to the timing of payments to vendors. Cash used for investing activities during fiscal year 2010 of $49.4 million relates primarily to payments of $29.4 million for capital expenditures and $20.0 million of net purchases of short-term investments. The capital expenditures in fiscal year 2010 related to the opening of 36 stores, the renovation and/or relocation of several stores, the expansion of our distribution and office space, expenditures related to our regional tailor shops, expenditures related to new business initiatives including tuxedo rentals and Factory stores and the implementation of various systems projects including the development of two new websites under our existing Internet infrastructure. Cash provided by financing activities for fiscal year 2010 of $2.3 million relates primarily to net proceeds from the exercise of stock options (including the related tax benefits).

Cash provided by our operating activities of $84.7 million in fiscal year 2009 was primarily impacted by net income of $71.2 million and depreciation and amortization of $22.4 million, offset by an increase in net operating working capital and other operating items of $8.9 million. The increase in net operating working capital and other operating items included an increase of $9.1 million in inventories due largely to the opening of new stores and a reduction in accounts payable totaling $11.5 million related primarily to the timing of payments to vendors. These cash outflows were partially offset by an increase of $12.1 million in accrued expenses related primarily to higher accrued compensation and accrued income taxes. Cash used for investing activities during fiscal year 2009 of $186.1 million relates primarily to payments for capital expenditures of $16.3 million and $169.7 million of net purchases of short-term investments. The capital expenditures in fiscal year 2009 related to the opening of 14 stores, the renovation and/or relocation of several stores, the replacement of our existing Internet infrastructure and payments for various system initiatives. Cash provided by financing activities for fiscal year 2009 of $0.3 million relates to net proceeds from the exercise of stock options (including the related tax benefits).

For fiscal year 2012, we expect to spend approximately $35 million to $38 million on capital expenditures, primarily to fund the anticipated opening of approximately 45 to 50 new stores, the renovation and/or relocation of several stores, the expansion and maintenance of our distribution space and the implementation of various systems and infrastructure projects. In addition, these capital expenditures include payments for property, plant and equipment additions accrued at the end of fiscal year 2011 primarily related to stores opened in fiscal year 2011.

The capital expenditures include the cost of the construction of leasehold improvements for new stores and several stores to be renovated or relocated, of which approximately $6.0 million to $7.0 million is expected to be reimbursed through landlord contributions. These amounts are typically paid by the landlords after we complete construction and receive the appropriate lien waivers from contractors. For the stores opened, renovated and relocated in fiscal year 2011, we negotiated approximately $6.8 million of landlord contributions. The table below summarizes the landlord contributions that were negotiated and collected related to the stores opened, renovated and relocated in fiscal years 2011 and 2010.

| | Negotiated Amounts | | Amounts Collected in Fiscal Year 2010 | | Amounts Collected in Fiscal Year 2011 | | Amounts Outstanding January 28, 2012 |
|---|---|---|---|---|---|---|---|
| | | | (In Thousands ) | | | | |
| Fiscal Year 2010 Store Openings, Renovations and Relocations (36 Stores) | $ | 5,382 | $ | 2,599 | $ | 2,616 | $ | 167 |
| Fiscal Year 2011 Store Openings, Renovations and Relocations (47 Stores) | | 6,758 | | — | | 3,901 | | 2,857 |
| | $ | 12,140 | $ | 2,599 | $ | 6,517 | $ | 3,024 |

29

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 197 of 260

The majority of the remaining balance of the landlord contributions to be collected for the stores opened and renovated in fiscal year 2011 is expected to be received by the end of fiscal year 2012.

For fiscal year 2012, we expect total inventories to increase at a similar rate as fiscal year 2011 through at least the first half of the year due to new store openings, continued sales growth, higher inventory sourcing costs and carryover of cold weather inventory from fiscal year 2011 due to lower than planned sales as a result of the effects of the warmer winter weather. We are adjusting our future purchases of this cold weather inventory for the third and fourth quarters of fiscal year 2012. As a result, we expect the rate of inventory growth by the end of the year to be approximately 15% to 20%, depending on sales and other factors in fiscal year 2012.

Management believes that our cash from operations, existing cash and cash equivalents and short-term investments will be sufficient to fund our planned capital expenditures and operating expenses through at least the next 12 months.

*Off-Balance Sheet Arrangements* — We have no off-balance sheet arrangements other than our operating lease agreements.

**Effects of Inflation and Changing Prices**

Inflation and changing prices could have a material adverse impact on our operations, financial condition and results of operations, especially with respect to our product costs which are largely driven by cotton and wool prices and other production inputs such as labor costs which are largely tied to the labor markets and economies of the various countries in which our vendors are located. In general, we will attempt, over time, to increase prices to largely counteract the increasing costs due to inflation. However there is no assurance that our customers will accept such higher prices, especially over a short-term period.

**Disclosures about Contractual Obligations and Commercial Commitments**

Our principal commitments are non-cancellable operating leases in connection with our retail stores, certain tailoring facilities and equipment and inventory purchase commitments. Under the terms of certain of the retail store leases, we are required to pay a base annual rent, plus a contingent amount based on sales ("contingent rent"). In addition, many of these leases include scheduled rent increases. Base annual rent and scheduled rent increases are included in the contractual obligations table below for operating leases, as these are the only rent-related commitments that are determinable at this time.

The following table reflects a summary of our contractual cash obligations and other commercial commitments as of January 28, 2012:

| Contractual Obligations and Commercial Commitments | Payments Due by Fiscal Year | | | | |
|---|---|---|---|---|---|
| | 2012 | 2013-2015 | 2016-2017 | Beyond 2017 | Total[(g)] |
| | (In thousands) | | | | |
| Operating lease obligations [(a) (b)] | $ 68,989 | $ 166,789 | $ 68,408 | $ 63,414 | $ 367,600 |
| Inventory purchase commitments [(c)] | 399,027 | — | — | — | 399,027 |
| Related party agreement [(d)] | 825 | 825 | — | — | 1,650 |
| License agreement [(e) (f)] | 165 | 495 | — | — | 660 |
| Total | 469,006 | 168,109 | 68,408 | 63,414 | 768,937 |

(a)    Includes various lease agreements signed prior to January 28, 2012 for stores to be opened and equipment placed in service subsequent to January 28, 2012. (See Note 9 to the Consolidated Financial Statements).

(b)    Excludes contingent rent and other lease costs.

(c)    Represents the value of expected future inventory purchases for receipts through the end of fiscal year 2012 for which purchase orders have been issued or other commitments have been made to vendors as of January 28, 2012.

(d)    Relates to consulting agreement with our current Chairman of the Board to consult on matters of strategic planning and initiatives (See Note 13 in the Consolidated Financial Statements).

(e)    Relates to an agreement with David Leadbetter, a golf professional, which allows us to produce golf and other apparel under his name.

(f)    Excludes sales and royalties, which are not determinable at this time.

Case 2:16-cv-02786-JAM-AC    Document 1    Filed 11/23/16    Page 199 of 260

(g)      Obligations related to unrecognized tax benefits and related penalties and interest of $0.6 million have been excluded from the above table as the amount to be settled in cash and the specific payment dates are not known.

<div align="center">30</div>

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 200 of 260

**Item 7A.**   *QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.*

At fiscal year-end 2011, we were not a party to any derivative financial instruments. We do business with all of our product vendors in U.S. currency and we do not have direct foreign currency risk. However, a devaluation of the U.S. dollar against the foreign currencies of our suppliers could have a material adverse effect on our product costs and resulting gross profit. We currently invest substantially all of our excess cash in short-term investments, primarily in U.S. Treasury bills with original maturities of less than one year, overnight federally-sponsored agency notes and money market accounts, where returns effectively reflect current interest rates. As a result, market interest rate changes may impact our net interest income or expense. The impact will depend on variables such as the magnitude of rate changes and the level of excess cash balances. A 100 basis point change in interest rates would have changed net interest income by approximately $2.8 million in fiscal year 2011.

**Item 8.**   *FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.*

Refer to pages F-1 to F-20 of this Annual Report on Form 10-K, which are incorporated herein by reference.

**Item 9.**   *CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.*

None.

**Item 9A.**   *CONTROLS AND PROCEDURES.*

**Disclosure Controls and Procedures and Changes in Internal Control Over Financial Reporting**

*Limitations on Control Systems* — Because of their inherent limitations, disclosure controls and procedures and internal control over financial reporting (collectively, "Control Systems") may not prevent or detect all failures or misstatements of the type sought to be avoided by Control Systems. Also, projections of any evaluation of the effectiveness of our Control Systems to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. Management, including our Chief Executive Officer (the "CEO") and Chief Financial Officer (the "CFO"), does not expect that our Control Systems will prevent all errors or all fraud. A Control System, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the Control System are met. Further, the design of a Control System must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all Control Systems, no evaluation can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been detected. Reports by management, including the CEO and CFO, on the effectiveness of our Control Systems express only reasonable assurance of the conclusions reached.

*Disclosure Controls and Procedures* — We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to management, including the CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

Management, with the participation of the CEO and CFO, has evaluated the effectiveness, as of January 28, 2012, of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act). Based on that evaluation, the CEO and CFO have concluded that our disclosure controls and procedures were effective as of January 28, 2012.

*Management's Annual Report on Internal Control over Financial Reporting* — Management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act). Management, with the participation of the CEO and CFO, has evaluated the effectiveness, as of January 28, 2012, of our internal control over financial reporting. In making this evaluation, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in its publication *Internal Control-Integrated Framework*. Based on that evaluation, management has concluded that our internal control over financial reporting was effective as of January 28, 2012.

*Changes in Internal Control over Financial Reporting* — There were no changes in our internal control over financial reporting identified in connection with the evaluation required by paragraph (d) of Section 240.13a-15 of the Exchange Act that occurred during our last fiscal quarter (our fourth quarter in the case of an annual report) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

*Attestation Report of the Registered Public Accounting Firm* — Our independent registered public accounting firm, Deloitte & Touche, LLP, has issued the following attestation report on the effectiveness of our internal control over financial reporting:

31

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 201 of 260

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of Jos. A. Bank Clothiers, Inc.
Hampstead, Maryland

We have audited the internal control over financial reporting of Jos. A. Bank Clothiers, Inc. and subsidiaries (the "Company") as of January 28, 2012, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of January 28, 2012, based on the criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements as of and for the year ended January 28, 2012 of the Company and our report dated March 28, 2012 expressed an unqualified opinion on those financial statements.

DELOITTE & TOUCHE LLP

Baltimore, Maryland
March 28, 2012

32

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 202 of 260

**Item 9B.**

**Item 9B.** *OTHER INFORMATION.*

**Award of 2011 Cash Incentive Payments**

At its March 29, 2011 meeting, our Compensation Committee adopted a program for cash incentives for fiscal year 2011 (the "2011 Cash Incentive Program") under the Jos. A. Bank Clothiers, Inc. Executive Management Incentive Plan (the "Cash Incentive Plan"). On March 27, 2012, the Compensation Committee determined that the following amounts are payable to the Company's executive officers under the 2011 Cash Incentive Program: R. Neal Black, President and Chief Executive Officer- $1,199,675; Robert B. Hensley, Executive Vice President for Human Resources, Real Estate and Loss Prevention- $321,685; Gary M. Merry, Executive Vice President for Store and Catalog Operations- $302,250; James W. Thorne- Executive Vice President for Merchandising and Chief Merchandising Officer- $286,000; and David E. Ullman-Executive Vice President and Chief Financial Officer- $305,273. Messrs. Hensley, Merry, Thorne and Ullman are herein referred to collectively as the "Executive Vice Presidents" and together with Mr. Black as the "Executive Officers".

**Certification of 2011 Equity Incentive Programs**

*2011 Equity Incentive Program*

At its March 29, 2011 meeting, the Company's Compensation Committee adopted a program for equity incentives for fiscal year 2011 (the "2011 Equity Incentive Program") under the Jos. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan (the "Equity Incentive Plan") and granted to each of the Company's Executive Officers a number of performance-based restricted stock units (the "Performance RSUs"), subject to achievement of specified performance goals. On March 27, 2012, the Compensation Committee authorized, subject to the terms of each Executive Officer's Performance Restricted Stock Unit Award Agreement and the terms of the Equity Incentive Plan, that (i) 40,341 Performance RSUs be credited to Mr. Black, 16,242 of which will vest on March 29, 2012, 12,050 of which will vest on March 29, 2013 and the remaining 12,049 of which will vest on March 29, 2014; and (ii) 3,078 Performance RSUs, all of which will vest on March 29, 2014, be credited to each of the Executive Vice Presidents.

*2011 Supplemental Equity Incentive Program*

At its March 29, 2011 meeting, the Company's Compensation Committee adopted a supplemental program for equity incentives for fiscal 2011 (the "2011 Supplemental Equity Incentive Program") under the Equity Incentive Plan and granted to each of the Executive Officers the opportunity to earn a stated maximum number of Performance RSUs, subject to the Company earning at least $102.6 million of net income in fiscal 2011 (the "Supplemental 2011 Goal"). The grants were made on the terms and subject to the conditions provided in the Equity Incentive Plan and in each Executive Officer's Performance Restricted Stock Unit Award Agreement. Pursuant to such agreements, (i) Mr. Black could have earned up to a maximum of 5,131 Performance RSUs ($250,000) and (ii) each Executive Vice President could have earned up to a maximum of 2,052 Performance RSUs ($100,000). As the Company did not satisfy the Supplemental 2011 Goal, no Performance RSUs were payable under the 2011 Supplemental Equity Incentive Program.

**2012 Incentive Programs**

*Cash Incentive Program*

On March 27, 2012, the Company's Compensation Committee established for the Executive Officers a cash incentive program for fiscal year 2012 (the "2012 Cash Incentive Program") pursuant to the Cash Incentive Plan. The 2012 Cash Incentive Program permits the Company to grant "performance-based compensation" within the meaning of Section 162(m) of the Internal Revenue Code, thereby preserving the Company's ability to receive federal income tax deductions for those awards to the extent that they in fact comply with that Code section. If payable under the 2012 Cash Incentive Program, award payments are expected to be paid in cash.

The key performance goal under the 2012 Cash Incentive Program is the Company earning net income within or above a specified range (the "Eligibility Range") in fiscal year 2012. If the Company's net income in fiscal year 2012 is below the Eligibility Range, an award payment cannot be authorized under the 2012 Cash Incentive Program. If the Company's net income is within the Eligibility Range, the percentage of the award target which the Executive Officers are eligible to earn increases as net income increases, up to 100% of the award target. If the Company's net income is at or above the highest level of net income within the Eligibility Range, each Executive Officer is eligible to earn his maximum award target.

The Company earning net income within or above the Eligibility Range is the only performance goal under the 2012 Cash Incentive Program for Mr. Black. With respect to the Executive Vice Presidents, the following "personal" goals may also be considered and utilized by the Compensation Committee in its exercise of negative discretion to reduce the amount of an award that would otherwise have been payable at any particular level of net income achieved by the Company: (a) the participant receiving an overall job performance rating of "Effective" or better (the equivalent of 3 out of 5); (b) the participant complying with the

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 203 of 260

Company's Code of Conduct, Associate Handbook and other rules, regulations and policies and not engaging in any dishonest acts or other acts that are or may be detrimental to customers, fellow associates or the Company; and

33

(c) the participant achieving specific goals for departmental or individual performance.

For the 2012 Cash Incentive Program, the Eligibility Range for Mr. Black is $97.5 million to $107.3 million of net income and the Eligibility Range for the Executive Vice Presidents is $100.9 million to $108.7 million of net income. If the Company earns net income below the low end of the applicable Eligibility Range, the Executive Officer will not receive an award payment under this program. At $97.5 million of net income, Mr. Black will be eligible to receive up to 60% of his base salary; at $100.9 million of net income, each Executive Vice President will each be eligible to receive up to 10% of his base salary. At or above $107.3 million of net income, Mr. Black will be eligible to receive up to approximately 151.6% of his base salary; at or above $108.7 million of net income, each of the Executive Vice Presidents will be eligible to receive up to 65% of their respective base salaries. Between the low and high ends of the Eligibility Ranges, the percentage of base salary which each participant will be eligible to receive will increase as net income increases.

### 2012 Equity Incentive Program

On March 27, 2012, the Company's Compensation Committee established for the Executive Officers an equity incentive program for fiscal year 2012 (the "2012 Equity Incentive Program") pursuant to the Equity Incentive Plan. The 2012 Equity Incentive Program permits the Company to grant "performance-based compensation" within the meaning of Section 162(m) of the Internal Revenue Code, thereby preserving the Company's ability to receive federal income tax deductions for those awards to the extent that they in fact comply with that Code section. If payable under the 2012 Equity Incentive Program, award payments are expected to be paid in Performance RSUs.

The performance goals under the 2012 Equity Incentive Program are qualitatively the same as the performance goals under the 2012 Cash Incentive Program, i.e. such goals are based upon the Company earning net income within or above an Eligibility Range for fiscal year 2012 and, with respect to the Executive Vice Presidents, personal goals as set forth above under "2012 Incentive Programs-Cash Incentive Program." However, the levels of net income within the Eligibility Ranges for the 2012 Equity Incentive Program are higher than those established under the 2012 Cash Incentive Program.

If the Company's net income is below the Eligibility Range for the 2012 Equity Incentive Program, no Performance RSUs can be earned under that program. If the Company's net income is within the Eligibility Range, the number of Performance RSUs which the Executive Officers are eligible to earn increases as net income increases, up to 100% of the award target. If the Company's net income is at or above the highest level of net income within the Eligibility Range, each Executive Officer is eligible to earn his maximum award target.

For the 2012 Equity Incentive Program, the Compensation Committee established for Mr. Black an Eligibility Range of $99.5 million to $107.3 million of net income and for the Executive Vice Presidents an Eligibility Range of $107.7 million to $109.7 million of net income. If the Company earns net income below the low end of the Eligibility Range, the applicable participant cannot earn Performance RSUs under this program. At $99.5 million of net income, Mr. Black will be eligible to earn up to a value of $178,675 of Performance RSUs; at $107.7 million of net income, each of the Executive Vice Presidents will be eligible to earn up to a value of $50,000 of Performance RSUs. At or above $107.3 million of net income, Mr. Black will be eligible to earn up to a value of $1,965,425 of Performance RSUs; at or above $109.7 million of net income, each of the Executive Vice Presidents will be eligible to earn up to a value of $150,000 of Performance RSUs. Between the low and high ends of the Eligibility Ranges, the value of Performance RSUs which each participant will be eligible to earn will increase as net income increases. The "value" of the Performance RSUs, and the number of Performance RSUs to be granted, will be determined by reference to the closing price of the Company's stock on March 27, 2012.

### Negative Discretion

For both of the 2012 Incentive Programs (i.e., the 2012 Cash Incentive Program and the 2012 Equity Incentive Program), the Compensation Committee may exercise negative discretion to reduce the amount of a cash award that otherwise would have been payable to, or to reduce the number of Performance RSUs that would otherwise have been earned by, an Executive Officer at any particular level of net income achieved by the Company, even if the Company's net income is within or above the applicable Eligibility Range or level. In deciding whether, and to what extent, to pay a cash award to, or to certify the earning of Performance RSUs by, an Executive Vice President, an important factor which may be considered by the Compensation Committee in exercising its negative discretion is Mr. Black's evaluation of the individual performance of each Executive Vice President. Generally, Mr. Black makes his recommendation based upon his evaluation of the Executive Vice President's

34

individual contributions to the performance of the Company and such other factors as he may deem relevant. The final determination of the amount of a cash award that will be paid to, or the number of Performance RSUs that will be earned by, each Executive Officer is made by the Compensation Committee; however, the Compensation Committee may not increase the cash award payable to, or the number of Performance RSUs which will be earned by, an Executive Officer above the amount or number that is otherwise applicable at any particular level of net income achieved by the Company.

35

**Employment Contract Amendments**

On March 27, 2012, the Compensation Committee of the Company's Board of Directors approved the extension of the employment term of each of the Company's Executive Vice Presidents through February 1, 2014. The Company also extended the employment term of the Company's senior vice president-general counsel through February 1, 2014. Amendments to the employment agreements of such officers are attached to this Annual Report on Form 10-K as Exhibits 10.3(f), 10.5(d), 10.6(f), 10.8(h), and 10.11(e).

## PART III

**Item 10.    *DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.***

The disclosure required under Item 10, other than the following information concerning our code of ethics, is omitted in accordance with General Instruction G to Form 10-K. We will disclose the information required under this item either by (a) incorporating the information by reference from our definitive proxy statement under the sections entitled "Proposal One - Election of Directors," " Executive Compensation and Related Information" and "Section 16(a) Beneficial Ownership Reporting Compliance" if filed by May 28, 2012 (the first business day following 120 days from the close of fiscal year-end 2011) or (b) filing an amendment to this Form 10-K which contains the required information by May 28, 2012.

We have adopted a "code of ethics" as defined by applicable rules of the Securities and Exchange Commission and the NASDAQ Stock Market, which is applicable to, among others, our chief executive officer, chief financial officer, principal accounting officer and other senior financial and reporting persons and our directors. If we make any amendments to the code of ethics for our senior officers, financial and reporting persons or directors (other than technical, administrative, or other non-substantive amendments), or grant any waivers, including implicit waivers, from a provision of this code to such persons, we will disclose the nature of the amendment or waiver, its effective date and to whom it applies on our website or in a report on Form 8-K filed with the Securities and Exchange Commission. We have posted our code of ethics on our Internet website at www.josbank.com.

**Item 11.    *EXECUTIVE COMPENSATION.***

The disclosure required under Item 11 is omitted by us in accordance with General Instruction G to Form 10-K. We will disclose the information required under this item either by (a) incorporating the information by reference from our definitive proxy statement under the sections entitled "Compensation Discussion and Analysis," "Compensation Committee Report," "Compensation Tables" and "Compensation Committee Interlocks and Insider Participation" if filed by May 28, 2012 or (b) filing an amendment to this Form 10-K which contains the required information by May 28, 2012.

**Item 12.    *SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS.***

The disclosure required under Item 12 is omitted by us in accordance with General Instruction G to Form 10-K. We will disclose the information required under this item either by (a) incorporating the information by reference from our definitive proxy statement under the sections entitled "Security Ownership of Certain Beneficial Owners and Management" and "Equity Compensation Plan Information" if filed by May 28, 2012 or (b) filing an amendment to this Form 10-K which contains the required information by May 28, 2012.

**Item 13.    *CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.***

The disclosure required under Item 13 is omitted by us in accordance with General Instruction G to Form 10-K. We will disclose the information required under this item either by (a) incorporating the information by reference from our definitive proxy statement under the sections entitled "Transactions with Related Persons" and "Proposal One - Election of Directors" if filed by May 28, 2012 or (b) filing an amendment to this Form 10-K which contains the required information by May 28, 2012.

**Item 14.    *PRINCIPAL ACCOUNTING FEES AND SERVICES.***

The disclosure required under Item 14 is omitted by us in accordance with General Instruction G to Form 10-K. We will disclose the information required under this item either by (a) incorporating the information by reference from our definitive proxy statement under the section entitled "Proposal Two - Ratification of Registered Public Accounting Firm" if filed by May 28, 2012 or (b) filing an amendment to this Form 10-K which contains the required information by May 28, 2012.

36

**Item 15.    *EXHIBITS, FINANCIAL STATEMENT SCHEDULES.***

(a) (1) *List of Financial Statements*

The following Consolidated Financial Statements of Jos. A. Bank Clothiers, Inc. and the related notes are filed as part of this Annual Report pursuant to Item 8:

|  | **Page** |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-1 |
| Consolidated Balance Sheets as of January 29, 2011 and January 28, 2012 | F-2 |
| Consolidated Statements of Income for the Years Ended January 30, 2010, January 29, 2011 and January 28, 2012 | F-3 |
| Consolidated Statements of Stockholders' Equity for the Years Ended January 30, 2010, January 29, 2011 and January 28, 2012 | F-4 |
| Consolidated Statements of Cash Flows for the Years Ended January 30, 2010, January 29, 2011 and January 28, 2012 | F-5 |
| Notes to Consolidated Financial Statements | F-6 |

(a) (2) *List of Financial Statement Schedules*

All required information is included within the Consolidated Financial Statements and the notes thereto.

(a) (3) *List of Exhibits*

| 3.1 | — | Certificate of Amendment of the Restated Certificate of Incorporation of the Company and the Restated Certificate of Incorporation of the Company.*(9) |
|---|---|---|
| 3.2 | — | Amended and Restated By-Laws of the Company as of February 24, 2011.*(23) |
| 4.1 | — | Form of Common Stock certificate.*(1) |
| 4.2 | — | Rights Agreement, dated as of September 6, 2007, including Exhibit B thereto (the form of Right Certificate).*(10) |
| 4.3 | — | Certificate Eliminating Reference to Series A Preferred Stock from Restated Certificate of Incorporation of Company.*(11) |
| 4.4 | — | Certificate of Designation of Series A Junior Participating Preferred Stock.*(11) |
| 10.1 | — | 1994 Incentive Plan.*(1)† |
| 10.1(a) | — | Amendments, dated as of October 6, 1997, to Incentive Plan.*(2)† |
| 10.2 | — | Summary of 2011 and 2012 Cash and Equity Incentive Programs.*(25)† |
| 10.3 | — | Amended and Restated Employment Agreement, dated as of May 15, 2002, between David E. Ullman and Jos. A. Bank Clothiers, Inc.*(5)† |
| 10.3(a) | — | Fifth Amendment, dated as of April 9, 2008, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between David E. Ullman and Jos. A. Bank Clothiers, Inc.*(12)† |
| 10.3(b) | — | Sixth Amendment, dated as of April 7, 2009, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between David E. Ullman and Jos. A. Bank Clothiers, Inc.*(15)† |
| 10.3(c) | — | Seventh Amendment, dated as of March 30, 2010, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between David E. Ullman and Jos. A. Bank Clothiers, Inc.*(18)† |
| 10.3(d) | — | Eighth Amendment, dated as of December 28, 2010, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between David E. Ullman and Jos. A. Bank Clothiers, Inc.*(22)† |
| 10.3(e) | — | Ninth Amendment, dated as of March 29, 2011, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between David E. Ullman and Jos. A. Bank Clothiers, Inc.*(24)† |
| 10.3(f) | — | Tenth Amendment, dated as of March 27, 2012, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between David E. Ullman and Jos. A. Bank Clothiers, Inc.*(25)† |
| 10.4 | — | Jos. A. Bank Clothiers, Inc. Nonqualified Deferred Compensation Trust Agreement, dated January 20, 2004.*(8)† |
| 10.5 | — | Employment Agreement, dated as of January 30, 2009, between James W. Thorne and Jos. A. Bank Clothiers, Inc.*(15)† |
| 10.5(a) | — | First Amendment, dated as of March 30, 2010, to Employment Agreement dated as of January 30, 2009, between James W. Thorne and Jos. A. Bank Clothiers, Inc.*(18)† |

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 208 of 260

| 10.5(b) | — | Second Amendment, dated as of December 28, 2010, to Employment Agreement dated as of January 30, 2009, between James W. Thorne and Jos. A. Bank Clothiers, Inc.*(22)† |
| 10.5(c) | — | Third Amendment, dated as of March 29, 2011, to Employment Agreement dated as of January 30, 2009, between James W. Thorne and Jos. A. Bank Clothiers, Inc.*(24)† |
| 10.5(d) | — | Fourth Amendment, dated as of March 27, 2012, to Employment Agreement dated as of January 30, 2009, between James W. Thorne and Jos. A. Bank Clothiers, Inc.*(25)† |
| 10.6 | — | Amended and Restated Employment Agreement, dated May 15, 2002, by and between Charles D. Frazer and Jos. A. Bank Clothiers, Inc.*(5)† |
| 10.6(a) | — | Fifth Amendment, dated as of April 9, 2008, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between Charles D. Frazer and Jos. A. Bank Clothiers, Inc.*(12)† |
| 10.6(b) | — | Sixth Amendment, dated as of April 7, 2009, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between Charles D. Frazer and Jos. A. Bank Clothiers, Inc.*(15)† |
| 10.6(c) | — | Seventh Amendment, dated as of June 17, 2010, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between Charles D. Frazer and Jos. A. Bank Clothiers, Inc.*(20)† |
| 10.6(d) | — | Eighth Amendment, dated as of December 28, 2010, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between Charles D. Frazer and Jos. A. Bank Clothiers, Inc.*(22)† |
| 10.6(e) | — | Ninth Amendment, dated as of March 29, 2011, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between Charles D. Frazer and Jos. A. Bank Clothiers, Inc.*(24)† |
| 10.6(f) | — | Tenth Amendment, dated as of March 27, 2012, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between Charles D. Frazer and Jos. A. Bank Clothiers, Inc.*(25)† |
| 10.7 | — | Employment Agreement, dated as of November 1, 1999, between Robert N. Wildrick and Jos. A. Bank Clothiers, Inc.*(3)† |
| 10.7(a) | — | Fourth Amendment, dated as of September 9, 2008, to Employment Agreement, dated as of November 1, 1999, by and between Robert N. Wildrick and Jos. A. Bank Clothiers, Inc.*(14)† |
| 10.7(b) | — | Consulting Agreement, dated as of September 9, 2008, between Robert N. Wildrick and Jos. A. Bank Clothiers, Inc.*(14)† |
| 10.7(c) | — | First Amendment, dated as of November 30, 2010, to Consulting Agreement, dated as of September 9, 2008, between Robert N. Wildrick and Jos. A. Bank Clothiers, Inc.*(21)† |
| 10.8 | — | Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(3)† |
| 10.8(a) | — | First Amendment, dated as of January 1, 2000, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(4)† |
| 10.8(b) | — | Fourth Amendment, dated as of May 28, 2002, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(5)† |
| 10.8(c) | — | Ninth Amendment, dated as of April 9, 2008, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(12)† |
| 10.8(d) | — | Tenth Amendment, dated as of April 7, 2009, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(15)† |
| 10.8(e) | — | Eleventh Amendment, dated as of March 30, 2010, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(18)† |
| 10.8(f) | — | Twelfth Amendment, dated as of December 28, 2010, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(22)† |
| 10.8(g) | — | Thirteenth Amendment, dated as of March 29, 2011, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(24)† |
| 10.8(h) | — | Fourteenth Amendment, dated as of March 27, 2012, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(25)† |
| 10.9 | — | Amended and Restated Employment Agreement, dated as of August 30, 2010, by and between R. Neal Black and Jos. A. Bank Clothiers, Inc.*(20)† |
| 10.10 | — | Employment Offer Letter, dated November 20, 2000, from Jos. A. Bank Clothiers, Inc. to Jerry DeBoer.*(4)† |
| 10.10(a) | — | Amendment to Employment Offer Letter, dated as of December 28, 2010, by and between Jerry DeBoer and Jos. A. Bank Clothiers, Inc.*(22)† |
| 10.10(b) | — | Written description of 2012 base salary for Jerry DeBoer.*(25)† |

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 210 of 260

10.11          — Employment Agreement, dated as of June 3, 2008, between Gary Merry and Jos. A. Bank Clothiers, Inc.* (13)†

38

| | | |
|---|---|---|
| 10.11(a) | — | First Amendment, dated as of April 7, 2009 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(15)† |
| 10.11(b) | — | Second Amendment, dated as of March 30, 2010 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(18)† |
| 10.11(c) | — | Third Amendment, dated as of December 28, 2010 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(22)† |
| 10.11(d) | — | Fourth Amendment, dated as of March 29, 2011 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(24)† |
| 10.11(e) | — | Fifth Amendment, dated as of March 27, 2012 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(25)† |
| 10.12 | — | 2002 Long-Term Incentive Plan.*(6)† |
| 10.13 | — | Form of stock option agreement under the 2002 Long-Term Incentive Plan.*(7)† |
| 10.14 | — | Collective Bargaining Agreement, dated March 1, 2009, by and between Joseph A. Bank Mfg. Co., Inc. and Mid-Atlantic Regional Joint Board, Local 806.*(18)† |
| 10.15 | — | Form of Officer and Director Indemnification Agreement.*(17)† |
| 10.15(a) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Robert N. Wildrick.*(17)† |
| 10.15(b) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Andrew A. Giordano.*(17)† |
| 10.15(c) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and R. Neal Black.*(17)† |
| 10.15(d) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and James H. Ferstl.*(17)† |
| 10.15(e) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Gary S. Gladstein.*(17)† |
| 10.15(f) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and William E. Herron.*(17)† |
| 10.15(g) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Henry Homes, III.*(17)† |
| 10.15(h) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Sidney H. Ritman.*(17)† |
| 10.15(i) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and David E. Ullman.*(17)† |
| 10.15(j) | — | Indemnification Agreement dated August 30, 2010 between JoS. A. Bank Clothiers, Inc. and Robert Hensley.*(20)† |
| 10.15(k) | — | Indemnification Agreement dated August 30, 2010 between JoS. A. Bank Clothiers, Inc. and Charles D. Frazer.*(20)† |
| 10.16 | — | JoS. A. Bank Clothiers, Inc. Executive Management Incentive Plan.*(16)† |
| 10.16(a) | — | Amendment to JoS. A. Bank Clothiers, Inc. Executive Management Incentive Plan.*(18)† |
| 10.17 | — | JoS. A. Bank Clothiers, Inc. 2010 Deferred Compensation Plan.*(18)† |
| 10.18 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan.*(18)† |
| 10.19 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – CEO Performance Restricted Stock Unit Award Agreement, dated June 17, 2010, by and between JoS. A. Bank Clothiers, Inc. and R. Neal Black.*(19)† |
| 10.20 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – EVP Performance Restricted Stock Unit Award Agreement.*(19)† |
| 10.21 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – Non-Employee Director Restricted Stock Unit 2010 Award Agreement.*(19)† |
| 10.22 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – Non-Employee Director Restricted Stock Unit Annual Award Agreement.*(19)† |
| 10.23 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – Non-Employee Director Restricted Stock Unit Inaugural Award Agreement.*(19)† |
| 21.1 | — | Company subsidiaries.*(24) |

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 212 of 260

23.1      —   Consent of Deloitte & Touche LLP.*(25)

31.1      —   Certification of Principal Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*(25)

39

| 31.2 | — | Certification of Principal Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*(25) |
| 32.1 | — | Certification of Principal Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.*(25) |
| 32.2 | — | Certification of Principal Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.*(25) |
| 101.INS | — | XBRL Instance Document. **(25) |
| 101.SCH | — | XBRL Taxonomy Extension Schema Document. **(25) |
| 101.CAL | — | XBRL Taxonomy Extension Calculation Linkbase Document. **(25) |
| 101.DEF | — | XBRL Taxonomy Extension Definition Linkbase Document. **(25) |
| 101.LAB | — | XBRL Taxonomy Extension Label Linkbase Document. **(25) |
| 101.PRE | — | XBRL Taxonomy Extension Presentation Linkbase Document. **(25) |

| *(1) | — | Incorporated by reference to the Company's Registration Statement on Form S-1 filed May 3, 1994. |
| *(2) | — | Incorporated by reference to the Company's Annual Report on Form 10-K for the year ended January 31, 1998. |
| *(3) | — | Incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended October 30, 1999. |
| *(4) | — | Incorporated by reference to the Company's Annual Report on Form 10-K for the year ended February 3, 2001. |
| *(5) | — | Incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended May 4, 2002. |
| *(6) | — | Incorporated by reference to the Company's Definitive Proxy Statement on Schedule 14(A) filed May 20, 2002. |
| *(7) | — | Incorporated by reference to the Company's Current Report on Form 8-K, dated April 7, 2005. |
| *(8) | — | Incorporated by reference to the Company's Annual Report on Form 10-K for the year ended January 29, 2005. |
| *(9) | — | Incorporated by reference to Amendment No. 1 to the Company's Quarterly Report on Form 10-Q for the quarter ended July 29, 2006. |
| *(10) | — | Incorporated by reference to the Company's Current Report on Form 8-K, dated September 6, 2007. |
| *(11) | — | Incorporated by reference to the Company's Current Report on Form 8-K, dated September 20, 2007. |
| *(12) | — | Incorporated by reference to the Company's Annual Report on Form 10-K for the year ended February 2, 2008. |
| *(13) | — | Incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended May 3, 2008. |
| *(14) | — | Incorporated by reference to the Company's Current Report on Form 8-K, dated September 9, 2008. |
| *(15) | — | Incorporated by reference to the Company's Annual Report on Form 10-K for the year ended January 31, 2009. |
| *(16) | — | Incorporated by reference to the Company's Current Report on Form 8-K, dated June 18, 2009. |
| *(17) | | Incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended August 1, 2009. |
| *(18) | | Incorporated by reference to the Company's Annual Report on Form 10-K for the year ended January 30, 2010. |
| *(19) | | Incorporated by reference to the Company's Current Report on Form 8-K, dated June 17, 2010. |
| *(20) | | Incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended July 31, 2010. |
| *(21) | | Incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended October 30, 2010. |
| *(22) | | Incorporated by reference to the Company's Current Report on Form 8-K, dated December 28, 2010. |
| *(23) | | Incorporated by reference to the Company's Current Report on Form 8-K, dated March 2, 2011. |
| *(24) | — | Incorporated by reference to the Company's Annual Report on Form 10-K for the year ended January 29, 2011. |

40

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 214 of 260

| *(25) | — | Filed herewith |
| ** | — | Pursuant to Rule 406T of Regulation S-T, these interactive data files are deemed not filed or part of a registration statement or prospectus for purposes of Sections 11 or 12 of the Securities Act of 1933, as amended, are deemed not filed for purposes of Section 18 of the Securities and Exchange Act of 1934, as amended, and otherwise are not subject to liability under those section. |
| † | | Exhibit represents a management contract or compensatory plan or arrangement. |

<div align="center">41</div>

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 215 of 260

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of Jos. A. Bank Clothiers, Inc.
Hampstead, Maryland

      We have audited the accompanying consolidated balance sheets of Jos. A. Bank Clothiers, Inc. and subsidiaries (the "Company") as of January 29, 2011 and January 28, 2012, and the related consolidated statements of income, stockholders' equity, and cash flows for each of the three years in the period ended January 28, 2012. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the financial statements based on our audits.

      We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

      In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Jos. A. Bank Clothiers, Inc. and subsidiaries as of January 29, 2011 and January 28, 2012, and the results of their operations and their cash flows for each of the three years in the period ended January 28, 2012, in conformity with accounting principles generally accepted in the United States of America.

      We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of January 28, 2012, based on the criteria established in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 28, 2012 expressed an unqualified opinion on the Company's internal control over financial reporting.

DELOITTE & TOUCHE LLP

Baltimore, MD
March 28, 2012

F-1

## JOS. A. BANK CLOTHIERS, INC.
### CONSOLIDATED BALANCE SHEETS
### AS OF JANUARY 29, 2011 AND JANUARY 28, 2012

|  | January 29, 2011 | January 28, 2012 |
|---|---|---|
|  | (In thousands, except share information) | |
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 80,979 | $ 87,230 |
| Short-term investments | 189,789 | 240,252 |
| Accounts receivable, net | 9,525 | 15,906 |
| Inventories | 233,310 | 304,655 |
| Prepaid expenses and other current assets | 19,494 | 20,886 |
| Total current assets | 533,097 | 668,929 |
| **NONCURRENT ASSETS:** | | |
| Property, plant and equipment, net | 128,603 | 144,392 |
| Other noncurrent assets | 337 | 291 |
| Total assets | $ 662,037 | $ 813,612 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| Accounts payable | $ 31,505 | $ 66,664 |
| Accrued expenses | 88,165 | 92,937 |
| Deferred tax liability — current | 5,276 | 8,479 |
| Total current liabilities | 124,946 | 168,080 |
| **NONCURRENT LIABILITIES:** | | |
| Deferred rent | 49,279 | 47,600 |
| Deferred tax liability — noncurrent | 4,147 | 11,973 |
| Other noncurrent liabilities | 989 | 1,025 |
| Total liabilities | 179,361 | 228,678 |
| **COMMITMENTS AND CONTINGENCIES** | | |
| **STOCKHOLDERS' EQUITY:** | | |
| Preferred stock, $1.00 par, 500,000 shares authorized, none issued or outstanding | — | — |
| Common stock, $0.01 par, 45,000,000 shares authorized, 27,622,054 issued and outstanding at January 29, 2011 and 27,827,837 issued and outstanding at January 28, 2012 | 275 | 277 |
| Additional paid-in capital | 86,792 | 91,766 |
| Retained earnings | 395,531 | 493,022 |
| Accumulated other comprehensive income (loss) | 78 | (131) |
| Total stockholders' equity | 482,676 | 584,934 |
| Total liabilities and stockholders' equity | $ 662,037 | $ 813,612 |

The accompanying notes are an integral part of these consolidated financial statements.

Case 2:16-cv-02786-JAM-AC    Document 1    Filed 11/23/16    Page 218 of 260

**JOS. A. BANK CLOTHIERS, INC.**
**CONSOLIDATED STATEMENTS OF INCOME**
**FOR THE YEARS ENDED JANUARY 30, 2010, JANUARY 29, 2011 AND JANUARY 28, 2012**

|  | Fiscal Year | | |
|---|---|---|---|
|  | 2009 | 2010 | 2011 |
|  | (In thousands, except per share information) | | |
| NET SALES | $ 770,316 | $ 858,128 | $ 979,852 |
| Cost of goods sold | 298,193 | 320,585 | 371,577 |
| GROSS PROFIT | 472,123 | 537,543 | 608,275 |
| OPERATING EXPENSES: | | | |
| Sales and marketing, including occupancy costs | 293,663 | 326,464 | 372,268 |
| General and administrative | 61,057 | 69,472 | 76,600 |
| Total operating expenses | 354,720 | 395,936 | 448,868 |
| OPERATING INCOME | 117,403 | 141,607 | 159,407 |
| OTHER INCOME (EXPENSE): | | | |
| Interest income | 375 | 589 | 347 |
| Interest expense | (395) | (136) | (312) |
| Total other income (expense) | (20) | 453 | 35 |
| Income before provision for income taxes | 117,383 | 142,060 | 159,442 |
| Provision for income taxes | 46,228 | 56,261 | 61,951 |
| NET INCOME | $ 71,155 | $ 85,799 | $ 97,491 |
| PER SHARE INFORMATION | | | |
| Earnings per share: | | | |
| Basic | $ 2.59 | $ 3.11 | $ 3.51 |
| Diluted | $ 2.56 | $ 3.08 | $ 3.49 |
| Weighted average shares outstanding: | | | |
| Basic | 27,452 | 27,553 | 27,757 |
| Diluted | 27,785 | 27,851 | 27,961 |

The accompanying notes are an integral part of these consolidated financial statements.

F-3

**JOS. A. BANK CLOTHIERS, INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**FOR THE YEARS ENDED JANUARY 30, 2010, JANUARY 29, 2011 AND JANUARY 28, 2012**

| | Shares of Common Stock | Common Stock | Additional Paid-In Capital | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | | | (In thousands, except share information) | | | |
| **BALANCE, JANUARY 31, 2009** | 27,436,466 | $ 182 | $ 82,951 | $ 238,668 | $ 12 | $ 321,813 |
| Net income | — | — | — | 71,155 | — | 71,155 |
| Adjustment to minimum pension liability, net of tax effect of $30 | — | — | — | — | 43 | 43 |
| Comprehensive income | | | | | | 71,198 |
| Issuance of common stock pursuant to equity compensation plans | 90,278 | 1 | 233 | — | — | 234 |
| Income tax benefit from stock compensation plans | — | — | 65 | — | — | 65 |
| **BALANCE, JANUARY 30, 2010** | 27,526,744 | 183 | 83,249 | 309,823 | 55 | 393,310 |
| Net income | — | — | — | 85,799 | — | 85,799 |
| Adjustment to minimum pension liability, net of tax effect of $8 | — | — | — | — | 23 | 23 |
| Comprehensive income | | | | | | 85,822 |
| Stock dividend transfer of par value | — | 91 | — | (91) | — | — |
| Fractional share payments | (542) | — | (21) | — | — | (21) |
| Equity compensation | — | — | 1,252 | — | — | 1,252 |
| Issuance of common stock pursuant to equity compensation plans | 95,852 | 1 | 1,012 | — | — | 1,013 |
| Income tax benefit from stock compensation plans | — | — | 1,300 | — | — | 1,300 |
| **BALANCE, JANUARY 29, 2011** | 27,622,054 | 275 | 86,792 | 395,531 | 78 | 482,676 |
| Net income | — | — | — | 97,491 | — | 97,491 |
| Adjustment to minimum pension liability, net of tax effect of $115 | — | — | — | — | (209) | (209) |
| Comprehensive income | | | | | | 97,282 |
| Equity compensation | — | — | 2,547 | — | — | 2,547 |
| Issuance of common stock pursuant to equity compensation plans | 205,783 | 2 | 544 | — | — | 546 |
| Income tax benefit from stock compensation plans | — | — | 1,883 | — | — | 1,883 |
| **BALANCE, JANUARY 28, 2012** | 27,827,837 | $ 277 | $ 91,766 | $ 493,022 | $ (131) | $ 584,934 |

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 220 of 260

The accompanying notes are an integral part of these consolidated financial statements.

F-4

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 221 of 260

**JOS. A. BANK CLOTHIERS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEARS ENDED JANUARY 30, 2010, JANUARY 29, 2011 AND JANUARY 28, 2012**

|  | Fiscal Year | | |
|---|---|---|---|
|  | 2009 | 2010 | 2011 |
|  | | (In thousands) | |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net income | $ 71,155 | $ 85,799 | $ 97,491 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 22,382 | 24,479 | 26,101 |
| Loss on disposals of property, plant and equipment | 160 | 357 | 311 |
| Asset impairment charges | 1,554 | 1,215 | 294 |
| Non-cash equity compensation | — | 1,252 | 2,547 |
| Increase (decrease) in deferred taxes | (2,537) | 2,751 | 11,029 |
| Changes in assets and liabilities: | | | |
| (Increase) decrease in accounts receivable | 1,544 | (3,665) | (6,381) |
| (Increase) in inventories | (9,079) | (14,989) | (71,345) |
| (Increase) decrease in prepaids and other current assets | 1,741 | (3,459) | (1,392) |
| Decrease in non-current assets | 61 | 83 | 46 |
| Increase (decrease) in accounts payable | (11,549) | 13,280 | 35,159 |
| Increase (decrease) in accrued expenses | 12,120 | 1,738 | (77) |
| (Decrease) in deferred rent | (2,890) | (2,574) | (1,679) |
| Increase (decrease) in other noncurrent liabilities | 86 | (28) | (288) |
| Net cash provided by operating activities | 84,748 | 106,239 | 91,816 |
| **CASH FLOWS USED IN INVESTING ACTIVITIES:** | | | |
| Payments for capital expenditures | (16,333) | (29,352) | (37,531) |
| Proceeds from maturities of short-term investments | 34,951 | 169,736 | 393,424 |
| Payments to acquire short-term investments | (204,687) | (189,789) | (443,887) |
| Net cash (used in) investing activities | (186,069) | (49,405) | (87,994) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Income tax benefit from stock compensation plans | 65 | 1,300 | 1,883 |
| Net proceeds from issuance of common stock | 234 | 1,013 | 546 |
| Fractional share payments | — | (21) | — |
| Net cash provided by financing activities | 299 | 2,292 | 2,429 |
| Net increase (decrease) in cash and cash equivalents | (101,022) | 59,126 | 6,251 |
| **CASH AND CASH EQUIVALENTS, beginning of year** | 122,875 | 21,853 | 80,979 |
| **CASH AND CASH EQUIVALENTS, end of year** | $ 21,853 | $ 80,979 | $ 87,230 |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 222 of 260

## JOS. A. BANK CLOTHIERS, INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1.    **SIGNIFICANT ACCOUNTING POLICIES**

*Description of Business* — Jos. A. Bank Clothiers, Inc. is a nationwide designer, manufacturer, retailer and direct marketer (through stores, catalog call center and Internet) of men's tailored and casual clothing and accessories and is a retailer of tuxedo rental products.

*Principles of Consolidation* — The consolidated financial statements include the accounts of Jos. A. Bank Clothiers, Inc. and its wholly-owned subsidiaries (collectively referred to as "we", "us" or "our"). All intercompany balances and transactions have been eliminated in consolidation.

*Fiscal Year* — We maintain our accounts on a fifty-two/fifty-three week fiscal year ending on the Saturday closest to January 31. The fiscal years ended January 30, 2010, January 29, 2011, and January 28, 2012 each contained fifty-two weeks.

*Seasonality* — Our net sales, net income and inventory levels fluctuate on a seasonal basis and therefore the results for one quarter are not necessarily indicative of the results that may be achieved for a full fiscal year. The increased customer traffic during the holiday season and our increased marketing efforts during this peak selling time have resulted in sales and profits generated during the fourth quarter becoming a larger portion of annual sales and profits as compared to the other three quarters. Seasonality is also impacted by growth as more new stores have historically been opened in the second half of the year. During the fourth quarters of fiscal years 2009, 2010 and 2011, we generated approximately 36%, 37% and 35%, respectively, of our annual net sales and approximately 50%, 48% and 45%, respectively, of our annual net income.

*Use of Estimates* — The preparation of the consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Estimates have been prepared on the basis of the most current and best information. However, actual results could and probably will differ from those estimates. Significant estimates in these financial statements include net realizable value of inventory, estimates of future cash flows associated with asset impairments, useful lives for depreciation and amortization, estimates related to the liability for health care costs, estimates related to the sales returns reserve, estimates related to legal contingencies and estimates related to the realizability of deferred tax assets, among others.

*Cash and Cash Equivalents* — Cash and cash equivalents totaled $81.0 million and $87.2 million at fiscal year-end 2010 and fiscal year-end 2011, respectively, and include bank deposit accounts, money market accounts and other highly liquid investments with original maturities of 90 days or less. At fiscal year-end 2011, substantially all of the cash and cash equivalents were invested in U.S. Treasury bills with original maturities of 90 days or less and overnight federally-sponsored agency notes.

*Short-term Investments* — Short-term investments consist of investments in securities with remaining maturities of less than one year, excluding investments with original maturities of 90 days or less. At fiscal year-end 2011, short-term investments consisted solely of U.S. Treasury bills with remaining maturities ranging from less than one month to six months. These investments are classified as held-to-maturity and their market values approximate their carrying values.

*Supplemental Cash Flow Information* — Interest and income taxes paid were as follows:

|  | Fiscal Year | | |
|---|---|---|---|
|  | **2009** | **2010** | **2011** |
|  | | **(In thousands)** | |
| Interest paid | $       312 | $       116 | $       312 |
| Income taxes paid | $    44,893 | $    59,523 | $    57,206 |

*Inventories* — We record inventory at the lower of cost or market ("LCM"). Cost is determined using the first-in, first-out method. We capitalize into inventory certain warehousing and freight delivery costs associated with shipping our merchandise to the point of sale. We periodically review quantities of inventories on hand and compare these amounts to the expected sales of each product. We record a charge to cost of goods sold for the amount required to reduce the carrying value of inventory to net realizable value.

*Franchise Fees* — We have 15 stores operated by franchisees, representing approximately 3% of our store base. Monthly franchise fees are recognized when earned under the franchise agreements. The fees are based on a percentage of sales generated by the Franchise stores. In addition, the Company sells inventory at a mark-up to the franchisees. Such fees are included in net sales in

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 223 of 260

the Consolidated Statements of Income. Initial franchise fees are fully earned upon execution of the franchise agreements. There are no further obligations on the part of the Company in order to earn the initial franchise fee.

F-6

We do not have any controlling interest in any of our franchisees through voting rights or any other means and, in accordance with FASB ASC 810-10, "Consolidation of Variable Interest Entities," we do not consolidate these entities. We sell inventory to our Franchise stores at prices above cost and the Franchise stores have the right to return some of their inventory to us.

*Gift Cards and Certificates* — We sell gift cards and gift certificates to individuals and companies. Our incentive gift certificates are used by various companies as a reward for achievement for their employees. We also redeem proprietary gift cards and gift certificates marketed by third-party premium/incentive companies. We record a liability when a gift card/certificate is purchased. As the gift card/certificate is redeemed, we reduce the liability and record revenue. Substantially all of our gift cards/certificates do not have expiration dates and they are all subject to state escheatment laws. Based on historical experience, gift cards/certificates redemptions after the escheatment due date are remote and we recognize any income (also referred to as "breakage") on these unredeemed gift cards/certificates on a specific identification basis on the escheatment date.

*Tuxedo Rental Products* — Revenues from tuxedo rental products are recognized on a gross basis upon delivery of rental products to customers. When a customer orders a tuxedo rental from us, an order is placed with a national distributor who delivers the product to our stores, typically within several days of intended use. The national distributor owns the rental product and charges the company a rental cost for each rental and delivery which is recorded as "Costs of goods sold".

*Landlord Contributions* — We typically receive reimbursement from landlords for a portion of the cost of leasehold improvements for new stores and, occasionally, for renovations and relocations. These landlord contributions are initially accounted for as an increase to deferred rent and as an increase to prepaid expenses and other current assets when the related store is opened. When collected, we record cash and reduce the prepaid expenses and other current assets account. The collection of landlord contributions is presented in the Condensed Consolidated Statements of Cash Flows as an operating activity. The deferred rent is amortized over the lease term in a manner that is consistent with our policy to straight-line rent expense over the term of the lease. The amortization is recorded as a reduction to sales and marketing expense, which is consistent with the classification of lease expense. The amortization of deferred rent recognized in the Consolidated Statements of Income was $7.6 million, $8.0 million and $8.2 million in fiscal years 2009, 2010 and 2011, respectively.

*Catalog* — Costs related to mail order catalogs, including design, printing and distribution, are included in prepaid expenses and other current assets consistent with FASB ASC 720-35, "Advertising Costs." These costs are amortized as sales and marketing expense based on actual revenue for the period as compared to aggregate projected revenue over the benefit period in which customers are expected to order, which is typically over a six month period. The benefit period is based on historical ordering patterns. At fiscal year-end 2010 and fiscal year-end 2011, the amounts included in prepaid expenses and other current assets related to catalog costs were $1.1 million and $0.8 million, respectively.

*Marketing Expenses* — Marketing expenses consist of advertising, display, list rental and Internet advertising costs. Marketing costs are recognized as expenses the first time the marketing takes place. Marketing expense, excluding catalog costs, was approximately $49.5 million, $57.1 million and $70.0 million in fiscal years 2009, 2010 and 2011, respectively. These amounts exclude catalog production costs of approximately $5.7 million, $5.9 million and $6.2 million for fiscal years 2009, 2010 and 2011, respectively. Marketing and catalog costs are included in "Sales and marketing" in the accompanying Consolidated Statements of Income.

*Contingent Rental Expense* — We have certain store leases that determine all or a portion of their rent based on annual aggregate sales from the respective stores. We recognize contingent rental expense prior to achievement of the specified target that triggers the contingent rental provided that achievement of that target is probable. The amount is recorded on a straight-line basis throughout the year.

*Property, Plant and Equipment* — Property, plant and equipment are stated at cost. We depreciate and amortize property, plant and equipment on a straight-line basis over the following estimated useful lives:

| Asset Class | Estimated Useful Lives |
| --- | --- |
| Buildings and improvements | 25 years |
| Equipment | 3-10 years |
| Furniture and fixtures | 10 years |
| Leasehold improvements | Generally 10 years |

We amortize leasehold improvements over the shorter of the lease term or the useful life of the improvements. Depreciation and amortization expense of property, plant, and equipment for fiscal years 2009, 2010 and 2011 was approximately $22.4 million, $24.5 million and $26.1 million, respectively. Maintenance and repairs that do not extend the lives of the assets are expensed as incurred.

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 225 of 260

F-7

*Long-Lived Assets* — Long-lived assets, such as property, plant, and equipment, subject to depreciation and amortization, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by comparing the carrying amount of an asset to estimated undiscounted future cash flows expected to be generated by the asset. If the carrying amount of an asset exceeds its estimated future cash flows, an impairment charge is recognized in the amount by which the carrying amount of the asset exceeds the fair value of the asset. During fiscal years 2009, 2010 and 2011, we recognized impairment charges of $1.6 million, $1.2 million and $0.3 million, respectively, relating to several stores within our Stores segment. The charges were included in "Sales and marketing" in the Consolidated Statements of Income. The aggregate fair value of the property plant and equipment recorded for the stores impaired in fiscal years 2009, 2010 and 2011 were estimated to be $0.3 million, $0.2 million and $0.3 million, respectively. The fair value measurements related to these assets are considered to fall under level 3 of the fair value hierarchy of ASC 820, "Fair Value Measurements and Disclosures," since the valuations are based on significant unobservable inputs. These valuations are based on discounted cash flow analyses with the significant unobservable inputs being the future projected cash flows which are reflective of the Company's best estimates and the discount rates which we believe are representative of arms-length third-party required rates of return.

*Fair Value of Financial Instruments* — For cash and cash equivalents, accounts receivable and accounts payable, the carrying amounts reflect the market value due to the short-term nature of these accounts. For short-term investments, the carrying amounts reflect the market value due to the short-term maturities of these instruments.

*Net Sales* — In our Stores segment, net sales are recognized at the point-of-sale. In our Direct Marketing segment, sales are recognized when products are shipped to the customer. We present sales net of sales tax in the accompanying Consolidated Statements of Income. We provide for sales returns based on estimated returns in future periods. The sales return reserves at fiscal years 2009, 2010 and 2011 were $2.0 million, $2.4 million and $2.6 million, respectively, and were included in "Accrued expenses" in the accompanying Consolidated Balance Sheets.

*Classification of Expenses* — Cost of goods sold primarily includes the cost of merchandise, tailoring and freight from vendors to the distribution center and from the distribution center to the stores. Sales and marketing expenses consist primarily of Full-line store, Outlet and Factory store and Direct Marketing occupancy, payroll, selling and other variable costs and total Company advertising and marketing expenses. General and administrative expenses consist primarily of corporate and distribution center costs and total company performance based incentive compensation (other than commissions).

*Lease Accounting* — Most lease agreements provide for monthly rent payments that may change over the lease term. For leases whereby rent payments can be reasonably estimated, rent expense is recorded on a straight-line basis over a consistent lease period (generally, the initial non-cancelable lease term plus renewal option periods provided for in the lease that can be reasonably assured) and the excess of rent expense over cash amounts paid are included in "deferred rent" in the accompanying Consolidated Balance Sheets. For lease agreements with monthly rent payments that cannot be estimated, rent expense is recorded as incurred. Any rent concessions, including landlord contributions, are amortized over the lease term as a reduction of rent expense. The term of the lease begins on the date we have the right to control the use of the leased property, generally approximately six to nine weeks prior to opening the store.

*Store Opening Costs* — Costs incurred in connection with store start-up costs, such as travel for recruitment, training and setup of new store openings, are expensed as incurred.

*Income Taxes* — Income taxes are accounted for under the asset and liability method in accordance with FASB ASC 740, "Income Taxes," ("ASC 740"). Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carry forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the Consolidated Statements of Income in the period that includes the enactment date.

We account for uncertainties in income taxes pursuant to ASC 740, which clarifies the accounting for uncertainty in income taxes recognized in financial statements. We recognize tax liabilities for uncertain income tax positions ("unrecognized tax benefits") where an evaluation has indicated that it is more likely than not that the tax positions will not be sustained in an audit. We estimate the unrecognized tax benefits as the largest amount that is more than 50% likely to be realized upon ultimate settlement. We re-evaluate these uncertain tax positions on a quarterly basis or when new information becomes available to management. The re-evaluations are based on many factors, including, but not limited to, changes in facts or circumstances, changes in tax law, settled issues as a result of audits, expirations due to statutes of limitations, and new federal or state audit activity. We also recognize accrued interest and penalties related to these unrecognized tax benefits. Changes in these accrued items are included in the provision for income taxes in the Condensed Consolidated Statements of Income.

F-8

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 228 of 260

*Earnings Per Share ("EPS")* — Basic EPS is calculated by dividing net income by the weighted average number of common shares outstanding for the period. Diluted EPS is calculated by dividing net income by the diluted weighted average common shares, which reflects the potential dilution of common stock equivalents. The weighted average shares used to calculate basic and diluted EPS are as follows:

|  | Fiscal Year | | |
|---|---|---|---|
|  | 2009 | 2010 | 2011 |
|  | | (In thousands) | |
| Weighted average shares outstanding for basic EPS | 27,452 | 27,553 | 27,757 |
| Dilutive effect of common stock equivalents | 333 | 298 | 204 |
| Weighted average shares outstanding for diluted EPS | 27,785 | 27,851 | 27,961 |

We use the treasury method for calculating the dilutive effect of common stock equivalents. For fiscal years 2009, 2010 and 2011, there were no anti-dilutive common stock equivalents which were excluded from the calculation of diluted shares.

On June 17, 2010, our Board of Directors declared a stock split in the form of a 50% stock dividend which was distributed on August 18, 2010 to stockholders of record as of July 30, 2010. All share and per share amounts of common shares included in this Annual Report on Form 10-K have been adjusted to reflect this stock dividend.

*Performance-Based Incentive Plans* — Performance-based incentive plans provide annual cash incentive compensation to certain employees based upon, among other things, the attainment of certain annual earnings and performance goals. At each interim quarter-end, we estimate the probability that such goals will be attained based on results-to-date and the likelihood of discretionary payments and record incentive compensation accordingly, based on the projected annual incentive payments.

*Equity Compensation* — We account for our equity awards in accordance with FASB ASC 718, "Share-Based Payment" ("ASC 718"), which requires the compensation cost resulting from all share-based awards to be recognized in the financial statements. The amount of compensation is measured based on the grant-date fair value of the awards and is recognized over the vesting period of the awards. The vesting of awards to both the officers and directors is subject to service conditions being met, currently ranging from one to three years. Additionally, the vesting of awards to officers is subject to performance conditions being met in the fiscal year that the awards are granted such as, among other things, the attainment of certain annual earnings and performance goals. For these officer awards (which represents approximately $2.5 million of the aggregate grant date fair value of $3.4 million for fiscal year 2010 and approximately $2.6 million of the aggregate grant date fair value of $3.2 million for fiscal year 2011), we estimate the probability that such goals will be attained based on results-to-date at each interim quarter-end and record compensation cost to "General and administrative expense" for these awards based on the shares projected to vest. Share-based compensation expense recognized for fiscal years 2010 and 2011 related to equity awards issued under the Jos. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan ("Equity Incentive Plan") was $1.2 million and $2.5 million, respectively, and the tax benefit recognized related to this compensation was $0.5 million and $1.0 million, respectively. There was no share based compensation expense in fiscal year 2009 as all of the stock option awards issued under equity plans existing prior to fiscal year 2010 were fully issued and vested prior to the effective date of ASC 718.

*Healthcare Costs* — Healthcare claims for eligible participating employees are self-insured by us, subject to certain deductibles and limitations per incident where third-party insurance provides "stop loss" coverage. The liability for healthcare costs includes an estimate for claims incurred but not reported. In estimating this liability, we consider historical claims experience and the timing of the submission of expected claims.

**Recently Issued Accounting Standards** - In October 2009, the FASB issued ASU 2009-13, "Multiple-Deliverable Revenue Arrangements" ("ASU 2009-13"). ASU 2009-13 addresses revenue recognition of multiple-element sales arrangements. It establishes a selling price hierarchy for determining the selling price of each product or service, with vendor-specific objective evidence ("VSOE") at the highest level, third-party evidence of VSOE at the intermediate level, and a best estimate at the lowest level. It replaces "fair value" with "selling price" in revenue allocation guidance. It also significantly expands the disclosure requirements for such arrangements. ASU 2009-13 is effective prospectively for sales entered into or materially modified in fiscal years beginning on or after June 15, 2010, with early adoption permitted. The adoption of ASU 2009-13 for fiscal year 2011 did not have a material impact on our consolidated financial statements.

In May 2011, the FASB issued ASU 2011-04, "Fair Value Measurement" ("ASU 2011-04"). ASU 2011-04 is intended to create consistency between GAAP and International Financial Reporting Standards ("IFRS") on the definition of fair value and on the guidance on how to measure fair value and on what to disclose about fair value measurements. ASU 2011-04 will be effective for financial statements issued for fiscal periods beginning after December 15, 2011, with early adoption prohibited for public entities. We are currently evaluating the impact ASU 2011-04 may have on our consolidated financial statements.

Case 2:16-cv-02786-JAM-AC    Document 1    Filed 11/23/16    Page 229 of 260

F-9

**Recently Proposed Amendments to Accounting Standards** - In August 2010, the FASB issued an exposure draft, "Leases" (the "Exposure Draft"), which would replace the existing guidance in ASC 840, "Leases." Under the Exposure Draft, a lessee's rights and obligations under all leases, including existing and new arrangements, would be recognized as assets and liabilities, respectively, on the balance sheet. In July 2011, the FASB decided to issue a revised exposure draft; however, deliberations are still ongoing and the timing of the issuance of the revised exposure draft and the issuance of a final standard are uncertain at this time. If this lease guidance becomes effective on the terms currently proposed by FASB, it will likely have a significant negative impact on our consolidated financial statements. However, as the standard-setting process is still ongoing, we are unable to determine at this time the impact this proposed change in accounting may have on our consolidated financial statements.

## 2.     INVENTORIES:

Inventories as of January 29, 2011 and January 28, 2012, consist of the following:

|  | January 29, 2011 | January 28, 2012 |
|---|---|---|
|  | (In thousands) | |
| Finished goods, net | $ 222,251 | $ 288,182 |
| Raw materials | 11,059 | 16,473 |
| Total inventories, net | $ 233,310 | $ 304,655 |

## 3.     PREPAID EXPENSES AND OTHER CURRENT ASSETS:

Prepaid expenses and other current assets as of January 29, 2011 and January 28, 2012, consist of the following:

|  | January 29, 2011 | January 28, 2012 |
|---|---|---|
|  | (In thousands) | |
| Landlord contributions receivable | $ 2,783 | $ 3,024 |
| Prepaid rents | 4,916 | 5,389 |
| Prepaid expenses and other current assets | 11,795 | 12,473 |
| Total prepaid expenses and other current assets, net | $ 19,494 | $ 20,886 |

## 4.     PROPERTY, PLANT AND EQUIPMENT:

Property, plant and equipment as of January 29, 2011 and January 28, 2012, consist of the following:

|  | January 29, 2011 | January 28, 2012 |
|---|---|---|
|  | (In thousands) | |
| Land | $ 1,819 | $ 1,819 |
| Buildings and improvements | 15,053 | 17,109 |
| Leasehold improvements | 132,790 | 144,761 |
| Furniture and fixtures | 85,500 | 94,992 |
| Equipment and other | 51,141 | 63,521 |
|  | 286,303 | 322,202 |
| Less: accumulated depreciation and amortization | (157,700) | (177,810) |
| Property, plant and equipment, net | $ 128,603 | $ 144,392 |

As of fiscal year-end 2010 and fiscal year-end 2011, included in "Property, plant and equipment, net" and "Accrued expenses" in the Condensed Consolidated Balance Sheets are $1.8 million and $6.7 million, respectively, of accrued property, plant and equipment additions that have been incurred but not completely invoiced by vendors, and therefore, not paid by the respective fiscal year-ends. The net increases in these amounts of $1.2 million and $4.9 million for fiscal years 2010 and 2011, respectively, and the net decrease in fiscal year 2009 of $1.7 million, are excluded from payments for capital expenditures and changes in accrued expenses in the Condensed Consolidated Statements of Cash Flows as these changes are non-cash items.

**5.      ACCRUED EXPENSES:**

Accrued expenses as of January 29, 2011 and January 28, 2012, consist of the following:

| | January 29, 2011 | January 28, 2012 |
|---|---|---|
| | (In thousands) | |
| Accrued compensation and benefits | $ 24,918 | $ 26,184 |
| Gift cards and certificates payable | 15,440 | 17,805 |
| Accrued federal and state income tax | 9,056 | 2,330 |
| Current portion of deferred rent | 9,745 | 10,238 |
| Accrued advertising expenses | 5,667 | 6,702 |
| Other accrued expenses | 23,339 | 29,678 |
| Total | $ 88,165 | $ 92,937 |

Other accrued expenses consist primarily of liabilities related to: accrued franchise fees, sales return reserves, accrued property, plant and equipment additions, sales and property taxes and other accrued costs.

**6.      LONG-TERM DEBT AND CREDIT AGREEMENT:**

We had no long-term or short-term debt outstanding as of January 29, 2011 or January 28, 2012.

During the past several years and through the first quarter of fiscal year 2010, we maintained a $100 million credit facility with a maturity date of April 30, 2010. Based on our then current cash and short-term investment positions, and projected cash needs and market conditions, we elected not to negotiate a renewal or replacement of the credit facility. As a result, the credit facility expired on April 30, 2010 in accordance with its terms.

**7.      INCOME TAXES**

The provision for income taxes consisted of the following:

| | Fiscal Year | | |
|---|---|---|---|
| | 2009 | 2010 | 2011 |
| | (In thousands) | | |
| Federal: | | | |
| Current | $ 40,638 | $ 43,768 | $ 42,161 |
| Deferred | (2,132) | 2,949 | 10,463 |
| State: | | | |
| Current | 8,158 | 9,742 | 8,761 |
| Deferred | (436) | (198) | 566 |
| Provision for income taxes | $ 46,228 | $ 56,261 | $ 61,951 |

Provision for income tax is reconciled to the amount computed by applying the statutory Federal income tax rate of 35% for fiscal years 2009, 2010 and 2011 to income before provision for income taxes as follows:

| | Fiscal Year | | |
|---|---|---|---|
| | 2009 | 2010 | 2011 |
| | (In thousands) | | |
| Computed federal tax provision at statutory rates | $ 41,084 | $ 49,721 | $ 55,805 |
| State income taxes, net of federal income tax effect | 5,019 | 6,204 | 6,063 |
| Non-deductible compensation | — | 131 | — |
| Change in tax reserves | 32 | 107 | 74 |
| Other, net | 93 | 98 | 9 |
| Provision for income taxes | $ 46,228 | $ 56,261 | $ 61,951 |

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 232 of 260

F-11

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 233 of 260

The tax effects of temporary differences that give rise to significant positions of deferred tax assets and deferred tax liabilities as of January 29, 2011 and January 28, 2012 are as follows:

|  | January 29, 2011 | January 28, 2012 |
|---|---|---|
|  | (In thousands) | |
| Deferred tax assets: | | |
| Current accrued liabilities and other | $ 7,042 | $ 9,595 |
| Noncurrent lease obligations | 15,978 | 11,053 |
| Noncurrent accrued liabilities and other | 448 | 338 |
|  | 23,468 | 20,986 |
| Deferred tax liabilities: | | |
| Current inventories | (10,882) | (16,491) |
| Current prepaid expenses and other current assets | (1,436) | (1,583) |
| Noncurrent property, plant and equipment | (20,573) | (23,364) |
|  | (32,891) | (41,438) |
| Net deferred tax liability | $ (9,423) | $ (20,452) |

The following table summarizes the activity related to our unrecognized tax benefits and related accrued interest and penalties for fiscal years 2010 and 2011:

|  | Fiscal Year | |
|---|---|---|
|  | 2010 | 2011 |
|  | (In thousands) | |
| Unrecognized tax benefit, beginning of year | $ 786 | $ 823 |
| Increases related to current year tax positions | 408 | 210 |
| Settlement of tax positions | (70) | (271) |
| Expiration of the statue of limitations for the assessment of taxes | (301) | (136) |
| Unrecognized tax benefit, end of year | $ 823 | $ 626 |

In assessing the realizability of deferred tax assets, management considered whether it was more likely than not that some portion or all of the deferred tax assets will be realized. The ultimate realization of the deferred tax assets is dependent upon existence of taxable income in carryback periods and the generation of future taxable income during periods in which temporary differences become deductible. Management considered income taxes paid during the previous two years and projected future taxable income in making this assessment. Based upon the level of historical taxable income and projections for future taxable income over the periods in which the temporary differences are deductible, management has determined that no valuation allowance was required at January 29, 2011 and January 28, 2012.

The fiscal year 2011 effective income tax rate was 38.9%, as compared with 39.6% for fiscal year 2010. The decrease during fiscal year 2011 was primarily driven by lower state income taxes.

Significant changes to U.S. federal or state income tax rules could occur as part of future legislation. Such changes could influence our future income tax expense and/or the timing of income tax deductions. The impact of such changes on our business operations and financial statements remains uncertain. However, as the possibility of any enactment progresses, we will continue to monitor current developments and assess the potential implications of these tax law changes on our business and consolidated financial statements.

We file a federal income tax return and state and local income tax returns in various jurisdictions. The Internal Revenue Service ("IRS") has audited tax returns through fiscal year 2008, including its examination of the tax returns for fiscal years 2007 and 2008 which was finalized in October 2010. No material adjustments were required to these tax returns as a result of the examination by the IRS. For the years before fiscal year 2008, the majority of our state and local income tax returns are no longer subject to examinations by taxing authorities.

F-12

**8.      BENEFIT PLANS**

*Defined Benefit Pension & Post-Retirement Plans* — We maintain a noncontributory defined benefit pension plan and a post-retirement benefit plan which cover certain union and nonunion employees. The annual contributions for the pension plan are not less than the minimum funding standards set forth in the Employee Retirement Income Security Act of 1974, as amended. We do not pre-fund the benefits for the post-retirement benefit plan. The plans provide for eligible employees to receive benefits based principally on years of service. We record the expected cost of these benefits as expense during the years that employees render service.

We account for these plans under FASB ASC 715, "Defined Benefit Plans - Pension," which requires an employer to recognize the funded status of any defined benefit pension and/or other postretirement benefit plans, including any unrecognized prior service costs, transition obligations or actuarial gains/losses, as an asset or liability in its balance sheet.

The following table sets forth the plans' benefit obligations, fair value of plan assets, and funded status at January 29, 2011 and January 28, 2012:

|  | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
|  | Fiscal Year | | Fiscal Year | |
|  | 2010 | 2011 | 2010 | 2011 |
|  | (In thousands) | | | |
| Accumulated benefit obligation | $   1,207 | $   1,633 | $   53 | $   46 |
| Fair value of plan assets | 1,395 | 1,777 | — | — |
| Funded status | 188 | 144 | (53) | (46) |
| Accrued (prepaid) benefit cost recognized in the balance sheets | $   (188) | $   (144) | $   53 | $   46 |

Weighted-average discount rate assumptions used to determine benefit obligations as of January 29, 2011 and January 28, 2012 (the dates of the latest actuarial calculations) were 5.75% and 4.75%, respectively. Weighted-average assumptions used to determine net cost included a discount rate of 6.25%, 6.00% and 5.75% for fiscal years 2009, 2010 and 2011, respectively. The return on plan assets assumption was 7.00% for fiscal years 2009, 2010 and 2011.

Plan assets of our pension benefits as of January 29, 2011 and January 28, 2012 consisted primarily of balanced mutual funds and short-term investment funds.

Pension expense recognized in our statements of income was $0.1 million for each of fiscal years 2009, 2010 and 2011. We contributed $0.1 million and $0.4 million in fiscal years 2010 and 2011, respectively, to the pension plan. We do not expect to be required to contribute significant amounts of cash in fiscal year 2012 to the pension plan.

*Profit Sharing Plan* — We maintain a defined contribution 401(k) profit sharing plan for our employees. All non-union and certain union employees are eligible to participate in the plan on the first day of the month following three months of service. Employee contributions to the plan are limited based on applicable sections of the Internal Revenue Code. Our contribution to the 401(k) plan is discretionary. Amounts expensed related to the plan were approximately $0.8 million, $0.9 million, and $0.9 million for fiscal years 2009, 2010 and 2011, respectively.

*Deferred Compensation Plan* — We also maintain a non-qualified deferred compensation plan for certain executives. All assets of the plan are fully subject to our creditors. There were no matching contributions in any of fiscal years 2009, 2010 or 2011, although contributions were made by certain executives. Included in the Consolidated Balance Sheets, within "Prepaid expenses and other current assets" and "Accrued Expenses," are separate amounts of an equal asset and liability of $2.2 million at fiscal year-end 2010 and $2.5 million at fiscal year-end 2011.

**9.      COMMITMENTS AND CONTINGENCIES**

On March 16, 2012, Neil Holmes, a former employee of the Company, individually and on behalf of all those similarly situated, filed a Complaint against the Company in the Superior Court of California, County of Santa Clara, Case No. 112CV220780 alleging various violations of California wage and labor laws. The Complaint seeks, among other things, certification of the case as a class action, injunctive relief, monetary damages, penalties, restitution, other equitable relief, interest, attorney's fees and costs. We intend to defend this lawsuit vigorously.

In addition to the litigation discussed above, we are a party to routine litigation matters that are incidental to our business. From time to time, additional legal matters in which we may be named as a defendant are expected to arise in the normal course of

http://www.sec.gov/Archives/edgar/data/920033/000092003311000007/...

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 235 of 260

our business activities.

F-13

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 236 of 260

The resolution of our litigation matters cannot be accurately predicted and we have not estimated the costs or potential losses, if any, associated with these matters. Accordingly, we cannot determine whether our insurance coverage, if any, would be sufficient to cover such costs or potential losses, if any, and we have not recorded any provision for cost or loss associated with these actions. It is possible that our consolidated financial statements could be materially impacted in a particular fiscal quarter or year by an unfavorable outcome or settlement of any of these actions.

*Employment Agreements and Performance-Based Incentive Compensation* — We have employment agreements with certain of our executives expiring at the end of either fiscal January 2013 or fiscal January 2014, with aggregated base compensation of $5.1 million (not including annual adjustments) over the terms. Depending on the circumstances of termination, we have severance obligations to these and certain other executives aggregating up to approximately $4.3 million, not including annual adjustments. These executives are also eligible for additional performance-based incentive payments. In addition, other employees are eligible for incentive-based payments based on performance, including store managers and regional sales directors, although these payments are not based on employment agreements. Performance-based incentive compensation expense (excluding commissions) for all eligible employees was approximately $8.5 million in fiscal year 2009, $9.2 million in fiscal year 2010 and $7.8 million in fiscal year 2011.

*Lease Obligations* — We have numerous noncancelable operating leases for retail stores, distribution center, office and tailoring space and equipment. Certain facility leases provide for annual base minimum rentals, plus contingent rentals based on sales. Renewal options are available under the majority of the leases.

Future minimum lease payments, including rent escalations, under noncancelable operating leases for stores and other leased facilities opened and equipment placed in service as of fiscal year-end 2011, were as follows:

| Fiscal Year Ending | | Amount |
|---|---|---|
| | | (In thousands) |
| Fiscal year 2012 | $ | 68,828 |
| Fiscal year 2013 | | 64,165 |
| Fiscal year 2014 | | 55,395 |
| Fiscal year 2015 | | 46,079 |
| Fiscal year 2016 | | 38,080 |
| Thereafter | | 90,806 |
| Total | $ | 363,353 |

The minimum rentals above do not include additional payments for contingent percentage rent, which is typically based on sales, deferred rent amortization, insurance, property taxes, utilities and other common area maintenance costs that may be due as provided for in the leases.

Total minimum rental expense for operating leases was approximately $52.0 million, $57.0 million and $62.8 million for fiscal years 2009, 2010 and 2011, respectively. Contingent rent expense in fiscal years 2009, 2010 and 2011, which was based on a percentage of net sales at the applicable properties, was approximately $2.2 million, $2.5 million and $3.6 million, respectively.

As of fiscal year-end 2011, we have also entered into various lease agreements for stores to be opened and equipment placed in service subsequent to year end. The future minimum lease payments under these agreements are $0.2 million in fiscal year 2012, $0.4 million in each of fiscal years 2013, 2014, 2015 and 2016, and $2.4 million thereafter.

*Inventories* — We ordinarily place orders for the purchases of inventory at least one to two seasons in advance. Approximately 2% of the total product purchases (including piece goods) in fiscal year 2011 were sourced from United States suppliers, and approximately 98% were sourced from suppliers in other countries. In fiscal year 2011, approximately 33% of the total product purchases were from suppliers in China (including Hong Kong), 23% in Mexico, 8% in Bangladesh, 8% in Malaysia, 7% in India and 6% in Sri Lanka. In fiscal year 2011, we purchased approximately 57% of our finished product through a single buying agent who sources the products from various vendors, including those described above. No other country represented more than 5% of total product purchases in fiscal year 2011. These percentages reflect the countries where the suppliers are primarily operating or manufacturing, which may not always be where the suppliers are actually domiciled. We purchase the raw materials for approximately 9% of our finished products. Five vendors accounted for over 69% of the raw materials purchased directly by us in fiscal year 2011. The remainder of our finished products are purchased as finished units, with the vendor responsible for the acquisition of the raw materials based on our specifications.

*Other* — We have a consulting agreement with our current Chairman of the Board to consult on matters of strategic planning and initiatives commencing February 1, 2009 at a fee of $0.8 million per year for a period of three years. On November 30, 2010, the consulting agreement was extended from January 31, 2012 to January 26, 2014 with all other terms of

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 237 of 260

F-14

the Consulting agreement remaining unchanged. We have an agreement with David Leadbetter, a golf professional, which allows us to produce golf and other apparel under Leadbetter's name. The agreement expires in January 2016. The minimum royalty under this agreement was $0.2 million in each of fiscal years 2009, 2010 and 2011 and is expected to be $0.2 million for fiscal year 2012.

## 10.  INCENTIVE STOCK OPTION AND OTHER EQUITY PLANS:

Effective January 28, 1994, the Company adopted an Incentive Plan (the "1994 Plan"). The 1994 Plan generally provides for the granting of stock, stock options, stock appreciation rights, restricted shares or any combination of the foregoing to the eligible participants, as defined, for issuance of up to 3.4 million shares of common stock in the aggregate, of which options to purchase all of such shares had been granted as of January 29, 2005 ("fiscal year 2004"). In March 2002, the Company adopted an Incentive Plan (the "2002 Plan" and together with the 1994 Plan) which provides for issuance of up to 1.4 million shares of common stock in the aggregate, of which options to purchase all of such shares had been granted as of the end of fiscal year 2005. The exercise price of an option granted under both the 1994 Plan and the 2002 Plan may not be less than the fair market value of the underlying shares of Common Stock on the date of grant, and employee options generally expire at the earlier of termination of employment or ten years from the date of grant. All options covered under the 1994 Plan and the 2002 Plan were fully vested as of the end of fiscal year 2005.

On March 30, 2010, the Board of Directors approved, subject to stockholder approval, the Jos. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan (the "2010 Plan"). The 2010 Plan was approved by stockholders at the Company's 2010 annual meeting of stockholders on June 17, 2010.

The principal purposes of the 2010 Plan are to promote the interests of the Company and its stockholders by providing employees, directors and consultants with appropriate incentives and rewards to encourage them to enter into and continue in the employ or service of the Company or its subsidiaries, to acquire a proprietary interest in the long-term success of the Company and to reward the performance of individuals in fulfilling their personal responsibilities for long-range and annual achievements. In addition, the 2010 Plan permits the Company to grant "performance-based compensation" within the meaning of Section 162(m) of the Internal Revenue Code ("Section 162(m)"), thereby preserving the Company's ability to receive federal income tax deductions for those awards to the extent that they in fact comply with that Code section. The 2010 Plan reserves 1.5 million shares of the Company's common stock for issuance pursuant to awards to be granted under the plan. Under the 2010 Plan, the Company may grant stock options, stock appreciation rights, restricted stock, restricted stock units and stock and cash-based awards.

The aggregate number of shares of Common Stock as to which awards may be granted under any of the Plans, the number of shares of Common Stock covered by each outstanding award under the Plans and the exercise price per share of Common Stock in each outstanding award, are to be proportionately adjusted for any increase or decrease in the number of issued shares of Common Stock resulting from a subdivision or consolidation of shares or other capital adjustment, or the payment of a stock dividend or other increase or decrease in such shares, effected without receipt of consideration by the Company, or other change in corporate or capital structure; provided, however, that any fractional shares resulting from any such adjustment are to be eliminated.

On March 30, 2010, the Board of Directors also approved the Jos. A. Bank Clothiers, Inc. 2010 Deferred Compensation Plan (the "Deferred Compensation Plan"). The Deferred Compensation Plan is a nonqualified, unfunded plan designed to provide a select group of the Company's senior management which includes each of the named executive officers, highly compensated employees, and non-employee directors, with the opportunity to accumulate Company shares (through stock units) by deferring compensation on a pre-tax basis, and to provide the Company with a method of rewarding and retaining these individuals by providing them with a means to defer receipt of cash and shares of Common Stock associated with future grants of restricted stock units, performance share awards and certain other cash- and stock-based awards. The Deferred Compensation Plan reserves 4.5 million shares of the Company's Common Stock for issuance pursuant to distributions under the plan. At January 29, 2011 and January 28, 2012, 2,100 and 26,500 stock units, respectively, were outstanding under this plan.

F-15

Changes in options outstanding that were issued under the 1994 and 2002 Plans were as follows:

| | Fiscal Year 2009 | | Fiscal Year 2010 | | Fiscal Year 2011 | |
|---|---|---|---|---|---|---|
| | Shares | Weighted Average Exercise Price | Shares | Weighted Average Exercise Price | Shares | Weighted Average Exercise Price |
| | (In thousands, except per share information) | | | | | |
| Outstanding at beginning of year | 491 | $ 6.10 | 401 | $ 6.89 | 305 | $ 5.73 |
| Granted | — | $ — | — | $ — | — | $ — |
| Exercised | (90) | $ 2.59 | (96) | $ 10.57 | (196) | $ 4.92 |
| Canceled | — | $ — | — | $ — | — | $ — |
| Outstanding at end of year | 401 | $ 6.89 | 305 | $ 5.73 | 109 | $ 7.18 |

The following table summarizes information about stock options outstanding and exercisable as of January 28, 2012 that were issued under the 1994 and 2002 Plans:

| Range of Exercise Prices | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| | Number Outstanding | Weighted Average Remaining Contractual Life per Share | Weighted Average Exercise Price per Share | Number Exercisable | Weighted Average Exercise Price per Share |
| | (In thousands, except per share and year information) | | | | |
| $0 - $5.00 | — | — | $ — | — | $ — |
| $5.01 - $10.00 | 102 | 1.12 | $ 6.59 | 102 | $ 6.59 |
| $15.01 - $20.00 | 7 | 3.14 | $ 15.86 | 7 | $ 15.86 |
| Total | 109 | 1.25 | $ 7.18 | 109 | $ 7.18 |

During fiscal 2011, we granted 66,000 restricted stock units ("RSUs") (representing whole units) under the 2010 Plan to certain of our officers and to the members of the Board of Directors at a weighted-average grant date fair value of $48.88, and an aggregate fair value of approximately $3.2 million. During fiscal year 2010, we granted 86,100 RSUs under this plan to this same group at a weighted-average grant date fair value of $39.72 and an aggregate fair value of approximately $3.4 million. The grant date fair value is based on the shares granted and the quoted price of the Company's Common Stock on the date of grant. The grants to the officers are intended to qualify under Section 162(m).

A summary of our nonvested RSU activity during fiscal years 2010 and 2011 is presented below:

| Nonvested Awards | Fiscal Year 2010 | | Fiscal Year 2011 | |
|---|---|---|---|---|
| | Shares | Weighted-Average Grant-Date Fair Value | Shares | Weighted-Average Grant-Date Fair Value |
| | (In thousands, except per share information) | | | |
| Nonvested at beginning of year | — | $ — | 86 | $ 39.72 |
| Granted | 86 | $ 39.72 | 66 | $ 48.88 |
| Vested | — | $ — | (42) | $ 39.72 |
| Forfeited | — | $ — | — | $ — |
| Nonvested at end of year | 86 | $ 39.72 | 110 | $ 45.22 |

As of January 28, 2012, there was unrecognized compensation expense related to nonvested RSUs of approximately $3.0 million, which is expected to be recognized over a weighted average period of 1.8 years. As of January 28, 2012, the intrinsic value of nonvested RSUs was $5.3 million based on a share price of $48.06. The total value of RSUs that vested during fiscal year 2011 was $2.0 million.

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 240 of 260

F-16

Excess tax benefits are realized tax benefits from tax deductions for the exercise of stock options or the issuance of other awards in excess of the deferred tax asset attributable to stock compensation expense for such equity awards. In accordance with ASC 718 such realized tax benefits are presented as part of cash flows from financing activities. For fiscal years 2009, 2010 and 2011, tax benefits realized from stock equity awards totaled $0.1 million, $1.3 million and $1.9 million, respectively.

## 11.    RIGHTS AGREEMENT:

We maintain a Rights Agreement in which preferred stock purchase rights ("Rights") were distributed as a dividend at the rate of one Right for each share of outstanding Common Stock held as of the close of business on September 20, 2007. This Rights Agreement has an outside expiration date of September 20, 2017 and replaced a similar agreement which expired on September 19, 2007. The number of Rights associated with each share of Common Stock will be proportionally adjusted in connection with any stock split or stock dividends issued by in accordance with the Rights Agreement. In addition, the Rights Agreement provides that at the time Rights certificates evidencing the Rights are to be issued, we will not be required to issue Rights certificates that evidence fractional Rights. In lieu of such fractional Rights, we will pay to the persons to which fractional Rights would otherwise be issuable, an amount in cash equal to the fraction of the market value of a whole Right.

Each Right will entitle stockholders to buy one 1/100th of a share of Series A Junior Participating Preferred Stock of Jos. A. Bank at an exercise price of $200. The Rights will be exercisable only if a person or group acquires beneficial ownership of 20 percent or more of our outstanding Common Stock (without the approval of the board of directors) or commences a tender or exchange offer upon consummation of which a person or group would beneficially own 20 percent or more of our outstanding Common Stock.

If any person becomes the beneficial owner of 20 percent or more of our outstanding common stock (without the approval of the board of directors), or if a holder of 20 percent or more of our Common Stock engaged in certain self-dealing transactions or a merger transaction in which the Company is the surviving corporation and its Common Stock remains outstanding, then each Right not owned by such person or certain related parties will entitle its holder to purchase, at the Right's then-current exercise price, units of the Company's Series A Junior Participating Preferred Stock (or, in certain circumstances, Common Stock, cash, property or other securities of the Company) having a market value equal to twice the then-current exercise price of the Rights. In addition, if we are involved in a merger or other business combination transaction with another person after which our Common Stock does not remain outstanding, or sell 50 percent or more of our assets or earning power to another person, each Right will entitle its holder to purchase, at the Right's then-current exercise price, shares of common stock of such other person having a market value equal to twice the then-current exercise price of the Rights. We will generally be entitled to redeem the Rights at $0.01 per Right at any time prior to the earlier of (i) such time that a person has become an Acquiring Person or (ii) the Final Expiration Date (as such terms are defined in the Rights Agreement).

## 12.    SEGMENT REPORTING:

We have two reportable segments: Stores and Direct Marketing. The Stores segment includes all Company-owned stores excluding Outlet and Factory stores ("Full-line Stores"). The Direct Marketing segment includes the catalog call center and the Internet. While each segment offers a similar mix of men's clothing to the retail customer, the Stores segment also provides complete alterations, while the Direct Marketing segment provides certain limited alterations.

The accounting policies of the segments are the same as those described in the summary of significant policies. We evaluate performance of the segments based on "four wall" contribution, which excludes any allocation of overhead from the corporate office and the distribution centers (except order fulfillment costs, which are allocated to Direct Marketing), interest and income taxes.

Our segments are strategic business units that offer similar products to the retail customer by two distinctively different methods. In the Stores segment, a typical customer travels to the store and purchases our merchandise and/or alterations and takes their purchases with them. The Direct Marketing customer receives a catalog in his or her home and/or office and/or visits our Internet web sites and places an order by phone, mail, fax or online. The merchandise is then shipped to the customer.

F-17

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 242 of 260

Segment data is presented in the following tables:

**Fiscal Year 2009**

| | Stores | | Direct Marketing | | Corporate and Other | | Total | |
|---|---|---|---|---|---|---|---|---|
| | | | (In thousands) | | | | | |
| Net sales [a] | $ | 689,408 | $ | 68,640 | $ | 12,268 | $ | 770,316 |
| Depreciation and amortization | | 19,613 | | 213 | | 2,556 | | 22,382 |
| Operating income (loss) [b] | | 155,190 | | 27,445 | | (65,232) | | 117,403 |
| Capital expenditures [c] | | 12,360 | | 2,077 | | 1,896 | | 16,333 |

**Fiscal Year 2010**

| | Stores | | Direct Marketing | | Corporate and Other | | Total | |
|---|---|---|---|---|---|---|---|---|
| | | | (In thousands) | | | | | |
| Net sales [a] | $ | 754,342 | $ | 85,410 | $ | 18,376 | $ | 858,128 |
| Depreciation and amortization | | 20,786 | | 558 | | 3,135 | | 24,479 |
| Operating income (loss) [b] | | 182,659 | | 31,870 | | (72,922) | | 141,607 |
| Capital expenditures [c] | | 19,340 | | 1,244 | | 8,768 | | 29,352 |

**Fiscal Year 2011**

| | Stores | | Direct Marketing | | Corporate and Other | | Total | |
|---|---|---|---|---|---|---|---|---|
| | | | (In thousands) | | | | | |
| Net sales [a] | $ | 854,322 | $ | 97,924 | $ | 27,606 | $ | 979,852 |
| Depreciation and amortization | | 21,465 | | 651 | | 3,985 | | 26,101 |
| Operating income (loss) [b] | | 203,553 | | 32,887 | | (77,033) | | 159,407 |
| Capital expenditures [c] | | 25,522 | | 401 | | 11,608 | | 37,531 |

---

(a)  Stores net sales represent all Full-line Store sales. Direct Marketing net sales represent catalog call center and Internet sales. Net sales from segments below the GAAP quantitative thresholds are attributable primarily to our two other operating segments. Those segments are Outlet and Factory stores and Franchise stores. These segments have never met any of the quantitative thresholds for determining reportable segments and are included in "Corporate and Other."

(b)  Operating income (loss) for the Stores and Direct Marketing segments represents profit before allocations of overhead from the corporate office and the distribution centers, interest and income taxes ("four wall" contribution). Total Company shipping costs to customers of approximately $9.7 million, $13.0 million and $17.9 million for fiscal years 2009, 2010 and 2011, respectively, were recorded to "Sales and marketing, including occupancy costs" in the Consolidated Statements of Income. Operating income (loss) for "Corporate and Other" consists primarily of costs included in general and administrative costs and operating income or loss related to the Outlet and Factory stores and the Franchise stores operating segments. Total operating income represents profit before interest and income taxes.

(c)  Capital expenditures include payments for property, plant and equipment made for the reportable segment.

F-18

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 243 of 260

**13.    RELATED PARTY TRANSACTIONS:**

On September 9, 2008, the Company and Mr. Wildrick entered into a Consulting Agreement (the "Consulting Agreement") pursuant to which the Company retained Mr. Wildrick to consult on matters of strategic planning and initiatives for a term of three years commencing February 1, 2009 at a fee of $0.8 million per year. On November 30, 2010, those members of the Board who are "independent directors" in accordance with the Nasdaq Rules met in executive session and approved an amendment to the Consulting Agreement. As Mr. Wildrick is the Chairman of the Board and the amendment constituted a related party transaction, generally the Audit Committee would have been responsible for evaluating the transaction. The Board instead met in executive session in order to increase the number of independent directors who participated in the decision. The First Amendment to Consulting Agreement extended the term of the Consulting Agreement to January 26, 2014. All other terms of the Consulting Agreement were unchanged.

The Consulting Agreement includes an agreement by Mr. Wildrick not to compete with the Company or to solicit its customers or employees during its term. The Consulting Agreement also provides for the acceleration of payments due thereunder to Mr. Wildrick in connection with certain termination events. If Mr. Wildrick's services are terminated by the Company without "cause" (as defined below), the Company will be obligated to pay Mr. Wildrick the balance of amounts due under the Consulting Agreement for its remaining term as and when such payments would otherwise be due. If Mr. Wildrick's services are terminated by the Company with "cause," the Company will be obligated to pay Mr. Wildrick the unpaid, prorated amount of the consulting fees payable through the date of termination. For purposes of the Consulting Agreement, "cause" means: (a) the conviction of Mr. Wildrick of a felony involving money or other property of the Company or any other felony or offense involving moral turpitude; or (b) the willful commission of any act of fraud or misrepresentation related to the business of the Company which would materially and negatively impact the Company. If within ninety (90) days following a change of control of the Company (defined consistently with Mr. Black's employment agreement), Mr. Wildrick exercises his right to terminate the Consulting Agreement or the Company terminates the Consulting Agreement based on a default thereunder by Mr. Wildrick, the Company will pay Mr. Wildrick a lump sum equal to the balance of amounts due under the Consulting Agreement for its remaining term.

The Company's policy regarding related party transactions is set forth in the Audit Committee's charter and in the Company's Corporate Governance Standards (both of which are available on our website at www.josbank.com). As used herein and therein, "related party transactions" are transactions that are required to be disclosed pursuant to Item 404(a) of Regulation S-K of the Securities and Exchange Commission. Item 404(a) generally requires disclosure of transactions in which the Company is a participant, the amount involved exceeds $120,000 and in which any related person (such as an executive officer, director, director nominee, or 5% stockholder of the Company or any family member of the foregoing) has a direct or indirect material interest. Except as otherwise set forth below, the Audit Committee shall review each related party transaction to determine whether it is fair and reasonable to the Company. Notwithstanding the foregoing, in lieu of the Committee so doing, the determination of whether a related party transaction is fair and reasonable to the Company may be made by the members of the Board who are independent directors. The Company will enter into or ratify a related party transaction only if the Committee or the independent directors, as the case may be, determines that it is fair and reasonable to the Company. In the event a related party transaction is entered into without prior approval as set forth in the Company's related party transaction policy and, after review by the Committee or the independent directors, as the case may be, such transaction is not determined to be fair and reasonable to the Company, the Company will make all reasonable efforts to cancel or annul such transaction. The First Amendment to Consulting Agreement was ratified by the independent directors in accordance with the foregoing procedures.

F-19

**14.**    **QUARTERLY FINANCIAL INFORMATION (Unaudited):**

Summarized quarterly financial information in fiscal years 2010 and 2011 as follows:

| | First Quarter | | Second Quarter | | Third Quarter | | Fourth Quarter | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | (In thousands, except per share information) | | | | | | | | |
| **Fiscal Year 2010** | | | | | | | | | |
| Net sales | $ | 178,125 | $ | 188,412 | $ | 173,268 | $ | 318,323 | $ 858,128 |
| Gross profit | | 113,316 | | 118,330 | | 110,839 | | 195,058 | 537,543 |
| Operating income | | 26,061 | | 27,407 | | 20,457 | | 67,682 | 141,607 |
| Net income | | 15,808 | | 16,479 | | 12,563 | | 40,949 | 85,799 |
| Diluted income per common share [a] | $ | 0.57 | $ | 0.59 | $ | 0.45 | $ | 1.47 | $ 3.08 |
| **Fiscal Year 2011** | | | | | | | | | |
| Net sales | $ | 193,270 | $ | 230,662 | $ | 209,635 | $ | 346,285 | $ 979,852 |
| Gross profit | | 125,313 | | 143,907 | | 131,252 | | 207,803 | 608,275 |
| Operating income | | 29,037 | | 34,598 | | 24,217 | | 71,555 | 159,407 |
| Net income | | 17,810 | | 20,554 | | 14,982 | | 44,145 | 97,491 |
| Diluted income per common share [a] | $ | 0.64 | $ | 0.74 | $ | 0.54 | $ | 1.58 | $ 3.49 |

(a)   Per common share amounts for the quarters and the full year have been calculated separately. Accordingly, quarterly amounts may not add to the full year amount because of the effects of rounding.

F-20

## SIGNATURE

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

<div align="center">

**JOS. A. BANK CLOTHIERS, INC.**
**(Registrant)**

By:      **/s/ R. NEAL BLACK**

**R. NEAL BLACK**
**PRESIDENT AND CHIEF EXECUTIVE OFFICER**

</div>

Dated:     March 28, 2012

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ R. NEAL BLACK | Director, President and Chief Executive Officer (Principal Executive Officer) | March 28, 2012 |
| /s/ DAVID E. ULLMAN | Executive Vice President, Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer) | March 28, 2012 |
| /s/ ROBERT N. WILDRICK | Director, Chairman of the Board | March 28, 2012 |
| /s/ ANDREW A. GIORDANO | Director, Chairman Emeritus and Lead Independent Director | March 28, 2012 |
| /s/ JAMES H. FERSTL | Director | March 28, 2012 |
| /s/ WILLIAM E. HERRON | Director | March 28, 2012 |
| /s/ HENRY HOMES, III | Director | March 28, 2012 |
| /s/ SIDNEY H. RITMAN | Director | March 28, 2012 |

## Exhibits Index

| | | |
|---|---|---|
| 3.1 | — | Certificate of Amendment of the Restated Certificate of Incorporation of the Company and the Restated Certificate of Incorporation of the Company.*(9) |
| 3.2 | — | Amended and Restated By-Laws of the Company as of February 24, 2011.*(23) |
| 4.1 | — | Form of Common Stock certificate.*(1) |
| 4.2 | — | Rights Agreement, dated as of September 6, 2007, including Exhibit B thereto (the form of Right Certificate).*(10) |
| 4.3 | — | Certificate Eliminating Reference to Series A Preferred Stock from Restated Certificate of Incorporation of Company.*(11) |
| 4.4 | — | Certificate of Designation of Series A Junior Participating Preferred Stock.*(11) |
| 10.1 | — | 1994 Incentive Plan.*(1)† |
| 10.1(a) | — | Amendments, dated as of October 6, 1997, to Incentive Plan.*(2)† |
| 10.2 | — | Summary of 2011 and 2012 Cash and Equity Incentive Programs.*(25)† |
| 10.3 | — | Amended and Restated Employment Agreement, dated as of May 15, 2002, between David E. Ullman and Jos. A. Bank Clothiers, Inc.*(5)† |
| 10.3(a) | — | Fifth Amendment, dated as of April 9, 2008, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between David E. Ullman and Jos. A. Bank Clothiers, Inc.*(12)† |
| 10.3(b) | — | Sixth Amendment, dated as of April 7, 2009, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between David E. Ullman and Jos. A. Bank Clothiers, Inc.*(15)† |
| 10.3(c) | — | Seventh Amendment, dated as of March 30, 2010, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between David E. Ullman and Jos. A. Bank Clothiers, Inc.*(18)† |
| 10.3(d) | — | Eighth Amendment, dated as of December 28, 2010, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between David E. Ullman and Jos. A. Bank Clothiers, Inc.*(22)† |
| 10.3(e) | — | Ninth Amendment, dated as of March 29, 2011, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between David E. Ullman and Jos. A. Bank Clothiers, Inc.*(24)† |
| 10.3(f) | — | Tenth Amendment, dated as of March 27, 2012, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between David E. Ullman and Jos. A. Bank Clothiers, Inc.*(25)† |
| 10.4 | — | Jos. A. Bank Clothiers, Inc. Nonqualified Deferred Compensation Trust Agreement, dated January 20, 2004.*(8)† |
| 10.5 | — | Employment Agreement, dated as of January 30, 2009, between James W. Thorne and Jos. A. Bank Clothiers, Inc.*(15)† |
| 10.5(a) | — | First Amendment, dated as of March 30, 2010, to Employment Agreement dated as of January 30, 2009, between James W. Thorne and Jos. A. Bank Clothiers, Inc.*(18)† |
| 10.5(b) | — | Second Amendment, dated as of December 28, 2010, to Employment Agreement dated as of January 30, 2009, between James W. Thorne and Jos. A. Bank Clothiers, Inc.*(22)† |
| 10.5(c) | — | Third Amendment, dated as of March 29, 2011, to Employment Agreement dated as of January 30, 2009, between James W. Thorne and Jos. A. Bank Clothiers, Inc.*(24)† |
| 10.5(d) | — | Fourth Amendment, dated as of March 27, 2012, to Employment Agreement dated as of January 30, 2009, between James W. Thorne and Jos. A. Bank Clothiers, Inc.*(25)† |
| 10.6 | — | Amended and Restated Employment Agreement, dated May 15, 2002, by and between Charles D. Frazer and Jos. A. Bank Clothiers, Inc.*(5)† |
| 10.6(a) | — | Fifth Amendment, dated as of April 9, 2008, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between Charles D. Frazer and Jos. A. Bank Clothiers, Inc.*(12)† |
| 10.6(b) | — | Sixth Amendment, dated as of April 7, 2009, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between Charles D. Frazer and Jos. A. Bank Clothiers, Inc.*(15)† |
| 10.6(c) | — | Seventh Amendment, dated as of June 17, 2010, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between Charles D. Frazer and Jos. A. Bank Clothiers, Inc.*(20)† |
| 10.6(d) | — | Eighth Amendment, dated as of December 28, 2010, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between Charles D. Frazer and Jos. A. Bank Clothiers, Inc.*(22)† |
| 10.6(e) | — | Ninth Amendment, dated as of March 29, 2011, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between Charles D. Frazer and Jos. A. Bank Clothiers, Inc.*(24)† |
| 10.6(f) | — | Tenth Amendment, dated as of March 27, 2012, to Amended and Restated Employment Agreement, dated as of May 15, 2002, by and between Charles D. Frazer and Jos. A. Bank Clothiers, Inc.*(25)† |

| | | |
|---|---|---|
| 10.7 | — | Employment Agreement, dated as of November 1, 1999, between Robert N. Wildrick and Jos. A. Bank Clothiers, Inc.*(3)† |
| 10.7(a) | — | Fourth Amendment, dated as of September 9, 2008, to Employment Agreement, dated as of November 1, 1999, by and between Robert N. Wildrick and Jos. A. Bank Clothiers, Inc.*(14)† |
| 10.7(b) | — | Consulting Agreement, dated as of September 9, 2008, between Robert N. Wildrick and Jos. A. Bank Clothiers, Inc.*(14)† |
| 10.7(c) | — | First Amendment, dated as of November 30, 2010, to Consulting Agreement, dated as of September 9, 2008, between Robert N. Wildrick and Jos. A. Bank Clothiers, Inc.*(21)† |
| 10.8 | — | Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(3)† |
| 10.8(a) | — | First Amendment, dated as of January 1, 2000, to Employment Agreement, dated as November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(4)† |
| 10.8(b) | — | Fourth Amendment, dated as of May 28, 2002, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(5)† |
| 10.8(c) | — | Ninth Amendment, dated as of April 9, 2008, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(12)† |
| 10.8(d) | — | Tenth Amendment, dated as of April 7, 2009, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(15)† |
| 10.8(e) | — | Eleventh Amendment, dated as of March 30, 2010, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(18)† |
| 10.8(f) | — | Twelfth Amendment, dated as of December 28, 2010, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(22)† |
| 10.8(g) | — | Thirteenth Amendment, dated as of March 29, 2011, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(24)† |
| 10.8(h) | — | Fourteenth Amendment, dated as of March 27, 2012, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(25)† |
| 10.9 | — | Amended and Restated Employment Agreement, dated as of August 30, 2010, by and between R. Neal Black and Jos. A. Bank Clothiers, Inc.*(20)† |
| 10.10 | — | Employment Offer Letter, dated November 20, 2000, from Jos. A. Bank Clothiers, Inc. to Jerry DeBoer.*(4)† |
| 10.10(a) | — | Amendment to Employment Offer Letter, dated as of December 28, 2010, by and between Jerry DeBoer and Jos. A. Bank Clothiers, Inc.*(22)† |
| 10.10(b) | — | Written description of 2012 base salary for Jerry DeBoer.*(25)† |
| 10.11 | — | Employment Agreement, dated as of June 3, 2008, between Gary Merry and Jos. A. Bank Clothiers, Inc.* (13)† |
| 10.11(a) | — | First Amendment, dated as of April 7, 2009 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(15)† |
| 10.11(b) | — | Second Amendment, dated as of March 30, 2010 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(18)† |
| 10.11(c) | — | Third Amendment, dated as of December 28, 2010 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(22)† |
| 10.11(d) | — | Fourth Amendment, dated as of March 29, 2011 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(24)† |
| 10.11(e) | — | Fifth Amendment, dated as of March 27, 2012 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(25)† |
| 10.12 | — | 2002 Long-Term Incentive Plan.*(6)† |
| 10.13 | — | Form of stock option agreement under the 2002 Long-Term Incentive Plan.*(7)† |
| 10.14 | — | Collective Bargaining Agreement, dated March 1, 2009, by and between Joseph A. Bank Mfg. Co., Inc. and Mid-Atlantic Regional Joint Board, Local 806.*(18)† |
| 10.15 | — | Form of Officer and Director Indemnification Agreement.*(17)† |
| 10.15(a) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Robert N. Wildrick.*(17)† |
| 10.15(b) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Andrew A. Giordano.*(17)† |

10.15(c)    —  Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and R. Neal Black.*(17)†

| 10.15(d) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and James H. Ferstl.*(17)† |
| 10.15(e) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Gary S. Gladstein.*(17)† |
| 10.15(f) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and William E. Herron.*(17)† |
| 10.15(g) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Henry Homes, III.*(17)† |
| 10.15(h) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Sidney H. Ritman.*(17)† |
| 10.15(i) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and David E. Ullman.*(17)† |
| 10.15(j) | — | Indemnification Agreement dated August 30, 2010 between JoS. A. Bank Clothiers, Inc. and Robert Hensley.*(20)† |
| 10.15(k) | — | Indemnification Agreement dated August 30, 2010 between JoS. A. Bank Clothiers, Inc. and Charles D. Frazer.*(20)† |
| 10.16 | — | JoS. A. Bank Clothiers, Inc. Executive Management Incentive Plan.*(16)† |
| 10.16(a) | — | Amendment to JoS. A. Bank Clothiers, Inc. Executive Management Incentive Plan.*(18)† |
| 10.17 | — | JoS. A. Bank Clothiers, Inc. 2010 Deferred Compensation Plan.*(18)† |
| 10.18 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan.*(18)† |
| 10.19 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – CEO Performance Restricted Stock Unit Award Agreement, dated June 17, 2010, by and between JoS. A. Bank Clothiers, Inc. and R. Neal Black.*(19)† |
| 10.20 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – EVP Performance Restricted Stock Unit Award Agreement.*(19)† |
| 10.21 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – Non-Employee Director Restricted Stock Unit 2010 Award Agreement.*(19)† |
| 10.22 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – Non-Employee Director Restricted Stock Unit Annual Award Agreement.*(19)† |
| 10.23 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – Non-Employee Director Restricted Stock Unit Inaugural Award Agreement.*(19)† |
| 21.1 | — | Company subsidiaries.*(24) |
| 23.1 | — | Consent of Deloitte & Touche LLP.*(25) |
| 31.1 | | Certification of Principal Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*(25) |
| 31.2 | | Certification of Principal Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*(25) |
| 32.1 | — | Certification of Principal Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.*(25) |
| 32.2 | — | Certification of Principal Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.*(25) |
| 101.INS | — | XBRL Instance Document. **(25) |
| 101.SCH | — | XBRL Taxonomy Extension Schema Document. **(25) |
| 101.CAL | — | XBRL Taxonomy Extension Calculation Linkbase Document. **(25) |
| 101.DEF | — | XBRL Taxonomy Extension Definition Linkbase Document. **(25) |
| 101.LAB | — | XBRL Taxonomy Extension Label Linkbase Document. **(25) |
| 101.PRE | — | XBRL Taxonomy Extension Presentation Linkbase Document. **(25) |

| *(1) | — | Incorporated by reference to the Company's Registration Statement on Form S-1 filed May 3, 1994. |
| *(2) | — | Incorporated by reference to the Company's Annual Report on Form 10-K for the year ended January 31, 1998. |
| *(3) | — | Incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended October 30, 1999. |
| *(4) | — | Incorporated by reference to the Company's Annual Report on Form 10-K for the year ended February 3, 2001. |
| *(5) | — | Incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended May 4, 2002. |

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 251 of 260

| | | |
|---|---|---|
| 10.7 | — | Employment Agreement, dated as of November 1, 1999, between Robert N. Wildrick and Jos. A. Bank Clothiers, Inc.*(3)† |
| 10.7(a) | — | Fourth Amendment, dated as of September 9, 2008, to Employment Agreement, dated as of November 1, 1999, by and between Robert N. Wildrick and Jos. A. Bank Clothiers, Inc.*(14)† |
| 10.7(b) | — | Consulting Agreement, dated as of September 9, 2008, between Robert N. Wildrick and Jos. A. Bank Clothiers, Inc.*(14)† |
| 10.7(c) | — | First Amendment, dated as of November 30, 2010, to Consulting Agreement, dated as of September 9, 2008, between Robert N. Wildrick and Jos. A. Bank Clothiers, Inc.*(21)† |
| 10.8 | — | Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(3)† |
| 10.8(a) | — | First Amendment, dated as of January 1, 2000, to Employment Agreement, dated as November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(4)† |
| 10.8(b) | — | Fourth Amendment, dated as of May 28, 2002, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(5)† |
| 10.8(c) | — | Ninth Amendment, dated as of April 9, 2008, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(12)† |
| 10.8(d) | — | Tenth Amendment, dated as of April 7, 2009, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(15)† |
| 10.8(e) | — | Eleventh Amendment, dated as of March 30, 2010, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(18)† |
| 10.8(f) | — | Twelfth Amendment, dated as of December 28, 2010, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(22)† |
| 10.8(g) | — | Thirteenth Amendment, dated as of March 29, 2011, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(24)† |
| 10.8(h) | — | Fourteenth Amendment, dated as of March 27, 2012, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(25)† |
| 10.9 | — | Amended and Restated Employment Agreement, dated as of August 30, 2010, by and between R. Neal Black and Jos. A. Bank Clothiers, Inc.*(20)† |
| 10.10 | — | Employment Offer Letter, dated November 20, 2000, from Jos. A. Bank Clothiers, Inc. to Jerry DeBoer.*(4)† |
| 10.10(a) | — | Amendment to Employment Offer Letter, dated as of December 28, 2010, by and between Jerry DeBoer and Jos. A. Bank Clothiers, Inc.*(22)† |
| 10.10(b) | — | Written description of 2012 base salary for Jerry DeBoer.*(25)† |
| 10.11 | — | Employment Agreement, dated as of June 3, 2008, between Gary Merry and Jos. A. Bank Clothiers, Inc.* (13)† |
| 10.11(a) | — | First Amendment, dated as of April 7, 2009 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(15)† |
| 10.11(b) | — | Second Amendment, dated as of March 30, 2010 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(18)† |
| 10.11(c) | — | Third Amendment, dated as of December 28, 2010 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(22)† |
| 10.11(d) | — | Fourth Amendment, dated as of March 29, 2011 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(24)† |
| 10.11(e) | — | Fifth Amendment, dated as of March 27, 2012 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(25)† |
| 10.12 | — | 2002 Long-Term Incentive Plan.*(6)† |
| 10.13 | — | Form of stock option agreement under the 2002 Long-Term Incentive Plan.*(7)† |
| 10.14 | — | Collective Bargaining Agreement, dated March 1, 2009, by and between Joseph A. Bank Mfg. Co., Inc. and Mid-Atlantic Regional Joint Board, Local 806.*(18)† |
| 10.15 | — | Form of Officer and Director Indemnification Agreement.*(17)† |
| 10.15(a) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Robert N. Wildrick.*(17)† |
| 10.15(b) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Andrew A. Giordano.*(17)† |

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 253 of 260

10.15(c)    —    Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and R. Neal Black.*(17)†

| | | |
|---|---|---|
| 10.15(d) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and James H. Ferstl.*(17)† |
| 10.15(e) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Gary S. Gladstein.*(17)† |
| 10.15(f) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and William E. Herron.*(17)† |
| 10.15(g) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Henry Homes, III.*(17)† |
| 10.15(h) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Sidney H. Ritman.*(17)† |
| 10.15(i) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and David E. Ullman.*(17)† |
| 10.15(j) | — | Indemnification Agreement dated August 30, 2010 between JoS. A. Bank Clothiers, Inc. and Robert Hensley.*(20)† |
| 10.15(k) | — | Indemnification Agreement dated August 30, 2010 between JoS. A. Bank Clothiers, Inc. and Charles D. Frazer.*(20)† |
| 10.16 | — | JoS. A. Bank Clothiers, Inc. Executive Management Incentive Plan.*(16)† |
| 10.16(a) | — | Amendment to JoS. A. Bank Clothiers, Inc. Executive Management Incentive Plan.*(18)† |
| 10.17 | — | JoS. A. Bank Clothiers, Inc. 2010 Deferred Compensation Plan.*(18)† |
| 10.18 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan.*(18)† |
| 10.19 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – CEO Performance Restricted Stock Unit Award Agreement, dated June 17, 2010, by and between JoS. A. Bank Clothiers, Inc. and R. Neal Black.*(19)† |
| 10.20 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – EVP Performance Restricted Stock Unit Award Agreement.*(19)† |
| 10.21 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – Non-Employee Director Restricted Stock Unit 2010 Award Agreement.*(19)† |
| 10.22 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – Non-Employee Director Restricted Stock Unit Annual Award Agreement.*(19)† |
| 10.23 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – Non-Employee Director Restricted Stock Unit Inaugural Award Agreement.*(19)† |
| 21.1 | — | Company subsidiaries.*(24) |
| 23.1 | — | Consent of Deloitte & Touche LLP.*(25) |
| 31.1 | | Certification of Principal Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*(25) |
| 31.2 | | Certification of Principal Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*(25) |
| 32.1 | — | Certification of Principal Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.*(25) |
| 32.2 | — | Certification of Principal Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.*(25) |
| 101.INS | — | XBRL Instance Document. **(25) |
| 101.SCH | — | XBRL Taxonomy Extension Schema Document. **(25) |
| 101.CAL | — | XBRL Taxonomy Extension Calculation Linkbase Document. **(25) |
| 101.DEF | — | XBRL Taxonomy Extension Definition Linkbase Document. **(25) |
| 101.LAB | — | XBRL Taxonomy Extension Label Linkbase Document. **(25) |
| 101.PRE | — | XBRL Taxonomy Extension Presentation Linkbase Document. **(25) |

| | | |
|---|---|---|
| *(1) | — | Incorporated by reference to the Company's Registration Statement on Form S-1 filed May 3, 1994. |
| *(2) | — | Incorporated by reference to the Company's Annual Report on Form 10-K for the year ended January 31, 1998. |
| *(3) | — | Incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended October 30, 1999. |
| *(4) | — | Incorporated by reference to the Company's Annual Report on Form 10-K for the year ended February 3, 2001. |
| *(5) | — | Incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended May 4, 2002. |

| | | |
|---|---|---|
| 10.7 | — | Employment Agreement, dated as of November 1, 1999, between Robert N. Wildrick and Jos. A. Bank Clothiers, Inc.*(3)† |
| 10.7(a) | — | Fourth Amendment, dated as of September 9, 2008, to Employment Agreement, dated as of November 1, 1999, by and between Robert N. Wildrick and Jos. A. Bank Clothiers, Inc.*(14)† |
| 10.7(b) | — | Consulting Agreement, dated as of September 9, 2008, between Robert N. Wildrick and Jos. A. Bank Clothiers, Inc.*(14)† |
| 10.7(c) | — | First Amendment, dated as of November 30, 2010, to Consulting Agreement, dated as of September 9, 2008, between Robert N. Wildrick and Jos. A. Bank Clothiers, Inc.*(21)† |
| 10.8 | — | Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(3)† |
| 10.8(a) | — | First Amendment, dated as of January 1, 2000, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(4)† |
| 10.8(b) | — | Fourth Amendment, dated as of May 28, 2002, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(5)† |
| 10.8(c) | — | Ninth Amendment, dated as of April 9, 2008, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(12)† |
| 10.8(d) | — | Tenth Amendment, dated as of April 7, 2009, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(15)† |
| 10.8(e) | — | Eleventh Amendment, dated as of March 30, 2010, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(18)† |
| 10.8(f) | — | Twelfth Amendment, dated as of December 28, 2010, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(22)† |
| 10.8(g) | — | Thirteenth Amendment, dated as of March 29, 2011, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(24)† |
| 10.8(h) | — | Fourteenth Amendment, dated as of March 27, 2012, to Employment Agreement, dated as of November 30, 1999, by and between Robert Hensley and Jos. A. Bank Clothiers, Inc.*(25)† |
| 10.9 | — | Amended and Restated Employment Agreement, dated as of August 30, 2010, by and between R. Neal Black and Jos. A. Bank Clothiers, Inc.*(20)† |
| 10.10 | — | Employment Offer Letter, dated November 20, 2000, from Jos. A. Bank Clothiers, Inc. to Jerry DeBoer.*(4)† |
| 10.10(a) | — | Amendment to Employment Offer Letter, dated as of December 28, 2010, by and between Jerry DeBoer and Jos. A. Bank Clothiers, Inc.*(22)† |
| 10.10(b) | — | Written description of 2012 base salary for Jerry DeBoer.*(25)† |
| 10.11 | — | Employment Agreement, dated as of June 3, 2008, between Gary Merry and Jos. A. Bank Clothiers, Inc.* (13)† |
| 10.11(a) | — | First Amendment, dated as of April 7, 2009 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(15)† |
| 10.11(b) | — | Second Amendment, dated as of March 30, 2010 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(18)† |
| 10.11(c) | — | Third Amendment, dated as of December 28, 2010 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(22)† |
| 10.11(d) | — | Fourth Amendment, dated as of March 29, 2011 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(24)† |
| 10.11(e) | — | Fifth Amendment, dated as of March 27, 2012 to Employment Agreement, dated as of June 3, 2008, by and between Gary Merry and Jos. A. Bank Clothiers, Inc.*(25)† |
| 10.12 | — | 2002 Long-Term Incentive Plan.*(6)† |
| 10.13 | — | Form of stock option agreement under the 2002 Long-Term Incentive Plan.*(7)† |
| 10.14 | — | Collective Bargaining Agreement, dated March 1, 2009, by and between Joseph A. Bank Mfg. Co., Inc. and Mid-Atlantic Regional Joint Board, Local 806.*(18)† |
| 10.15 | — | Form of Officer and Director Indemnification Agreement.*(17)† |
| 10.15(a) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Robert N. Wildrick.*(17)† |

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 256 of 260

| | | |
|---|---|---|
| 10.15(b) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Andrew A. Giordano.*(17)† |
| 10.15(c) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and R. Neal Black.*(17)† |
| 10.15(d) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and James H. Ferstl.*(17)† |
| 10.15(e) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Gary S. Gladstein.*(17)† |
| 10.15(f) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and William E. Herron.*(17)† |
| 10.15(g) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Henry Homes, III.*(17)† |
| 10.15(h) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and Sidney H. Ritman.*(17)† |
| 10.15(i) | — | Indemnification Agreement dated September 1, 2009 between JoS. A. Bank Clothiers, Inc. and David E. Ullman.*(17)† |
| 10.15(j) | — | Indemnification Agreement dated August 30, 2010 between JoS. A. Bank Clothiers, Inc. and Robert Hensley.*(20)† |
| 10.15(k) | — | Indemnification Agreement dated August 30, 2010 between JoS. A. Bank Clothiers, Inc. and Charles D. Frazer.*(20)† |
| 10.16 | — | JoS. A. Bank Clothiers, Inc. Executive Management Incentive Plan.*(16)† |
| 10.16(a) | — | Amendment to JoS. A. Bank Clothiers, Inc. Executive Management Incentive Plan.*(18)† |
| 10.17 | — | JoS. A. Bank Clothiers, Inc. 2010 Deferred Compensation Plan.*(18)† |
| 10.18 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan.*(18)† |
| 10.19 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – CEO Performance Restricted Stock Unit Award Agreement, dated June 17, 2010, by and between JoS. A. Bank Clothiers, Inc. and R. Neal Black.*(19)† |
| 10.20 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – EVP Performance Restricted Stock Unit Award Agreement.*(19)† |
| 10.21 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – Non-Employee Director Restricted Stock Unit 2010 Award Agreement.*(19)† |
| 10.22 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – Non-Employee Director Restricted Stock Unit Annual Award Agreement.*(19)† |
| 10.23 | — | JoS. A. Bank Clothiers, Inc. 2010 Equity Incentive Plan – Non-Employee Director Restricted Stock Unit Inaugural Award Agreement.*(19)† |
| 21.1 | — | Company subsidiaries.*(24) |
| 23.1 | — | Consent of Deloitte & Touche LLP.*(25) |
| 31.1 | | Certification of Principal Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*(25) |
| 31.2 | | Certification of Principal Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.*(25) |
| 32.1 | — | Certification of Principal Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.*(25) |
| 32.2 | — | Certification of Principal Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.*(25) |
| 101.INS | — | XBRL Instance Document. **(25) |
| 101.SCH | — | XBRL Taxonomy Extension Schema Document. **(25) |
| 101.CAL | — | XBRL Taxonomy Extension Calculation Linkbase Document. **(25) |
| 101.DEF | — | XBRL Taxonomy Extension Definition Linkbase Document. **(25) |
| 101.LAB | — | XBRL Taxonomy Extension Label Linkbase Document. **(25) |
| 101.PRE | — | XBRL Taxonomy Extension Presentation Linkbase Document. **(25) |

---

| | | |
|---|---|---|
| *(1) | — | Incorporated by reference to the Company's Registration Statement on Form S-1 filed May 3, 1994. |
| *(2) | — | Incorporated by reference to the Company's Annual Report on Form 10-K for the year ended January 31, 1998. |
| *(3) | — | Incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended October 30, 1999. |
| *(4) | — | Incorporated by reference to the Company's Annual Report on Form 10-K for the year ended February 3, 2001. |

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 257 of 260

*(5)     — Incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended May 4, 2002.

*(6)     — Incorporated by reference to the Company's Definitive Proxy Statement on Schedule 14(A) filed May 20, 2002.

*(7)     — Incorporated by reference to the Company's Current Report on Form 8-K, dated April 7, 2005.

*(8)     — Incorporated by reference to the Company's Annual Report on Form 10-K for the year ended January 29, 2005.

*(9)     — Incorporated by reference to Amendment No. 1 to the Company's Quarterly Report on Form 10-Q for the quarter ended July 29, 2006.

*(10)    — Incorporated by reference to the Company's Current Report on Form 8-K, dated September 6, 2007.

*(11)    — Incorporated by reference to the Company's Current Report on Form 8-K, dated September 20, 2007.

*(12)    — Incorporated by reference to the Company's Annual Report on Form 10-K for the year ended February 2, 2008.

*(13)    — Incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended May 3, 2008.

*(14)    — Incorporated by reference to the Company's Current Report on Form 8-K, dated September 9, 2008.

*(15)    — Incorporated by reference to the Company's Annual Report on Form 10-K for the year ended January 31, 2009.

*(16)    — Incorporated by reference to the Company's Current Report on Form 8-K, dated June 18, 2009.

*(17)    — Incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended August 1, 2009.

*(18)    — Incorporated by reference to the Company's Annual Report on Form 10-K for the year ended January 30, 2010.

*(19)    — Incorporated by reference to the Company's Current Report on Form 8-K, dated June 17, 2010.

*(20)    — Incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended July 31, 2010.

*(21)    — Incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended October 30, 2010.

*(22)    — Incorporated by reference to the Company's Current Report on Form 8-K, dated December 28, 2010.

*(23)    — Incorporated by reference to the Company's Current Report on Form 8-K, dated March 2, 2011.

*(24)    — Incorporated by reference to the Company's Annual Report on Form 10-K for the year ended January 29, 2011.

*(25)    — Filed herewith

**       — Pursuant to Rule 406T of Regulation S-T, these interactive data files are deemed not filed or part of a registration statement or prospectus for purposes of Sections 11 or 12 of the Securities Act of 1933, as amended, are deemed not filed for purposes of Section 18 of the Securities and Exchange Act of 1934, as amended, and otherwise are not subject to liability under those section.

†        — Exhibit represents a management contract or compensatory plan or arrangement.

Case 2:16-cv-02786-JAM-AC   Document 1   Filed 11/23/16   Page 258 of 260

# EXHIBIT 4



Store #: 756
Trn #: 33484
Date : 0_

209-475-9267
Reg #:    1
156  Brett
2014  12:01
Sale                      *

Employee: 75619

007813600215              995.00      995.00  T
2B/PLT GRYBLK MINIBONE
44 LONG DARK G
PLU

Employee: 75619

007897000217      0.00
2B/PLT MILLED GY ST W/S              0.00  T
44 LONG GRY ST
PLU

Employee: 75619

007880810259      0.00
2B/PLN OLIVE SHARKSKIN W              0.00  T
44 LONG OLIVE
PLU

Employee: 75619

007884540258      0.00                0.00  T
2B/PLN BLUE/GREY SHARK P
44 LONG BLUE P
PLU

Employee: 75619

007771630006              79.50       79.50  T
NAVY PLAID
ONE SZ NAVY P

Employee: 75619

007770570005              99.50       99.50  T
PURPLE PAISLEY
ONE SZ PURPLE

Employee: 75619

1                         151.00      151.00  T
JAB Alterations

180 ID

                                    1,325.00
Subtotal
Tax    825%                           109.31
                          ----------------
                                    1,434.31
Total

Total Units Sold:  6                1,434.31